# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

NDA AESTHETICS, LLC, and
WARREN IMPORTS, LLC d/b/a SUBARU
WORLD OF HACKETTSTOWN,
And all others similarly situated,

*Plaintiffs,*

v.

VISA INC.,
One Market Plaza
San Francisco, CA 94105,

*Defendant.*

Case No. 24-cv-8269

**CLASS ACTION
COMPLAINT**

**JURY TRIAL DEMANDED**

## TABLE OF CONTENTS

I.    INTRODUCTION ..........................................................................................................4

II.   CASE OVERVIEW ......................................................................................................6

III.  JURISDICTION, VENUE, AND COMMERCE ..........................................................9

IV.   THE PARTIES ...........................................................................................................10

V.    DEBIT TRANSACTIONS AND DEBIT NETWORKS ............................................11

   1.    Debit Transactions ............................................................................................ 11

   2.    Debit Networks ................................................................................................. 15

      A.    Network Fees .......................................................................................... 15

      B.    The United States Debit Network Evolution Helped Visa Obtain Dominance ......................... 16

      C.    PIN Networks Lack Scale and Meaningful Opportunities to Compete for Debit Transactions ........................................................................................... 19

      D.    Alternative Debit Networks .................................................................... 21

VI.   VISA SYSTEMATICALLY DOMINATES DEBIT TRANSACTIONS IN THE UNITED STATES THROUGH EXCLUSIONARY AND ANTICOMPETITIVE CONDUCT .................22

   1.    Visa Has Been the Largest, Most Powerful Debit Network for Over a Decade ........................... 22

   2.    Visa Entered into a Web of Contracts to Hinder PIN Networks from Competing ......................... 24

   3.    Visa Imposes Conditions in Contracts with Merchants and Acquirers that Unlawfully Inhibit Competition and Stifle Innovation ........................................................................... 25

   4.    Visa's Contracts with Issuers Unlawfully Restrict the Growth of Its Debit Competitors ............. 29

   5.    Visa's Response to the Durbin Amendment Successfully Protected Its Monopoly from Competition ................................................................................................... 31

   6.    Visa Uses Its Monopoly Power to Deprive Its Rivals of Scale ........................ 33

   7.    Visa Uses Its Monopoly Power to Squash Innovative Alternatives to Its Debit Network ............. 36

   8.    Visa Fears that Fintech Debit Networks Will Disintermediate Its Lucrative Debit Business ........ 38

9.    Visa Leveraged Its Debit Monopoly to Prevent PayPal and Others from Disintermediating Visa with Staged Digital Wallets ................................................................................................ 40

10.    Visa Uses Its Leverage Over Its Potential Debit Competitors, Including Apple, Paying Them Not to Create or Promote Competitive Products .............................................................................. 45

VII.  ANTICOMPETITIVE EFFECTS ................................................................................46

VIII. NO PRO-COMPETITIVE JUSTIFICATIONS ...................................................................49

IX.    THE RELEVANT MARKETS ...................................................................................50

1.    The United States Is a Relevant Geographic Market ...................................................... 50

2.    Relevant Product Markets ............................................................................................. 51

   A.    General Purpose Debit Network Services Are a Relevant Product Market ............................... 51

   B.    General Purpose Card-Not-Present Debit Network Services Are a Relevant Product Market .. 54

X.    VISA HAS MONOPOLY POWER IN THE UNITED STATES DEBIT MARKETS ........55

XI.    PLAINTIFFS AND THE CLASS HAVE BEEN INJURED BY VISA'S CONDUCT ........59

XII.    CLASS ACTION ALLEGATIONS ..........................................................................60

XIII. VIOLATIONS ALLEGED ......................................................................................62

XIV. REQUEST FOR RELIEF .......................................................................................133

NDA Aesthetics, LLC and Warren Imports, LLC d/b/a Subaru World of Hackettstown ("Plaintiffs"), on behalf of themselves and the Class defined below, bring this action under Sections 1, 2, and 3 of the Sherman Act (15 U.S.C. §§ 1, 2, and 3), Sections 4 and 16 of the Clayton Act (15 U.S.C.§§ 15 and 26), and pursuant to the various state laws alleged herein, against Defendant Visa Inc. ("Visa") for the injuries sustained by Plaintiffs and other members of the Class from Visa's anticompetitive conduct in the markets for general purpose debit network services and card-not-present debit network services in the United States described herein and to enjoin Visa from engaging in further violations. Plaintiffs allege the following based on personal knowledge as to itself and upon information and belief as to all others:

## I.     INTRODUCTION

1.     Plaintiffs, like millions of other United States merchants, depend on Visa's debit network to facilitate the connection between the consumer's bank and the merchant's bank for processing debit card transactions. In the U.S., more than 60% of debit transactions are processed through Visa's network, effectively forcing merchants to comply with Visa's business terms. This dominance enables Visa to collect over $7 billion annually in processing fees while maintaining operating margins as high as 83%. As an investigation and recent complaint filed by the Department of Justice confirmed, Visa has unlawfully entrenched its monopoly by using a multi-faceted exclusionary strategy to stifle competition and innovation in the United States debit market, resulting in enormous financial harms to merchants like Plaintiffs.

2.     When a consumer uses a Visa debit card to purchase goods or services, Visa acts as an intermediary between a consumer's bank (the "issuing bank" or "issuer") and the merchant's bank ("acquiring bank" or "acquirer"). For the transaction to work, the issuer bank

and the acquiring bank must be part of the same network. Issuers decide which networks to place on their debit cards, and merchants decide which networks they will accept.

3.      Merchants must accept Visa due to its widespread consumer adoption. Visa-branded cards represent a large portion of all United States debit cards, making it a near necessity for merchants to accept Visa to avoid losing sales. This "must-have" status gives Visa significant leverage in negotiating contracts with merchants.

4.      Because of Visa's monopoly, Visa imposes supracompetitive fees on merchants through their acquiring banks, who process payments for merchants as their agents, pay Visa a fee for each transaction on its network as well as additional fees and costs, and then charge those fees through to merchants. These fees represent a substantial cost burden that merchants are obligated to bear when accepting debit card payments.

5.      Acquirer banks are captive and frequently have only one option for routing a debit transaction: the front-of-card network, which on over 70% of debit card payments means Visa. These captive transactions give Visa the power to demand and enforce significant volume commitments. Visa imposes these conditions on acquirer banks, forcing upon them loyalty contracts which they must accept or face contractual penalties and punitively high network fees, known as "rack rates," which would in turn be paid by merchants.

6.      Visa's contracts with merchants also often include volume commitments and cliff pricing structures. To secure discounts and avoid high rack rates, merchants must agree to route a high percentage of their eligible debit transactions through Visa. These agreements, as well as the restrictions on acquiring banks, effectively limit merchants' ability to choose alternative networks, even if those networks offer lower fees or better terms.

7.     These practices have stifled innovation and competition. By locking up merchant volume through exclusive or near-exclusive routing agreements, Visa hinders the growth of competing debit networks by depriving competitors of the scale they need to thrive. This lack of competition reduces the incentive for other networks to innovate and offer better services or lower prices.

8.     Beyond its exclusion of competing debit transaction networks, Visa also actively seeks to prevent disintermediation by fintech companies. Visa fears that fintech companies, with their existing relationships with consumers and merchants, could create alternative debit networks that bypass Visa entirely. To counter this threat, Visa offers incentives to potential competitors in exchange for agreements not to develop or support competing payment products.

9.     All this anticompetitive conduct has reduced choice and innovation in the market and enabled Visa to charge supracompetitive fees, imposing massively increased costs on merchants. Plaintiffs, therefore, bring this case on behalf of themselves and other Class members to stop Visa's unlawful conduct, redress past harms, and restore competition in the relevant debit network markets.

## II.    CASE OVERVIEW

10.     Because merchants and issuers must be on the same network to facilitate a transaction, debit networks face what Visa calls "a chicken-and-egg problem." For networks to work, they must have many issuers and acquirers to accept the network. In contrast, few issuers are likely to join the debit network if few merchants accept their debit cards. The inverse is also true: merchants are unlikely to join the network unless a sufficient number of customers want to make purchases using cards on that network. Visa recognizes this, stating: "build[ing] scale on

both sides. . . with consumers/payers and with merchants/payees" is "a herculean task." And thus, these effects create "an enormous moat" around Visa's business.

11.     Visa dominates this market. Visa's payment network processes over 60% of all United States debit transactions, and its dominance is even higher in ''card-not-present debit transactions," where Visa's market share exceeds 65%. Its competitors are far behind: Mastercard, the next-biggest network, processes less than 25% of all United States debit transactions. "PIN networks," so-called because they originally facilitated ATM transactions that required users to enter a PIN, are significantly smaller.

12.     Visa intentionally created the moat around its network because as the great recession receded, Visa recognized (1) legislation and (2) emerging technologies as the key threats to its business. The scheme described herein demonstrates how Visa took steps to counter both, to the detriment of Plaintiffs, the Class, and the market as a whole.

13.     Visa has been able to leverage its market dominance despite Congress's explicit efforts to open the markets in which it operates. In 2010, Congress passed the Durbin Amendment, which became law as part of the 2010 Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, 124 Stat. 1376 (2010). The Durbin Amendment was enacted with the purpose of increasing competition among debit networks—by requiring issuing banks to include at least two unaffiliated debit networks on every debit card (one in the front and at least one in the back of the card) and authorizing the Federal Reserve to prescribe regulations for any interchange transaction fee an issuer may receive or charge. Notably, the Durbin Amendment does not regulate the fees charged to acquiring banks.

14.     Visa reacted to the Durbin Amendment by leveraging its position in non-contestable transactions (necessary and valuable transactions to merchants where Visa faces no

competition), to coerce acquiring banks to enter into routing agreements or face high rack rates. This conduct effectively forecloses rival networks in contestable transactions and prevents them from gaining the necessary scale and network to compete.

15.     Other debit networks are unable to compete for non-contestable transactions and often struggle to gain a significant share of transactions involving merchants bound by a Visa routing agreement. This disadvantages merchants who choose not to accept Visa's terms.

16.     According to the Department of Justice's investigation, in 2014, Visa informed its Board of Directors that these routing deals with the largest issuers and acquirers allowed Visa "to stabilize [its] volume." Visa's routing contracts encompass more than 180 of its largest merchants and acquirer banks, effectively insulating at least 75% of Visa's debit volume from competition. This means that Visa has foreclosed nearly half of the total United States debit volume. Internally, Visa highlights the success of its routing agreements in limiting competition. In 2022, Visa renewed many of these agreements to further solidify its monopoly in the debit market for years to come.

17.     Visa also took deliberate action to prevent emerging technologies from contesting Visa's control over debit transactions. Visa recognized that digital platforms like Apple, PayPal, and Square have extensive networks connecting merchants and consumers, offering popular payment solutions. These platforms allow consumers to link their debit cards to services such as Apple Pay, PayPal, and Cash App, enabling convenient and efficient transactions.

18.     Visa feared these popular digital platforms may have "network ambitions" and remove Visa as an intermediary for debit transactions, which Visa characterized as an "existential threat" to its debit business. To address this threat, Visa's strategy is to "partner with

emerging players before they become disruptors." Visa achieves this by offering incentives, sometimes worth hundreds of millions of dollars annually, to these potential competitors conditioned upon their agreement not to compete with Visa. The alternative to accepting those incentives is high fees. Indeed, Visa has entered into these types of agreements with Apple, PayPal, and Square.

19.      Visa's anticompetitive conduct has allowed it to leverage its monopoly power in debit non-contestable transactions to foreclose entry and competition in debit-contestable transactions. This strategy has been successful; Visa has effectively foreclosed competition in at least 45% of relevant debit markets for all debit transactions and over 55% of card-not-present transactions.

20.      Leveraging its market power, Visa imposes high fees, limits choices, and stifles innovation, ultimately creating a system that favors Visa's profitability at the expense of merchants and consumers. Visa's conduct inflicts enormous harm to merchants in the form of higher fees and reduced innovation. Plaintiffs bring this suit to recover damages from Visa's conduct for themselves and the Class and to enjoin Visa from engaging in further anticompetitive conduct going forward.

### III.      JURISDICTION, VENUE, AND COMMERCE

21.      This Court has original subject-matter jurisdiction over Plaintiffs' federal law claims in this action under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26, as well as Sections 1 and 2 of the Sherman Antitrust Act, 15 U.S.C. §§ 1-3. Plaintiffs seek to recover overcharges and treble damages for injuries suffered by them and the Class due to Visa's anticompetitive exclusionary conduct, which reinforced Visa's monopoly power in the relevant markets. Because Plaintiffs seek relief for violations of the Clayton Act and Sherman Antitrust Act,

the Court also has original subject-matter jurisdiction over Plaintiffs federal law claims under 28

U.S.C. §§ 1331 and 1337(a). Additionally, this Court has supplemental jurisdiction over Plaintiffs'

state law claims under 28 U.S.C. § 1367.

22.     This Court also has original subject-matter jurisdiction over the state law claims in

this action under 28 U.S.C. § 1332(d) because it is a class action involving common legal or factual

questions, with the total amount in controversy exceeding $5,000,000, excluding interest and costs.

Additionally, the Class includes over one hundred members, and at least one Class member is a

citizen of a state different from that of the Defendant.

23.     Venue is proper in this Court pursuant to, among other statutes, § 12 of the

Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. § 1391 because Visa regularly transacts business

within this District, a substantial part of the events giving rise to Plaintiffs' claims occurred in

this District, and a substantial portion of the affected interstate trade and commerce discussed

below has been carried out in this District.

24.     Visa engages in, and its activities substantially affect, interstate trade and

commerce. Visa provides services that are marketed, distributed, and offered throughout the

United States, including across state lines and in this District. Visa's actions are ongoing and are

likely to continue or recur, including through other practices with the same purpose or effect.

## IV.    THE PARTIES

25.     Plaintiff NDA Aesthetics, LLC has its principal place of business in

Moorestown, New Jersey, and Plaintiff Warren Imports, LLC d/b/a Subaru World of

Hackettstown has its principal place of business in Hackettstown, New Jersey (collectively,

"Plaintiffs").

26.     Plaintiffs are two of the millions of merchants who accept debit payments routed on Visa's network. Accordingly, Plaintiffs have been forced to pay Visa's supra-competitive fees. Plaintiffs have, therefore, been injured in their business and property as a result of Visa's unlawful conduct.

27.     Visa Inc. ("Visa") is a Delaware company headquartered in San Francisco, California. Visa is a global payments company that operates the largest debit network in the United States, routing 57.6 billion debit transactions worth $2.8 trillion in 2023. Visa provides a platform that authorizes, clears, and settles debit transactions between businesses, consumers, and banks. Visa reported revenues of approximately $32.7 billion in fiscal year 2023, including $14 billion in the United States.

## V.     DEBIT TRANSACTIONS AND DEBIT NETWORKS

### 1.     Debit Transactions

28.     Debit transactions are a widely used and essential payment method in the United States financial system. Unlike other financial transactions, they instantly deduct funds from a consumer's bank account. Consumers who prefer debit are typically those who either cannot obtain or choose not to use credit cards. This includes individuals with limited credit access and those who want to avoid the risks and costs associated with credit cards, such as debt accumulation, fees, and interest charges, or the convenience of debit over cash or checks.

29.     Debit transactions involve funds being withdrawn directly from a consumer's bank account to pay for goods or services. These transactions can be used for in-store purchases or online bill payments. Debit cards have been available in the United States since the 1960s, originally designed for consumers to access their bank funds through ATMs. Eventually, these cards evolved to support retail purchases. By the 1990s, as more merchants accepted debit

payments and consumers sought more convenient options than cash or checks, debit card usage surged. Their popularity has grown steadily due to their convenience and security, leading to widespread adoption across the United States.

30.     Debit transactions rely on debit networks, which are the technological and communication systems that enable secure, real-time payments between businesses, merchants, and consumers directly from their bank accounts.

31.     The most common type of debit card is a **general-purpose debit card**, which can be accepted at numerous merchants. These cards are issued by **"issuing banks"** to account holders. Merchants receive those payments through merchant or **"acquiring banks**." When an account holder makes a purchase, the issuing bank (directly or through an issuing processor) connects to the **debit network**, which connects it (directly or through an acquiring processor) to the acquiring bank.

32.     Debit networks like Visa partner with issuing banks to offer debit cards to consumers and with acquiring banks to enable merchant acceptance. Debit networks facilitate interbank settlements by aggregating daily transactions, calculating net fees, and providing settlement reports. Banks use these reports to transfer funds, typically via a bank-exclusive wire service. The products provided by networks include a debit credential or other account identifier unique to the consumer that can be accepted at all merchants that participate in the network, payment guarantees for the merchant, the ability for a consumer or her bank to dispute and chargeback the transaction, fraud protections to all parties, and the "rail" or methods by which the merchants' and consumers' banks communicate between each other to facilitate the transaction and the transfer of funds.

33.     Notably, debit networks establish transaction rules for their systems. As the largest debit card network in the United States, Visa uses its intermediary role to set its own rules and influence those of other debit networks.

34.     Debit cards allow consumers to make purchases using funds from their bank accounts, either in-person or online, through a set of credentials including a 16-digit card number, expiration date, CVV, EMV chip, and a PIN. Cards typically display one primary network (front-of-card) and may also show a secondary, unaffiliated network (back-of-card), though most cards include no more than two networks.

**Figure 1**



35.     A debit transaction begins when a consumer presents their debit credentials to a merchant, who sends a payment request to its bank (the acquirer). Although merchants

theoretically can choose between the front-of-card network (usually Visa, receiving 70% of the debit card volume) and a back-of-card network, this choice is often limited due to Visa's practices. The acquirer sends the transaction to a debit network (e.g., Visa), which requests authorization from the consumer's bank (the issuer). If the consumer has sufficient funds and no fraud is detected, the issuer authorizes the transaction, holds the funds, and returns the authorization, minus an interchange fee, to the acquirer. The acquirer then completes the transaction with the merchant. Visa collects multiple fees from these transactions annually.

**Figure 2**



36.    The mechanics of debit transactions vary based on whether the card is physically present. A **card-present transaction** occurs when the debit card is used in person at a merchant. In contrast, a **card-not-present** transaction happens when the debit card is used online, in an app, or over the phone. Card-not-present transactions now account for about half of all debit spending, a significant increase since 2010. For these transactions, the accountholder manually enters their debit credentials or uses a digital wallet like Google Pay, Apple Pay, or PayPal. Unlike card-present transactions, PIN entry is not typically required for card-not-present

transactions. Instead, security measures like multi-factor authentication are used to enhance security.

## 2. Debit Networks

37.     In the United States, debit cards usually feature at least two networks: a primary "front-of-card" network displayed on the card and a secondary "back-of-card" network chosen by the issuer. The back-of-card network is not typically branded on the card. Consumers' debit network is normally selected by the bank where they open their accounts.

38.     Visa is the dominant front-of-card network (with 60% debit transactions), Mastercard is the distant second front-of-card network (with 25% of the transactions in the same market), and two much smaller players account for the remainder. Issuers seldom switch their front-of-card network due to high costs, such as reissuing debit cards. Visa holds long-term contracts with many issuers, limiting opportunities for Mastercard and other networks to contest Visa as the primary network.

39.     Visa-branded debit cards often include Visa's Interlink network and at least one unaffiliated back-of-card network, such as Mastercard's Maestro or smaller networks like STAR, NYCE, or Pulse. Similarly, Mastercard-branded debit cards typically include Maestro and an additional unaffiliated network. Issuers control which back-of-card networks can process specific transactions, such as card-present transactions without a PIN. Despite their inclusion on many cards, PIN networks struggle to gain significant market share due to Visa's exclusionary conduct.

## A. Network Fees

40.     Networks like Visa generate revenue by charging issuers and acquirers fees for each debit transaction. There are two main types of acquirer fees: per-transaction fees and fixed

fees. Acquirers pay Visa a network fee for each transaction, which varies depending on factors such as whether a PIN is used or if the transaction is card-present or card-not-present. Since 2012, Visa has also imposed a fixed monthly fee, the **Fixed Acquirer Network Fee** (**FANF**), based on the merchant's number of locations and transaction volume.

41.      Additionally, acquirers pay issuers a per-transaction interchange fee for their services. For large banks (assets over $10 billion), this fee is capped by the Federal Reserve; for smaller banks, debit networks like Visa set the fee.

42.      Merchants ultimately pay these fees as their acquiring banks bill the fees through to them (along with fees paid to acquirers for their services), and such fees represent a substantial cost for merchants. Visa's network fees are generally much higher than those of PIN networks.

### B. The United States Debit Network Evolution Helped Visa Obtain Dominance

43.      Beginning in the 1960s, the first debit networks in the United States started as ATM networks. Banks issued ATM cards to their accountholders so they could easily withdraw funds from their accounts. To use these cards, accountholders could enter a 4-digit number (known as the **PIN**) at an unattended ATM rather than approach the bank's counter to provide a signature.

44.      Merchants appreciated the elimination of checks and started installing PIN pads to enable more accountholders to use their ATM cards at the point of sale. Accountholders also became more comfortable carrying a physical card for purchases. With increased enablement across cities and geographic regions, these ATM networks, including STAR, NYCE, and Pulse, evolved to become the PIN networks.

45.      Only later, after the first introduction of ATM cards, did Visa and Mastercard begin to build their front-of-card debit products off of their dominant credit card infrastructure.

As debit emerged, Visa and Mastercard were each joint ventures owned and controlled exclusively by their member banks, which comprised virtually all United States banks. Visa leveraged the scale afforded by its member banks to jump-start its debit business. When Visa launched its point-of-sale debit product, the Visa Check Card, in the 1990s, it was quickly able to scale among its member banks, which issued debit cards with the Visa logo. Unlike the PIN networks, which processed debit cards over rails designed for ATM networks, Visa processed accountholders' debit purchases over Visa's existing credit card rails. Visa and Mastercard already had access to an existing base of merchants who accepted Visa and Mastercard credit cards. This eased the way for Visa and Mastercard to roll out widely usable debit cards, especially as Visa's network rules initially mandated merchants accept both its credit and debit products. By working with issuers to add Visa's credit processing infrastructure to the issuers' installed base of ATM cards, Visa was able to quickly scale its debit offering.

46.    Visa's and Mastercard's relationships with their respective issuers were exclusive until the early 2000s, each prohibiting their issuers from issuing American Express or Discover-branded credit and debit cards thereby impairing the growth of these smaller networks. The Second Circuit found those restrictions were illegal under the antitrust laws and affirmed the district court's injunction against them in 2003, and shortly thereafter, Visa and Mastercard settled private litigation and agreed to allow merchants to have the ability to accept their debit cards without accepting their credit cards, and vice versa. But Visa's dominance had already been cemented.

47.    Between 2006 and 2008, both Visa and Mastercard became independent public corporations, though banks continued to own significant stock in each of them. Although banks were now free to choose to issue a mix of Visa-branded debit cards and other cards featuring

17

different networks, most banks chose to issue only Visa-branded debit cards or only Mastercard-branded debit cards, with the two competing with each other for front-of-card placement. It was challenging for Visa or Mastercard to displace the other as a bank's chosen front-of-card network, due to the expense and difficulty of issuing new cards to all accountholders. It was also rare for any network other than Visa or Mastercard to win front-of-card placement because of the large base of merchant acceptance; other networks did not have the same scale of existing merchant relationships. Banks often chose to feature only one network—the front-of-card network—on debit cards they issued, meaning that merchants could not choose any network other than the front-of-card network for routing a particular transaction.

48.     That practice ended for issuers of Visa and Mastercard debit cards in 2012 after Congress passed the Durbin Amendment. The Durbin Amendment required each debit card to support at least two unaffiliated networks. In other words, issuers had to enable at least one unaffiliated back-of-card debit network as a competitor to the front-of-card brand (i.e., Visa or Mastercard), somewhat improving routing choice for many merchants accepting debit.

49.     The Durbin Amendment also set maximum limits on the interchange fees that merchants and their banks pay **regulated issuers** (banks with more than $10 billion in assets) for every debit transaction. The interchange cap has a no-evasion rule, which limits a network's ability to provide incentives to issuers by paying them more than the cap. These limits on incentives made it even more challenging for Mastercard or other networks to win front-of-card placement where Visa was the incumbent network because they often could not fully compensate the issuer for its switching costs.

50.     Today, Visa is the largest debit card network in the United States. It eclipses its smaller rival Mastercard, which has not been able to gain significant share from Visa or restrain

Visa's monopoly. Visa is the front-of-card brand for over 70% of the debit card payment volume in the United States. Mastercard, by contrast, is the front-of-card brand for around 25% of debit card payment volume, with American Express and Discover comprising the front-of-card brand on a much smaller number of debit cards. As Visa's former Head of Product North America has explained, Visa has "dominance on the front of card."

### C. PIN Networks Lack Scale and Meaningful Opportunities to Compete for Debit Transactions

51.     For a debit network to have a chance to win a transaction, the issuer must place it on the debit card it issues. Even if a network is on a card, it may be ineligible for certain transaction types unless each party to the transaction—the issuer, the acquirer, and the merchant itself—has enabled the debit network to process the particular transaction type.

52.     To compete effectively, however, a debit network also needs sufficient scale on both the issuer and merchant sides of the debit market. The desirability and effectiveness of a debit network depends on the breadth of its acceptance and enablement by all the network participants—accountholders, issuers, acquirers, and merchants. For example, the more issuers that place a network on a card, and therefore, the more accountholders who may present the debit network for payment, the more likely it is that merchants will accept the network, and vice versa. This feedback loop is known as **network effects**. For Visa, this is not a problem: it is the default routing option when Visa is the brand on the front of the debit card. As described earlier, however, a Visa executive has recognized that for smaller PIN networks and potential competitors, building scale on both sides of the market can be a "herculean task."

53.     Despite their smaller size, PIN networks have continued to innovate. While still referred to in the industry as "PIN" networks, they have since developed capabilities to process debit transactions without requiring a consumer to enter a PIN (referred to as **PIN less**

19

debit transactions). While PIN networks require PIN entry after consumers swipe or tap their cards, PINless technology allows these networks to process card-not-present transactions, such as online purchases, and in-person transactions in which the consumer does not enter a PIN.

54.     Despite these investments, Visa imposes contractual rules and terms in its merchant and acquirer agreements that, as a practical matter, require merchants to route the vast majority of their debit transactions to Visa, rather than back-of-card networks, which include the PIN networks, none of which has double-digit market share, and Mastercard's Maestro. Visa's dominance, its exclusionary rules, and the small size of the PIN networks mean that each PIN network can compete for only a tiny fraction of all debit transactions. Visa's contracts with merchants and acquirers lock up volume, depriving rivals of scale and limiting routing choices artificially.

55.     Some transactions must be routed to Visa and are not available to its back-of-card competitors under any circumstances. These transactions are non-contestable because those back-of-card networks are not available for particular transaction types, such as transactions over a certain dollar amount or transactions that fail to meet particular encryption criteria. Card-present transactions may be non-contestable if the issuer does not allow the network to process card-present PINless transactions and the network's PIN option is unavailable because the merchant chooses not to prompt customers to enter a PIN. Moreover, acquirers may not enable smaller PIN networks. Card-not-present transactions may be effectively non-contestable if they are tokenized, an encryption technology used to facilitate some Visa-branded debit card transactions initiated online, in a mobile app, or with a digital wallet. Indeed, only a tiny fraction of card-not-present tokenized transactions were routed over an unaffiliated networks' rails in 2023. Non-contestable transactions comprise a significant percentage of Visa-branded debit card

transactions. This is in part due to issuers historically not enabling card-not-present PINless transactions—at times at Visa's prompting—which had deterred merchants and acquirers from enabling card-not-present PINless acceptance.

56.    Merchants feel they must accept Visa or they will lose a substantial number of sales and consumers. Because of the large number of consumers using Visa-branded cards, nearly all merchants must accept Visa, which in turn requires nearly all merchants to route at least the non-contestable transactions to Visa instead of the often less costly back-of-card networks.

### D.  Alternative Debit Networks

57.    Although debit cards are the most common way to make a debit purchase in the United States, other options exist. Other ways to make a debit purchase include alternative rails developed by fintech firms (hereinafter **fintech debit**).

58.    A fintech debit network can facilitate consumer-to-merchant payments by providing end-to-end functionality equivalent to debit card networks: it authorizes payment from a consumer's bank account, facilitates communications with the consumer's bank to authorize and clear the transaction, and provides settlement services by initiating a payment to the merchant's financial institution. Alternative debit networks can complete this final transfer of funds using money transfer services available to banks, such as the **Automated Clearing House (ACH)** or **Real Time Payment (RTP)** networks, which are lower-cost alternatives to Visa's debit offering.

59.    Visa recognizes that accountholders may one day remove Visa from its privileged place as the dominant middleman between their bank account and the merchant. By combining real-time money transfers with additional services—such as a credential that can be

used at merchants that are members of the network, payment guarantees, dispute capabilities, chargeback capability, and fraud protection—the alternative debit networks could provide equivalent functionality to debit card networks like Visa's. Visa's internal documents make clear that Visa fears a world in which alternative debit networks mature and potentially take hold if fintechs choose to pursue their "network ambitions."

## VI.    VISA SYSTEMATICALLY DOMINATES DEBIT TRANSACTIONS IN THE UNITED STATES THROUGH EXCLUSIONARY AND ANTICOMPETITIVE CONDUCT

### 1.    Visa Has Been the Largest, Most Powerful Debit Network for Over a Decade

60.     Visa is one of the most profitable companies in the United States, with global operating income of $18.8 billion and an operating margin of 64% in 2022. North America is among Visa's most profitable regions, with 2022 operating margins of 83%.

61.     Visa's United States debit business is its largest source of revenue globally. Visa charges over $7 billion in network fees on United States debit volume annually, earning Visa $5.6 billion in net revenue. In 2022, Visa earned more revenue from its United States debit business than from its United States credit business, and more from its debit business in the United States than its debit business in any other region in the world.

62.     Visa's incremental cost of each additional transaction on the Visa network is "approximately zero." As Visa's former CFO put it, "the incremental transaction comes with little incremental cost." Moreover, Visa bears no financial risk for fraud. If someone uses a stolen debit card to run up fraudulent purchases, for example, the merchant or the issuer bears the financial risk—never Visa.

63.     Despite regulatory changes, the rise of e-commerce and mobile payments, the introduction of new technology, and an underlying product that is "increasingly viewed as a

commodity," Visa's high share of debit transactions has hardly budged in years. Visa's rails still carry over 60% of all debit transactions and 65% of all card-not-present debit transactions in the United States while imposing supracompetitive prices, stabilizing prices, and depressing price competition.

64.     Visa is the front-of-card brand for over 70% of the debit card payment volume in the United States. It is nearly three times the size of Mastercard, its next biggest rival, which is the front-of-card brand for around 25% of debit card payment volume. No other competitor has more than a single-digit share of front-of-card debit card payment volume. As Visa's former Head of Product North America has explained, Visa has "dominance on the front of card."

65.     Visa charges smaller fees to issuers than to acquirers. Issuers may avoid higher fees in exchange for taking actions that benefit Visa, as further described in Section V.

66.     Visa maintains its monopoly in debit both by preventing competitors from gaining the necessary scale to challenge Visa and by co-opting would-be competitors. Visa preserves its monopoly position against its smaller competitors by making it harder for them to develop scale on both sides of the debit market: (1) merchants and their acquirers and (2) accountholders and their issuers. For merchants and acquirers, Visa locks up their debit volume with *de facto* exclusive deals that have the practical and economic effect of requiring exclusive routing. For issuers, Visa pays them not to take actions that would make it possible for merchants and acquirers to route to Visa's rival PIN networks, such as enabling PINless routing. Broader issuer enablement would reduce Visa's leverage, make more transactions contestable by rival PIN networks and, potentially, cause a tipping point for broader merchant enablement. For potential competitors, such as digital platforms that contract with Visa, Visa requires or induces them to agree not to introduce or support innovative alternatives to Visa's traditional card-based

debit rails. The price of not signing a contract is high—Visa imposes onerous penalties. Those high penalties ensure that virtually all these merchants, acquirers, issuers, and digital platforms choose the deal with Visa.

### 2. Visa Entered into a Web of Contracts to Hinder PIN Networks from Competing

67.     Visa's dominance today is the result of a meticulous strategy to lock up debit volume to prevent competition at the point-of-sale. It is not an accidental historical artifact of its large size or the result of competition on the merits, but instead the result of deliberate efforts. Visa's efforts effectively forestall competition from smaller debit networks (e.g., PIN networks) and thwart government regulation implemented over a decade ago, which Visa has seen as threats to its dominance.

68.     This regulatory threat to Visa was the Durbin Amendment, which took effect in 2012. The Durbin Amendment sought to facilitate a minimum level of competition in a debit system that had historically limited the choices of accountholders and merchants. The Durbin Amendment attempted to foster competition by requiring all debit cards to support at least two unaffiliated networks. In 2023, the **Regulation II** clarification adopted by the Federal Reserve took effect, which sought to further promote debit competition and clarified that at least one network unaffiliated with the front-of-card network on each card must be enabled for card-not-present transactions.

69.     In the years immediately following the passage of the Durbin Amendment, Visa recognized that PIN networks, "outspoken merchants," and other industry participants would use the legislation to shift share away from Visa. According to its internal documents, Visa knew it needed to act "quic[k]ly and decisively."

70.        Visa responded to the Durbin Amendment by exploiting others' dependence on Visa for certain transactions. Despite Congress's efforts to facilitate competition, Visa understood that not all debit transactions can be routed to at least two unaffiliated networks. Even with Durbin's requirement for at least two unaffiliated networks on each debit card, Visa has estimated that roughly 45% of Visa card-present transactions are non-contestable. For card-not-present transactions, the numbers are even higher. Merchants and acquirers frequently have only one option for routing a debit transaction: the front-of-card network, which on over 70% of debit card payment volume means Visa. These captive transactions give Visa the power to demand and enforce significant volume commitments.

71.        Visa employs two reenforcing approaches to obtain the volume commitments. First, it shares its monopoly profits to buy exclusivity. Second, Visa both charges punitively expensive rack rates (listed pricing for network fees and interchange), which are divorced from Visa's incremental costs, to merchants or acquirers that refuse to sign routing agreements and includes harsh penalties in its contracts with merchants and acquirers who do sign its agreements but fail to achieve the exclusivity requirements.

### 3.    Visa Imposes Conditions in Contracts with Merchants and Acquirers that Unlawfully Inhibit Competition and Stifle Innovation

72.        Most merchants face staggering financial penalties each year unless they route all or nearly all eligible debit transactions to Visa, hindering PIN networks' ability to compete and frustrating one of the objectives of the Durbin Amendment. Visa ensures that most merchants who route more than a small percentage of eligible debit transactions to alternative networks will face higher fees on the non-contestable transactions.

73.        Visa has signed routing contracts both directly with many large merchants and with acquirers that control the routing decisions for merchants that do not have a direct

agreement with Visa. Visa pays for their loyalty and imposes harsh penalties if merchants and acquirers fall short. Visa sometimes structures its contracts with merchants as a bid for a top position on the routing table— a ranked list that determines which network a given debit transaction should be routed to, given the options available on the debit card used in the transaction. Absent a commitment to grant Visa the number one position or other high placement on the routing table, Visa threatens to charge the merchant high rack rates on all transactions routed to Visa. This is effectively a cliff pricing structure, where meaningfully routing away from Visa is yet again punished by the imposition of high rack rates. Dozens of merchants representing hundreds of billions of dollars of 2023 debit payment volume have signed contracts to route 100% of their eligible debit volume to Visa. For example, in 2023, Visa paid one large merchant over $20 million for exclusivity. While Visa's contracts with merchants and acquirers include varying pricing terms, one almost universal constant is that the routing contracts contain significant volume commitments.

74.     Visa structures its routing contracts, in combination with its posted rack rates (i.e., list prices), to artificially increase the cost merchants and acquirers face if they route transactions to a Visa competitor. In addition, in many routing contracts, failure to comply with Visa's volume requirements allows Visa to terminate the entire contract early and claw back as early termination fees incentives that Visa had previously paid the merchant. Terminating the routing contract may impact all the routing partner's Visa payments volume, both debit and credit: certain network fees covered by these contracts apply to both credit and debit transactions, and Visa sometimes uses credit interchange discounts to win debit routing.

75.     Visa's routing contracts artificially increase the cost merchants and acquirers face if they route transactions to a Visa competitor. Visa's volume requirements are structured as

cliff pricing. **Cliff pricing** (sometimes called "all unit" pricing) grants the merchant or acquirer a lower price for every transaction routed to Visa so long as its total volume of transactions exceeds the committed threshold. If the merchant does not meet the commitment, Visa will impose its high rack rates on all transactions routed to Visa. Visa insists on cliff pricing to discourage merchants from routing to Visa's competitors, denying them scale. In other words, merchants and acquirers that make a routing commitment to Visa receive substantial network fee, interchange, and cash concessions, but *only if* they meet their volume commitments. Absent qualification under limited safe harbors, any shortfall, even one as small as 0.01% of a merchant's volume, gives Visa the right to impose significant monetary penalties on *all* the merchant's Visa debit transactions (not just the marginal transactions). Each penalty imposed by Visa would be an additional cost to routing away from Visa.

76.    Merchants and acquirers are willing to accept *de facto* exclusive deals with Visa because they have a substantial number of debit transactions that they cannot route to any other network—these are non-contestable transactions. The merchant has only two choices: either (1) agree to exclusivity with Visa or (2) pay Visa's supracompetitive rack rates for non-contestable transactions and try to route its contestable transactions to Visa's competitors. Visa's rack rates are frequently higher than the PIN networks' rack rates. Yet if merchants want to secure better rates from Visa, they typically need to route all or almost all their Visa-eligible debit volume over Visa rails. Most of Visa's volume commitments are significant, with a minimum threshold of 90–100% of the merchant's or acquirer's eligible Visa volume. Thus, Visa leverages merchants' lack of choice for the non-contestable transactions to secure volume for additional transactions at higher rates than it would be able to secure in a competitive market.

77.    Even some acquirer processors that operate rival PIN networks have agreed to exclusive routing deals with Visa. Visa has provided incentives in exchange for volume commitments from such acquirers. Visa's payments disincentivize these competitors from using their own networks to vigorously compete.

78.    As a result of Visa's cliff pricing, for a PIN network to win a meaningful set of transactions away from Visa, it must do two things. First, the PIN network must offer a better per-transaction price than Visa. Second, and more significantly, the PIN network must also compensate the merchant for the penalty Visa will impose on all the transactions the merchant still has to route to Visa, which is larger than the set of transactions for which the PIN network can compete. To compensate some merchants for the loss of Visa incentives on Visa-eligible debit transactions, the PIN network may have to offer zero or negative per-transaction prices. These penalties reflect significant and cost-prohibitive barriers to expansion for the PIN networks.

79.    When discussing potentially lowering debit prices, one Visa executive advised against it, noting that Visa has such a large number of "uncontested" transactions that the "P&L would be hammered…And if you lower the price, there is nothing to put in a routing deal, merchant gets it by default with no commitment." Rather than competing on the merits, Visa chose to keep its penalty prices high so it could insulate its supracompetitive profits by creating a web of deals to foreclose rivals.

80.    To secure even more debit routing exclusivity, Visa sometimes prices other products, such as credit, based on how much debit volume merchants route to Visa. In one instance, Visa offered credit incentives, among other things, to win routing from Google and

toprotect against PINless enablement. Similarly, Visa offered credit incentives to win debit routing from a health food supermarket chain.

81.     Describing one proposed credit and debit routing contract with a different large merchant, a Visa employee wrote, "We continue to believe that we made a very strong offer that they cannot replicate with our competitors. While they could recover some (but not all) of the value they receive from us for the debit routing, they will lose all credit value. Walking away would not be a commercially reasonable decision for them." As Visa recognizes, PIN network competitors do not have credit businesses to raid to buy debit routing.

82.     Visa also has a history of introducing new fees that it can so-call "waive" in exchange for exclusivity (or near exclusivity), making it difficult for merchants to route transactions to different networks. For example, Visa introduced the FANF in 2012 in response to threats of increased competition once the Durbin Amendment went into effect. FANF changed the structure of Visa's merchant pricing by charging merchants (through their acquirers) a fixed monthly fee for accepting Visa debit transactions. Visa has raised FANF twice in subsequent years. FANF is another lever that Visa uses to lock-up merchant debit volume: as an incentive to enter into routing volume-commitment contracts.

### 4. Visa's Contracts with Issuers Unlawfully Restrict the Growth of Its Debit Competitors

83.     Issuers choose the number and identity of debit networks included on their cards. While the Durbin Amendment requires that each Visa-branded card include at least one additional network not affiliated with Visa, an issuer could choose to enable additional networks, thereby increasing the choices available to merchants and driving competition. However, Visa uses its monopoly power to induce issuers to limit the enablement of rival networks on their Visa-branded debit cards and thereby limit the choices available to merchants. In its issuing

contract with JPMorgan Chase ("Chase"), Visa made this requirement explicit. Chase's contract with Visa provides that only one unaffiliated PIN network can be enabled on 90% of Chase-issued Visa- branded debit cards. In 2023, Visa entered into an agreement with one of its largest fintech debit issuing customers, that limits enablement to a single non-Visa network for all debit cards issued through that fintech entity's partner issuing banks.

84.     Visa's contracts with other large and small issuers achieve a similar effect through different means. Visa has nearly 1,000 issuing contracts that contain significant volume incentives, which strongly deter the issuer putting more debit networks on the back of the card. These contracts frequently contain standardized volume requirements whereby the issuer must maintain its annual growth of Visa debit transactions in line with Visa's overall debit growth in the United States, which helps ensure that Visa's share of the issuer's transactions does not decrease.

85.     Visa debit volume gives Visa the power to impose significant monetary costs. For example, if an issuer does not meet the system growth requirement, it could be required to pay an early termination fee comprised of a percentage of the benefits it has already earned plus a multimillion-dollar fixed fee.

86.     Visa debit volume targets incentivize issuers not to enable additional networks on their debit cards and not to enable existing networks for additional transaction types (e.g., PINless routing). For example, in a 2020 issuing contract Visa included a minimum volume requirement that was designed to "mitigate a shift to PINless, RTP [Real Time Payment], etc." The language Visa obtained was viewed as "good enough" by senior Visa executives to "protect for PINless" because the only way the issuer could protect its volume was to "dump[] their debit network (Shazam) if it starts shifting volume." Similarly, Visa "signed incremental debit

incentive deals" with a number of large issuers and, as a result, Visa thought they were "unlikely to enable PINless on F2F [face-to-face] transactions." Many smaller issuers also rely on their issuer processors to make network selections, and there too Visa enters into agreements that are designed to "[p]rotect and grow existing [payment volume] from small issuers and discourage PINless enablement."

87.     Visa's issuer contracts reinforce the protections created by Visa's merchant and acquirer routing contracts by creating artificial barriers to expansion and, in effect, expanding or entrenching the transaction volume that is non-contestable. Regardless of a merchant's preferred routing choice, only networks enabled on a Visa-branded debit card can compete for the transaction. By virtue of being the dominant front-of-card network, Visa is enabled to process all transactions on over 70% of debit card payment volume in the United States.

88.     Like Visa's routing contracts with merchants and acquirers, Visa's volume requirements in issuing contracts are structured as cliff pricing. Any meaningful shortfall gives Visa the right to impose significant monetary penalties across *all* Visa debit transactions (not just the marginal transactions). If the issuer does not achieve the agreed level of exclusivity in any given year and that failure is attributable to any affirmative actions by the issuer, including enablement of any additional PIN networks, then Visa has the right to apply significant monetary penalties or even an early termination penalty.

89.     Visa sometimes leverages discounts on other products, such as its Debit Processing Services (DPS), to win issuer routing volume, similar to how it leverages discounts on other products to win merchant routing volume. Visa has packaged card-brand issuance contracts with its DPS processing services to win business from large banks.

**5.     Visa's Response to the Durbin Amendment Successfully Protected Its Monopoly from Competition**

31

90.    Visa feared that competition from PIN networks post-Durbin would erode its monopoly share of debit. Initially, the Durbin Amendment had some success in allowing the smaller PIN networks to grow share. While Visa initially lost share, it quickly recovered and increased its high share throughout the 14 years since the Durbin Amendment took effect.

91.    Since the enactment of the Durbin Amendment, smaller networks have attempted to chip away at Visa's dominance. For example, in the early years following the Durbin Amendment, Mastercard launched a PINless program for Maestro targeted at Visa-branded debit cards. But any gains were short lived. Again and again, Visa leveraged its tremendous scale and sheer volume of non-contestable transactions to penalize disloyalty from merchants, acquirers, and issuers, at the expense of competitors, consumers, merchants, and other market participants. Visa, by its own recognition, continues to win despite PIN networks generally offering lower prices.

92.    The Dubin Amendment did not exempt Visa, other debit networks, and issuers from complying with the antitrust laws. Rather, the Dodd-Frank Act, 12 U.S.C. § 5303, which includes the Durbin Amendment, provides that it is complementary to the antitrust laws, including the Sherman Act, and that requirements imposed on companies are in addition to, not to the exclusion of, those provided by the antitrust laws.

93.    In response to this new regulatory landscape, Visa has engaged in a relentless strategy of locking up the entities that control routing decisions and has now entered *de facto* exclusive routing contracts with over 180 of its largest merchants and acquirers. Visa's merchant and acquirer contracts cover over 75% of Visa's debit volume and results in the foreclosure of at least 45% of total United States debit volume. This denies competitors the scale necessary to compete effectively, because issuers have a lower incentive to add networks to the debit cards

they issue  if merchants predominantly route to Visa. Visa's contracts with issuers magnify this problem. Visa uses its contracts with issuers to incentivize the issuers to make decisions—like choosing to disable card-present PINless or choosing not to enable it—that may make more transactions non- contestable, providing Visa with additional leverage over merchants and acquirers.

94.     Visa deployed a similar response strategy in reaction to the Federal Reserve's October 2022 clarification of the rules implementing the Durbin Amendment, referred to as Regulation II. In anticipation of the Regulation II clarification going into effect, Visa strategized to secure more volume under routing deals, to target merchant and acquirer deals with early termination fees for longer, firmer commitments of routing volume as well as to renew issuing agreements. Visa then took steps to ensure volume was locked up prior to the regulation going into effect.

### 6.    Visa Uses Its Monopoly Power to Deprive Its Rivals of Scale

95.     When two-sided transaction platforms like Visa "achieve scale on the two sides, it's an enormous moat around their business, and far more powerful than a one-sided but still network effect businesses (e.g., Facebook, Microsoft Word, etc.)." Visa's separate contracts across both sides of the debit market—accountholders and issuers on one side and merchants and acquirers on the other—widen the moat around its business and prevent any other debit network from gaining a meaningful share of the debit market. On one side of the market, Visa incentivizes issuers to enable fewer networks and fewer routing options on each non-Visa network. Because fewer issuers enable Visa's PIN-network competitors and all their features, merchants and acquirers on the other side of the market are less likely to take the time and expense to enable routing to PIN networks.

96.      Rival networks cannot grow their networks to sufficient scale or improve their networks' features. They're caught in a vicious cycle as they lack enough usage and acceptance on either side of the market to effectively compete with Visa. This network effects phenomenon results from the difficulty in building scale on both sides of a two-sided market—as described before, a "herculean task."

97.      Visa uses its power to ensure control over non-contestable transactions and then leverages its control over those transactions to demand and enforce exclusivity. To overcome Visa's scale advantage, a PIN network must not only compete on the merits for transactions it seeks to route, but also compensate the merchants, acquirers, and issuers for the cost of penalties imposed by Visa on all non-contestable transactions that the PIN network is not eligible to route.

98.      Visa has made it nearly impossible for PIN networks to win additional share. Despite the increased placement of PIN debit networks on the back of cards after the implementation of the Durbin Amendment and the PIN debit networks' development of new features to compete more closely with Visa and Mastercard, Visa has cut off PIN debit networks from gaining sufficient usage and acceptance on either side of the market to overcome network effects. Collectively, the PIN networks represent approximately 11% of all debit transactions (and only 5% of card-not-present debit transactions). No PIN debit network has more than a single-digit share of debit transactions in the United States.

99.      In the years since the Durbin Amendment, smaller networks have tried to win transactions from Visa by offering lower fees, innovating, and broadening their features. But the returns to these efforts were minimal, Visa used its immense size and large volume of non-contestable transactions to stifle these attempts at competition.

100.     A lack of scale also inhibits smaller networks from offering fraud protections equivalent or better than the market leaders because networks need sufficient transaction data to have acceptably robust fraud detection. Visa claims internally that absent sufficient transaction data, PIN networks are unable to match Visa's speed and accuracy at identifying fraud. Visa just "see[s] more" and, by its own recognition, continues to win despite PIN networks generally offering lower prices.

101.     Visa is aware of these market dynamics and exploits them to limit competition. In Spring 2023, one Visa executive observed that less than half of the debit volume in the United States was enabled by issuers to be processed as a card-present PINless transaction, and "[a]s a result, many merchants have not enabled CP [card-present] PINless." Acknowledging that issuer enablement influences merchants' enablement decisions, Visa feared that a large United States issuer enabling card-present PINless could "create a tipping point . . . for more [acquirer] processors and merchants enabling and routing CP [card-present] PINless." Visa thought growing card-present PINless enablement would lead to more competition from its debit network rivals.

102.     For instance, in 2023, Chase had Visa-branded debit cards with Mastercard's Maestro as the back-of-card network unaffiliated with Visa. Although Chase's contract with Visa prohibited it from adding a second back-of-card network, Chase requested a waiver of this contractual requirement from Visa. Chase wanted to also add Discover's Pulse network to the back of its Visa-branded debit cards to comply with Regulation II clarification announced in 2022. At the time, Maestro did not offer the card-not-present PINless functionality whereas Pulse offered both card-present and card-not-present PINless functionality. Visa executives feared that if Chase enabled Pulse on the back of its debit cards, "more than 60% of the CNP volume will be

35

priced lower than Visa by the unaffiliated networks. As that happens, more merchants [] will adopt PINless, resulting in lower transaction win rates for Visa, as well as a decline in effective transaction clearing price." Visa executives were concerned that if Chase enabled Pulse's PINless functionality, it could create a tipping point for more processors and merchants to enable and route to PINless, driving an "additional 5-10% in merchant volume to be enabled for PINless." Fearing that a PIN network would win more widespread placement and enablement on both the issuer and merchant sides of the market, Visa granted only a short-term waiver of its back-of-card network restriction clause to allow Chase to temporarily add Pulse as a second unaffiliated network the back of its debit cards, but also required that Chase enter a debit routing agreement with Visa.

### 7.    Visa Uses Its Monopoly Power to Squash Innovative Alternatives to Its Debit Network

103.    Debit cards are not the only way for consumers to pay directly with money in their bank accounts. For instance, consumers may also use an alternative debit network, such as those created by fintech companies. Fintech debit networks cut Visa out of the transaction (see Figure 3 below). They rely on a consumer's bank account number, rather than a debit card credential, to make real-time purchases directly from the consumer's bank accounts. These potential debit competitors' networks may not require a network like Visa's. In place of a physical or virtual card, fintech debit networks may store consumers' bank account credentials, allowing accountholders to purchase goods and services from merchants that participate in their networks. Visa's CEO has recognized that these sorts of "disruptive innovations are happening elsewhere in the world." Visa fears that potential competitors would attempt to replicate those successes in the United States.

104.    These potential debit competitors could be embedded in different types of

payment solutions, such as digital wallets and other fintech products. Well-known digital wallets

include Apple Pay, Google Pay, and PayPal. Digital wallets are software-based systems, usually

on a smartphone or computer, that store a consumer's payment credentials—including debit

cards, credit cards, and, in some wallets, fintech debit networks—to fund consumer-to-merchant

transactions.

105.    Visa's philosophy towards preserving its monopoly from attacks by new

competitors can be boiled down to the words of its former CFO: "[E]verybody is a friend and

partner. Nobody is a competitor." As Visa's former CFO went on to say, "The only issue is to

figure out how to make it worth their while to partner with us. And so far, we've managed to do

that, whether it's with wallets, whether it's with large tech companies, whether it's with large

merchants. And as long as we keep doing that and keep our network valuable for everyone,

things should be fine." This strategy has worked.

106.    Over the past decade, there has been a substantial increase in the number and

volume of debit transactions that occur online. The rise of mobile payments and the COVID-19

pandemic have fueled this significant change in the industry. This trend, however, has not seen a

corresponding rise in the adoption of new payment methods—new technologies and new

services continue to largely run on the payment rails of the past. This is because Visa has used its

monopoly power in debit markets to stifle potential competitors, such as fintech debit networks,

from creating or enhancing any payment methods that compete with Visa. Visa's conduct is

deliberate and part of a strategy to maintain its monopoly. Visa is always on the lookout for ways

new payment technologies could reduce or eliminate the need for Visa to act as an intermediary

between both sides of a debit transaction. Rather than compete with alternatives to its debit rails, Visa "seek[s] to partner with technology disruptors to mitigate threats whenever possible. . . . Identify and partner with emerging players before they become disruptors."

107.    At the heart of the strategy is a quid pro quo: Visa uses "custom incentives programs" to "target a small number of Visa's largest and most influential merchants for a custom incentive arrangement in return for disintermediation/non-discrimination protections, non-disparagement, and future commitments." These contracts amount to a horizontal product market division. As Visa describes it, "These are not routing deals, these are relationship give away deals that have nothing to do with routing." In some cases, Visa "make[s] less money than [they] would in a worst case do nothing" scenario.

### 8.  Visa Fears that Fintech Debit Networks Will Disintermediate Its Lucrative Debit Business

108.    Since at least 2013, Visa has been concerned that fintech debit networks would displace Visa as an intermediary between both sides of a debit transaction. A fintech debit network can facilitate consumer-to-merchant payments by providing end-to-end functionality equivalent to debit card networks: it authorizes payments from a consumer's bank account, facilitates communications with the consumer's bank to clear the transaction, and provides settlement services by initiating a payment to the merchant's financial institution. The fintech debit networks provide additional capabilities like payment guarantee for merchants, dispute resolution and chargeback services, and fraud protections.

109.    Visa's fear of disintermediation has been exacerbated by two developments: increasing availability of alternative payment rails that move money in real time, and a growing number of fintech firms that are able to build upon these payment rails to compete with Visa, particularly Visa's lucrative card-not-present debit business. Other participants in the payments

ecosystem, such as payment processors, banks, and firms that have the ability to build the necessary connections between consumer bank accounts and merchants, also have the capability to offer fintech debit network services. As Visa recognized, real-time fintech payments "will become a viable merchant option: positioned and priced as a 'Substitute for Debit.'"

110.    Visa feared that its Big Tech "frenemies" would launch debit networks that compete with Visa by displacing card-based funding options with payments directly from consumers' bank accounts. This fear was heightened by new, non-card-based payment rails which created cheaper alternatives to Visa's payments rails. For decades, payment networks have facilitated bank transfers via ACH, an interbank payment service which took several days to settle payment and even longer to make funds available in a consumer's bank account. However, new alternatives have developed. Innovative fintech firms have sought to build new capabilities on ACH and even new infrastructure that provides a faster alternative to ACH (known as real-time payments or RTP). For example, The Clearing House launched RTP Network, a real-time-payments network that allows immediate clearance and settlement of transactions, and the Federal Reserve launched FedNow in 2023 to provide instant payment services between depository institutions. As faster payment alternatives emerge and banks begin to connect to them, they create the opportunity for making funds available in as close to real time as possible.

111.    To date, few digital wallets or other potential fintech debit networks have incorporated these new real-time payments networks. Digital wallets are financial transaction applications, usually stored in a smartphone or computer, that can be used to complete consumer-to-merchant transactions at more than one retailer using a stored payment credential. Digital wallets may enable consumers to pay for goods and services with funds in the wallet—these types of wallets are known as staged digital wallets or stored value wallets. Staged digital wallets

may use funds preloaded in the wallet or may pull funds into the wallet from a linked bank account (such as a checking account, using either a debit card or a bank account number) to make transactions. In the United States, PayPal and Square's Cash App operate as staged digital wallets. A second type of digital wallet, called a pass-through wallet, transmits a consumer's payment credentials (such as a debit card account number) directly to a merchant's acquirer, which then uses those credentials to process the payment in a manner similar to a traditional debit transaction. Apple Pay and Google Pay are two popular examples of pass-through digital wallets.

112.    Visa is particularly concerned with potential competitors that have relationships with both accountholders and merchants, because these companies are positioned to build the scale necessary to succeed as a payment platform. Visa knew that tech companies like PayPal, Apple, and Square had acceptance at millions of merchants and relationships with over one hundred million accountholders in the United States. Like traditional debit networks, fintech debit networks require both consumer and merchant participation. Consumers enroll in the fintech company's network, including going through the steps to link their bank accounts. Merchants also enroll in the service.

113.    For example, Visa understood that Apple Pay's broad merchant acceptance and popularity with consumers represented "an existential threat" to Visa's debit business. Visa has consistently viewed Apple as a threat, in large part due to its broad merchant acceptance and broad base of Apple Pay users. Visa feared that Apple on its own, or in partnership with another entity, could build its own payment network independent of Visa's rails. Visa was aware that Apple had approached a large debit issuer about building a network without Visa or Mastercard.

### 9.    Visa Leveraged Its Debit Monopoly to Prevent PayPal and Others from Disintermediating Visa with Staged Digital Wallets

114.     According to one Visa executive's assessment, the only major entity to successfully disintermediate Visa in the United States is PayPal. But in 2016 Visa blunted this threat by signing a massive deal with PayPal, using Visa's standard playbook of threatening high fees and dangling big payoffs to move PayPal transaction volume back to Visa's rails and stop PayPal from competing aggressively against Visa.

115.     In the 2000s and early 2010s, many merchants started accepting PayPal as part of their expansion into e-commerce. Some of PayPal's customers used their Visa debit cards to pay for transactions at these merchants, including many online small- and mid-sized businesses. As a result, PayPal brought significant incremental volume to Visa, which Visa initially supported. But in 2015, when PayPal was spun-off from its parent company, eBay, Visa's view of PayPal changed. Visa viewed the new company as an "innovative competitor that will be more aggressive as standalone entity." In particular, Visa was concerned about PayPal's scale and its move to encourage PayPal users to pay directly for goods and services with their bank accounts rather than with their debit or credit cards.

116.     PayPal offered a staged digital wallet with an alternative debit credential: accountholders loaded funds into their PayPal wallet using their bank credentials and could make purchases using ACH. ACH transactions from PayPal's wallet included many of the same features as debit, such as fraud detection, fund guarantees, and the ability to dispute a transaction. Visa wanted to discourage staged digital wallets, such as PayPal, because it viewed them as an "increased disintermediation risk for issuers and Visa" which came with a "cannibalization risk." A Visa executive viewed having a commercial relationship with a company supporting a staged wallet model as a "line that must never be crossed."

41

117.    Visa had an ace card in its negotiations with PayPal. Even with PayPal's new model encouraging consumers to pay directly with their bank accounts, a substantial number of its customers had continued to make payments through PayPal using their Visa-branded debit cards. To squash PayPal's use of ACH in the staged digital wallet model, Visa used the threat of exorbitant wallet fees and high rack rates on these Visa transactions to induce PayPal to enter into a new, expansive routing contract. PayPal risked losing customers who used Visa on its platform if it told them they could no longer use their Visa-branded cards, and so it had little choice but to take the deal.

118.    At this time, PayPal was also entering into new partnerships to bring its payments innovations to in-store merchants. Visa stymied these partnerships by imposing a restriction on ACH funding transactions when the PayPal customer had an existing Visa-branded card in their PayPal wallet. While Visa relaxed its restrictions in 2021, Visa mandated information sharing so that it could monitor PayPal's product success and to this day restricts PayPal's in-store ACH funding transactions to a QR code model whereby a consumer must scan a merchant's QR code before connecting to PayPal to complete a transaction. Visa's continued restrictions on PayPal add frictions that limit the use of PayPal as an in-store alternative to Visa. In 2022, PayPal and Visa entered into a new 10-year contract that limits PayPal's incentives and ability to disrupt the debit market. This includes a debit routing commitment of 100% of its Visa-eligible volume from years four to ten, penalties for failing to convert its co- branded debit cards to Visa, a requirement to participate in certain Visa programs and services, and preservation of most of Visa's "customer choice" provisions, which preference Visa payment methods over other competitive alternatives. Visa's continued dominance of the debit market and the looming

threat of Visa's exorbitant wallet fees and rack rates left PayPal with few alternatives to compete on Visa's terms.

119.    Since 2016, Visa has threatened to impose the staged digital wallet fee on other entities, but all have signed deals with Visa rather than pay it. Visa views the fee as "a behavioral fee to reflect the propensity of SDWOs [staged digital wallet operators] to disintermediate Visa," and waives the fee if the wallets behave as Visa demands. In other words, Visa offered the staged digital wallets a choice: agree not to compete with Visa or pay substantial targeted fees that make the alternative networks far less profitable to operate.

120.    Visa has also entered into a series of contracts with Square that have foreclosed Square from competing aggressively against Visa and prevented Square from developing a viable alternative for consumer-to-merchant payments.

121.    In 2013, Square launched a new service, Square Cash (later called Cash App) that enabled person-to-person payments. Square sought to avoid additional Visa fees for Square Cash so that it could facilitate such payments using debit cards. Visa worried that if it did not sign a contract for Square Cash, Square was "likely to build in an ACH option." An ACH routing option (which requires a consumer to link their bank account credential) would pose a threat to Visa's debit payment volume because Square could use the bank account credentials from person-to-person transactions to launch a new consumer-to-merchant debit product.

122.    Visa chose to participate in Square Cash and offered not to charge high rack rates for transactions using Visa's debit network, but Visa required that it have the right to terminate for convenience, in case Square started to compete with Visa. Visa believed it got two main benefits from the deal: (1) the debit routing commitment; and (2) "non-disintermediation, of which the major concern is ACH."

123.    After signing the first contract with Square in 2014, a Visa executive stated, "we've got Square on a short leash and our deal structure was meant to protect against disintermediation."

124.    In 2016, Square innovated and announced a new product, called "Cash Drawer" that allowed users to store funds in their Square Cash account, similar to PayPal and its person- to-person payments platform Venmo. Visa was concerned that the product was a "greater disintermediation threat" that had the potential to disrupt its (and its issuer clients') profitable debit rails.

125.    Visa acted quickly to prevent any disruption. Visa sent a letter of intent to terminate its contract with Square, reporting to Square that Cash Drawer was a "huge deal for us" and a "third rail" issue as "a staged wallet model was antithetical [to] what we worked so hard to develop together with Square Cash." Faced with the risk of paying higher fees and other penalties on its Visa debit transactions, Square quickly backed down and removed the feature; Visa did not terminate the contract.

126.    More recently, Square launched Cash App Pay, which enables consumers to use Cash App to make purchases from merchants. This new product would trigger Visa's burdensome staged digital wallet fees, and Square asked Visa to waive those fees. Visa recognized that these threatened fees gave it "a significant lever in negotiation." As one Visa executive noted after the launch of Cash App Pay, "Square's approach is predictable and follows the disintermediation playbook to the letter." But in 2023, Visa used the leverage from the staged digital wallet fees to obtain commitments from Square that it would route 97% of its Cash App Pay transactions over Visa's rails, which would preference Visa in Cash App Pay signup flow and default settings, and would not steer customers to ACH in Cash App Pay.

### 10. Visa Uses Its Leverage Over Its Potential Debit Competitors, Including Apple, Paying Them Not to Create or Promote Competitive Products

127.    Even for entities that do not operate staged digital wallets, Visa guards against the potential of being disintermediated. Many of Visa's potential competitors are also Visa customers. Visa uses its monopoly power, and the threat of imposing its high fees, rack rates, and other penalties, to induce potential competitors to sign contracts that preserve Visa's prime position in the payments ecosystem. Each year, Visa spends a portion of its supracompetitive profits to buy off potential competitors, ensuring Visa can continue to reap the financial benefits of its monopoly.

128.    Visa benefits from partnering with established Big Tech players like Google and Apple by obtaining "total control of ecommerce acceptance and online payments flow in their ecosystems."

129.    Visa targets a small number of Visa's largest and most influential Big Tech merchants with custom incentive arrangements on Visa-eligible debit volume in return for commitments from them to not dislodge Visa as the middleman, and other future commitments. These contracts amount to a horizontal product market division. As a Visa executive clarified, the incentive deals Visa has reached with Apple and Amazon, "are not routing deals, these are relationship give away deals that have nothing to do with routing." In some cases, Visa recognizes that its choice to enter into a routing deal might not be as profitable absent an impact on competition, stating that Visa "make[s] less money than [it] would in a worst case do nothing" scenario.

130.    For example, Visa has deals with Apple in which Apple agrees that it may not develop or deploy payment functionality with the aim of competing with Visa, such as creating payment functionality that relies primarily on non-Visa payment processes or payment products.

Apple is also barred from providing incentives "with the intent of disintermediating Visa or inciting customers to cease using Visa Cards." In return, Visa shares its monopoly profits with Apple. Visa has also provided Apple with reduced merchant fees in exchange for Apple's commitment not to "build, support, or introduce payment technologies that disintermediate Visa" or steer customers to third party payment methods such as ACH. Visa payments to Apple amounted to hundreds of millions of dollars in 2023.

131.    Visa recognized internally that the benefit of Visa's disintermediation terms with Apple was "volume staying on Visa." When Visa first entered its contract with Apple in 2012, Visa wanted the "right to terminate [the] deal if [a] competitor or competitive products emerge." As Visa noted: "Cooperation is preferred." Visa has continued to condition its participation on Apple maintaining its status as a non-competitor to Visa. In 2022, Visa worried that its relationship with Apple was at a "tipping point," as Apple created new inroads into the traditional debit and credit ecosystems. Visa viewed Apple as an "existential threat" that could negatively affect both Visa's yields and its transaction volumes. Visa's strategy has been to align its incentives with Apple, which Visa refers to as a "mutually assured destruction principle." Visa's key question for its Apple relationship: "Do we partner with Apple and if so, how?" Visa has always answered that question in the affirmative, with massive payments and financial incentives to Apple.

## VII.    ANTICOMPETITIVE EFFECTS

132.    For years, Visa has been able to maintain its dominant position in the market through actions that harm competition. Its web of exclusionary and anticompetitive contract terms and its control over currently non-contestable transactions both excludes competition for those transactions that can—and should—be contested and insulates those currently non-contestable transactions from competition in the future.

46

133.    Absent Visa's exclusionary and anticompetitive contracts with merchants, acquirers, and issuers, and other industry participants, Visa's back-of-card competitors (i.e., PIN networks, including Mastercard's Maestro), would have the chance to gain the scale needed to compete effectively with Visa and offer banks and merchants real choices. Absent Visa's exclusionary and anticompetitive contracts with potential fintech rivals, those would-be competitors would have greater incentive to innovate and compete more directly with Visa—and Visa would have more incentive to respond—offering consumers and businesses new choices and better features. Thus, absent Visa's anticompetitive and exclusionary conduct, competition from current and potential rivals would increase competition and likely lead to lower fees, better service, or greater innovation.

134.    Visa's exclusionary and anticompetitive conduct has broken the competitive process that should benefit other market participants, including issuers, acquirers, merchants, and consumers. Visa's conduct prevents its rivals from being enabled on both the consumer (issuer) and merchant (acquirer) sides of the debit networks at a scale to compete effectively with Visa.

135.    Visa's success in its anticompetitive endeavors is both facilitated and reflected by the substantial foreclosure of competition it has achieved in the relevant markets. Visa itself calculated that by the end of 2022 at least 75% of all its debit volume—and 80% of its card-not-present debit volume—were insulated from competition by its rivals through its contracts. Looking beyond the debit volume Visa received, its merchant and acquirer routing contracts alone foreclose at least 45% of all debit transactions in the United States, and an even higher fraction of card-not-present debit transactions.

136.    Visa's exclusionary and anticompetitive conduct creates a vicious cycle that further insulates it from competition. By locking up debit volume through agreements that

constrain competition on both sides of the market, Visa has deprived rivals of the scale they need to offer effective competition now and in the future. This means that rival networks have limited or no ability to compete on price and quality (e.g., fraud detection) today. Visa's agreements limit how much additional volume rival networks can win if they lower prices or invest in new benefits or features. This reduces the benefits to PIN networks of cutting prices or investing in new benefits and innovative features. And weakening its rivals in these ways not only protects Visa from competition for transactions that should be subject to competition today, but also reduces the chances that those rivals can offer the features and services necessary to erode Visa's advantage on non-contestable transactions later, such as further development of PINless routing.

137.    Visa's exclusionary and anticompetitive conduct has stopped beneficial innovation in other ways. For more than a decade, Visa has sought to delay or deter the development of fintech network services that would offer American Consumers new ways to pay merchants directly from their bank accounts. This has likely delayed or deterred the introduction of features such as staged digital wallets, store-credit or discount offers in digital wallets, or other features that would increase convenience and security and build closer relationships between merchants and consumers. Visa's efforts have not only reduced innovation from other companies that would benefit consumers and businesses today, but also its own incentives to innovate: Visa admitted that it has not materially invested in innovation in the last decade other than its tokenization efforts.

138.    Vigorous competition should constrain Visa's prices and spur its investment in innovation and benefits for its customers and American consumers. But that sort of vigorous competition is exactly what Visa has worked so hard to avoid. Visa insulates its debit transaction volume from competition whenever it can; sometimes by foreclosing rivals from being able to

meaningfully compete for significant shares of the market and sometimes by reducing incentives to compete via imposing fees or providing financial benefits. Visa's conduct further suppresses incentives of current and potential rivals—as well as its own incentives—to compete and innovate.

139.    But competition, not Visa, should control whether and how issuers, acquirers, merchants, and consumers interact with each other. Competition, not Visa, should set the fees that those issuers, acquirers, merchants, and consumers pay directly or indirectly to debit networks. And competition, not Visa, should set the pace of innovation—from both rivals and Visa itself—of features and services that benefit consumers, merchants, acquirers, and issuers in the markets for debit transactions.

140.    Visa has done exactly what it intended to do: capture a substantial volume of contestable transactions through anticompetitive means, preserve or expand the pool of non-contestable transactions, block or discourage competitive threats from current or would-be rivals, and benefit from the monopoly that results. Since the enactment of the Durbin Amendment, PIN networks have attempted to chip away at Visa. For example, in the early years following the Durbin Amendment, Mastercard launched a PINless program for Maestro targeted at Visa-branded debit cards. But any gains were short lived. Visa repeatedly leveraged its massive scale and immense volume of non-contestable transactions to penalize disloyalty from merchants, acquirers, and issuers, at the expense of competitors, consumers, merchants, and other market participants. Visa, by its own recognition, continues to win despite PIN networks generally offering lower prices.

## VIII.    NO PRO-COMPETITIVE JUSTIFICATIONS

141.    There are no valid, procompetitive benefits to Visa's exclusionary conduct that outweigh its anticompetitive effects or cannot be obtained through less restrictive means. Visa's

anticompetitive contract terms and related conduct are not reasonably necessary to protect Visa's technology, incentivize customer growth, prevent free-riding, or achieve any other claimed benefit. Visa can achieve any legitimate, procompetitive objectives without imposing the anticompetitive terms challenged in this case, or those benefits could be achieved through less restrictive means. Moreover, Visa's agreements with current and potential direct competitors are not ancillary to its vertical relationship. Rather, they are simply divisions of the relevant markets by direct competitors.

## IX.     THE RELEVANT MARKETS

142.     Courts define a relevant market, which has both a geographic and product market dimension, to help identify the lines of commerce and areas of competition impacted by alleged anticompetitive conduct. There can be multiple relevant markets covering the same or similar products and services.

143.     Visa's anticompetitive conduct affects two relevant markets: the United States market for general-purpose debit network services and the United States market for card-not-present debit network services (a narrower product market included within the broader United States general-purpose debit network services market).

### 1. The United States Is a Relevant Geographic Market

144.     The United States is a relevant geographic market. Federal laws and regulations that govern debit transactions, including card-not-present transactions, operate at the national level. Visa organizes its United States debit business at the national level, as demonstrated by its separate rules governing merchant acceptance in the United States and its separate pricing of debit, including card-not-present debit, to merchants, acquirers, and issuers in the United States. The relevant parties to a debit transaction—consumers, issuers, acquirers, and

merchants—could not practicably turn to debit network services offered elsewhere as alternatives. Therefore, a firm that was the only seller of general purpose debit network services or general purpose card-not- present debit network services in the United States would be able to maintain prices above the level that would prevail in a competitive market.

### 2. Relevant Product Markets

145.    Visa's conduct affects two relevant product markets: (1) general-purpose debit network services; and (2) general-purpose card-not-present debit network services.

### A. General Purpose Debit Network Services Are a Relevant Product Market

146.    General purpose debit network services are payment products and services that facilitate the debit (i.e., withdrawal) of funds directly out of a consumer's bank account, often using a credential or other account number to identify the consumer. Visa and its debit card network and fintech debit competitors provide products and services that are inputs to and that enable debit transactions. They compete to provide debit network services for general purposes, meaning that their debit credentials are accepted at numerous, unrelated merchants. These networks sell services simultaneously to both issuers and acquirers, or, in the case of some alternative debit networks, accountholders and merchants. They serve as intermediaries between accountholders and merchants, operating two-sided transaction platforms that facilitate transactions between merchants and accountholders from their respective bank accounts. These services that Visa and its debit network competitors enable constitute a relevant product market.

147.    Debit networks, like Visa, provide a variety of services that enable a debit transaction, and this suite of services constitutes a product that is jointly consumed by merchants and accountholders (as well as the acquirers and the issuers). These services include the ability for the consumer or her bank to dispute and chargeback the transaction; payment guarantees for

merchants; fraud protections for all parties; as well as the "rail" or methods in which the other parties communicate among each other to facilitate the transaction and transfer funds from the consumer's bank account to the merchant's account. These minimum attributes of debit are important to merchants, consumers, and banks alike and distinguish debit from other methods of payment. Although accountholders do not contract directly with Visa, the accountholders and their banks rely on Visa and other networks to make possible purchases from merchants.

148.    Debit networks are two-sided platforms that exhibit a high degree of interdependency between accountholders and issuers on the one side and merchants and acquirers on the other. Accountholders and issuers get more value from a network that connects to more merchants, and merchants and acquirers get more value from a network that connects to more accountholders.

149.    General purpose debit network services constitute a relevant product market under the antitrust laws. Many consumers would not find other payment services to be a suitable substitute for debit. Issuers, knowing that many of their accountholders value debit, do not consider alternative payment services to be a suitable substitute for debit. Merchants do not consider other payment services to be a substitute for debit because they do not want to risk lost sales by not accepting many consumers' preferred payment method. Acquirers, knowing that their merchants value debit, do not view alternative payment services to be a suitable substitute for debit. Thus, there are no reasonable substitutes for general purpose debit network services, and a firm that was the only seller of services to facilitate debit transactions would be able to maintain prices above the level that would prevail in a competitive market.

150.    The market for general purpose debit network services includes services sold by debit networks other than traditional debit card networks. Fintech debit networks can be

accepted at all merchants that participate in the network and provide payment guarantees, dispute resolution and chargeback capabilities, and fraud protection services. In a debit transaction processed by a fintech network, the consumer does not have a "debit card" and there is no "issuer" of a physical or virtual debit card, however, the services provided by fintech debit networks provide the same functionality to consumers and merchants.

151.     General purpose credit card network services are not reasonably interchangeable with debit network services because debit payments draw from funds already in a consumer's bank account, rather than from a line of credit. Visa describes debit as a "pay now" product and credit as a "pay later" product. The distinction between credit and debit is widely accepted in the payments industry. Visa and other card networks have different pricing for debit and credit transactions, and the Durbin Amendment's limitations of issuer transaction fees does not apply to credit. Many accountholders do not qualify for credit cards or have a strong preference for paying out of their existing funds rather than taking on debt to make purchases using a line of credit. Given many account holders' strong preference for debit, issuers cannot substitute from debit to credit.

152.     Network services for store cards and other prepaid cards are not reasonably interchangeable with debit network services. Rather, Visa sees prepaid cards as "complements" to its other card products. Prepaid cards are not connected to a consumer's bank account, so only funds that have been loaded on the card in advance can be spent. For that reason, Visa refers to prepaid as a "pay before" product, while debit is a "pay now" product. Visa also prices prepaid card network services differently to merchants, acquirers, and issuers than debit cards.

153.     Payments made through basic ACH transfers offered by The Clearing House or the Federal Reserve are often used for disbursements, paychecks, interbank settlements, and

recurring fixed payments like mortgage and tuition payments. A basic ACH transfer is not reasonably interchangeable for most debit transactions. Absent services created by fintech firms and other payment networks, basic ACH transfers are inconvenient for consumers because they require a burdensome onboarding process in which the consumer must enter his bank account and routing information for each merchant, and then take steps to verify his account, which requires additional input and can take several hours or even days. ACH transfers are inconvenient for merchants because it can take two to three days to determine whether a payment is successful, and such transfers are more subject to fraud. Basic ACH transfers also lack the guarantee of payment for merchants and the dispute resolution and chargeback capabilities for consumers that debit offers. Newer interbank instant payment services, such as the Federal Reserve's FedNow and The Clearing House's RTP, may provide faster payment transfers in the future, but they would require the same additional services from a fintech or other payment network, such as fraud detection, dispute resolution, and chargeback services, to become a viable alternative to debit.

154.    Cash and check payments are not reasonably interchangeable for debit network services. Merchants and accountholders do not view cash and check transactions as reasonably interchangeable with debit transactions. The procedures and costs for accepting and processing cash and check payments differ widely from those for accepting and processing payments directly from the accountholder's bank.

## B.  General Purpose Card-Not-Present Debit Network Services Are a Relevant Product Market

155.    General purpose network services for all debit transactions, where debit credentials are accepted at numerous, unrelated merchants, constitute a relevant market; however, industry participants, including Visa, also categorize debit network services in

narrower markets that are best understood as submarkets of the larger market for debit network services. General purpose card-not-present debit network services are a narrower relevant product market included within the broader general purpose debit network services market. Card-not-present debit network services are primarily utilized for e-commerce transactions.

156.    The general purpose card-not-present debit network services market includes both traditional debit card transactions and fintech debit transactions. Both enable consumers to pay for goods and services at numerous, unrelated merchants directly from the funds in their bank accounts.

157.    General purpose card-not-present debit network services constitutes a relevant product market under the antitrust laws. Few consumers, issuers, merchants, or acquirers would find other payment services to be a suitable substitute for card-not-present debit. In the card-not-present channel, there are even fewer viable forms of payment (for example, cash is not an option) than in the broader general purpose debit network services market. Thus, there are no reasonable substitutes for card-not-present debit, and a firm that was the only seller of general purpose card-not-present debit network services would be able to maintain prices above the level that would prevail in a competitive market.

## X.    VISA HAS MONOPOLY POWER IN THE UNITED STATES DEBIT MARKETS

158.    Visa is a monopolist in the general purpose debit network services and general purpose card-not-present debit network services markets in the United States with market shares of at least 60% and 65%, respectively, by payment volume. Mastercard is the second largest debit network in the United States and processes less than 25% of debit transactions in either

relevant market. No other competitor has more than a single digit share of debit transactions in either market.

159.    Visa has monopoly power in the relevant debit markets because it has the power to control prices and exclude competition in each market.

160.    Visa has been able to maintain monopoly prices as reflected in its high profit margins. Visa has an operating margin of 83% in North America, of which its United States debit business is the largest contributor. These margins are well above Visa's reported high margins globally, since it became a public company in 2007, and much higher than the vast majority of public companies.

161.    Visa has been able to successfully exclude competition in each market, as reflected in its durable high market shares that persist in the face of regulatory changes. After a brief period of adjustment when the Durbin Amendment took effect in 2012, Visa's market shares have increased over the last decade. Immediately after the Durbin Amendment went into effect, Visa's share dropped from approximately 63% of debit payment volume in 2011 to approximately 56% in 2012. But leading up to the implementation of the Durbin Amendment, Visa took steps to insulate its debit business from PIN network competition. Visa began a program of signing contracts with merchants and acquirers to ensure that all or nearly all their Visa-eligible debit volume was routed to Visa. Within a few years, Visa was able to regain and strengthen its debit monopoly. And in subsequent years, it has repeated this playbook in response to each new threat to its debit monopoly.

162.    Similarly, even with the recent Regulation II clarification requiring issuers to enable at least one network unaffiliated with the front-of-card network for card-not-present debit transactions, there has been no meaningful impact to Visa's market shares.

163.    Several additional factors beyond Visa's high margins and durable market shares show that it has monopoly power.

164.    Unlike the smaller PIN networks, Visa and Mastercard are accepted by nearly all United States merchants that accept debit as a form of payment—regardless of whether the merchant derives most of its revenue from card-present or card-not-present sales. Merchants view Visa and Mastercard as must-haves, accepting both networks to maximize their ability to make a sale with whichever debit cards their customers present. This feature of the market for debit transactions increases the power that Visa is able to exercise over merchants. In contrast to more competitive industries, merchants cannot simply walk away from Visa when charged higher prices or given worse terms. In addition, debit networks face barriers to entry and expansion such as regulation and brand recognition.

165.    Merchants and acquirers are more likely to incur the costs of enabling and maintaining compliance with networks that have sufficient volume to make the expense an effort worth it. Similarly, issuers are more likely to enable networks if those networks are widely accepted by merchants. Additionally, Visa recognizes that smaller rivals lack scale—widespread enablement by issuers on their debit cards and acceptance by merchants. Because the market is two-sided, it is difficult to win widespread enablement without widespread acceptance and vice-versa. This creates a feedback loop, known as "network effects," that makes the need for scale a particularly significant barrier to entry and expansion.

166.    Banks generally only issue debit cards under a single front-of-card network, entering long-term contracts with either Visa or Mastercard and infrequently switching between the two, in part because of the cost and consumer disruption associated with switching. These

switching costs further protect Visa's dominance on the front-of-card by inhibiting Mastercard's growth and the potential for other front-of-card competitors to enter or expand.

167.    Visa recognizes and exploits these barriers to entry, including switching costs and network effects, to protect itself from competition from rival networks and potential competitors that may break Visa's stranglehold on United States debit markets. For example, to prevent any PIN network from gaining scale, in 2023, Visa informed issuers they may be required to pay monetary penalties if they enabled new features of rival PIN networks that resulted in the loss of Visa debit network volume. At the time, new regulations from the Federal Reserve mandated that issuers enable at least two unaffiliated networks for card-not-present transactions. Previously, many issuers had relied exclusively on the front-of-card networks— either Visa or Mastercard— to process those transactions. Visa worried that merchants and acquirers would finally enable rival debit networks' PINless capabilities. However, the Federal Reserve's requirement applied only to card-not-present transactions. To slow the enablement of PINless capabilities by merchants and acquirers, Visa began encouraging issuers to turn off PINless capabilities for card-present debit transactions. Among the approved talking points was a reminder that enabling card- present PINless may result in the issuing partner paying higher fees and other penalties. These penalties would serve as a price increase to issuers, one which they could not easily avoid due to the costs of switching networks. Visa's actions to encourage disabling card-present PINless helps Visa increase its set of non-contestable transactions, which it utilizes to create penalties for disloyalty.

168.    Visa is able to set prices without regard to its costs. Visa is also able to price discriminate between various industry groups, and such price discrimination is unrelated to Visa's costs in providing its services to those industry groups.

169.     Moreover, Visa has successfully imposed new, unfavorable pricing structures without losing debit volume. For example, in 2012, Visa implemented its new monthly FANF across all merchants and acquirers. In October 2023, Visa introduced the mandatory Digital Commerce Service fee. This fee bundled several previously optional "value-added services" fees charged to card-not-present transactions. Visa anticipates almost five-times the net revenue from the new mandatory fee than from the previously optional fees. Despite imposing a new fee for merchants through their acquirers, Visa knew it wouldn't lose transactions. Visa sets fees, not based on its costs or competition, but rather "relative to value we provide," i.e., Visa's perception of its own value.

## XI.     PLAINTIFFS AND THE CLASS HAVE BEEN INJURED BY VISA'S CONDUCT

170.     Visa's anticompetitive conduct has caused injury to Plaintiffs and the Class. As a result of Visa's monopolization of general-purpose debit network services and card-not-present debit network services, Class members have paid and continue to pay supercompetitive rack rates and other fees for debit transactions which are billed to them by their acquirer banks.

171.     Class members have also been affected by loss of innovation due to Visa's tactics, which have prevented the development of alternative services for routing debit card transactions, resulting in an overall lack of competition in the provision of those services. This has prevented Class members from being able to choose between Visa and other potential payment providers.

172.     Members of the Class have paid supercompetitive fees Visa for each transaction on Visa's network including both card present and not present transactions.

173.     During the Class Period, members of the Class also paid Visa a fixed monthly fee, known as the **Fixed Acquirer Network Fee** (**FANF**), through their acquirer banks based on

factors like the number of locations operated by the merchant and the volume of the merchant's

card-not-present transactions. Due to Visa's anticompetitive conduct, this fee also exceeded the

amount that Visa would have been able to charge in a competitive market.

## XII.    CLASS ACTION ALLEGATIONS

174.    Plaintiffs bring this action on behalf of themselves and under Federal Rule of

Civil Procedure 23(a), (b)(2), and (b)(3) as representatives of a nationwide class of acquiring

banks defined as:

> All persons, businesses, and other entities in the United States that
> have paid Visa's fees for debit transaction routing services during
> the period from September 24, 2020, through the present. Excluded
> from the class are any persons, businesses, and other entities whose
> claims have been entirely released pursuant to the Superseding and
> Amended Class Settlement Agreement of the Rule 23(b)(3) Class
> Plaintiffs and the Defendants in Case No. 05-MD-1720 (E.D.N.Y.),
> ECF No. 7257-2; Visa; Visa's affiliates and subsidiaries; Visa's
> current or former employees, officers, directors, agents, and
> representatives; the district judge or magistrate judge to whom this
> case is assigned, as well as those judges' immediate family
> members; counsel to Plaintiffs and the proposed classes, as well as
> counsel's employees; and all governmental entities.

175.    The Class is so numerous as to make joinder impracticable. Plaintiffs do not

know the exact number of Class members, but the above-defined class is readily identifiable and

is one for which records should exist in Visa's files. Plaintiffs believe that due to the nature of

the product market, there are millions of members of the Class in the United States.

176.    Common questions of law and fact exist as to all members of the Class and all

members were injured by Visa's anticompetitive conduct, and Visa's anticompetitive conduct is

applicable to all members of the Class, and relief to the Class as a whole is appropriate.

177.    Common issues of fact and law include, among others, the following:

    a.    Whether Visa has monopoly power in a relevant market;

b.    Whether Visa's conduct alleged herein unlawfully maintained Visa's monopoly power;

c.    Whether Visa's conduct alleged herein constitutes exclusionary or predatory behavior;

d.    Whether Visa specifically intended to monopolize a relevant market;

e.    Whether Visa had a dangerous probability of success in monopolizing a relevant market;

f.    Whether Visa's contracts and agreements unreasonably restrained trade in a relevant market;

g.    Whether Visa's conduct alleged herein caused injury to the business or property of the Plaintiffs and other members of the Class;

h.    The amount of class-wide damages.

178.    These and other questions of law or fact, which are common to the members of the Class, predominate over any questions affecting only individual members of the Class.

179.    Plaintiffs' claims are typical of the claims of Class members, and Plaintiffs will fairly and adequately protect the interests of the Class. Plaintiffs and all members of the Class are similarly affected by Visa's unlawful conduct in that they paid artificially inflated prices.

180.    Plaintiffs' claims arise out of the same common course of conduct giving rise to the claims of the other members of the Class. Plaintiffs' interests are coincident with and typical of, and not antagonistic to, those of the other members of the Class.

181.    Plaintiffs have retained counsel with substantial experience litigating complex antitrust class actions in myriad industries and courts throughout the nation.

182.     Visa's anticompetitive conduct impacts members of the Class generally such that injunctive relief is appropriate for the Class as a whole.

183.     The questions of law and fact common to the members of the Class predominate over any questions affecting only individual members, including issues relating to liability and damages.

184.     Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated entities to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, include providing injured entities with a method for obtaining redress for claims that it might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action. Moreover, the prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Visa.

185.     Plaintiffs know of no difficulty likely to be encountered in the maintenance of this action as a class action under Federal Rule of Civil Procedure 23.

## XIII.   VIOLATIONS ALLEGED

### 1.   First Claim for Relief: Monopolization of the Markets for General Purpose Debit Network Services and General Purpose Card-Not-Present Debit Network Services in the United States in Violation of Sherman Act §§ 2 & 3

186.     Plaintiffs incorporate the allegations of paragraphs 1 through 185 above.

187.     Visa has monopolized, in violation of Sherman Act, 15 U.S.C. §§ 2 & 3, two relevant markets related to debit transactions in the United States: (1) the market for general

purpose card-not-present debit network services; and (2) the market for general purpose debit network services.

188.    Visa has monopoly power in both relevant markets. Visa has willfully and unlawfully maintained its monopoly in each relevant market through an exclusionary course of conduct and anticompetitive acts described herein. Each of Visa's actions individually and collectively increased, maintained, or protected its monopoly in each relevant market.

189.    While each of Visa's acts is anticompetitive in its own right, Visa's interrelated and interdependent actions have had a cumulative and self-reinforcing effect that has harmed competition and the competitive process in each relevant market, including, as compared to a more competitive environment, raising barriers to competition by other current and potential competitors, imposing supracompetitive prices, stabilizing prices, depressing price competition, restricting output or other services, and slowing innovation.

190.    Visa's exclusionary conduct lacks a procompetitive justification that offsets the harm caused by Visa's anticompetitive and unlawful conduct.

191.    Visa's exclusionary conduct has caused harm to the Class in the form of higher fees paid to Visa and reduced innovation in the market. These harms entitle the Class to damages and to an injunction to prevent further harm.

**2.    Second Claim for Relief: Attempted Monopolization of the Markets for General Purpose Debit Network Services and General Purpose Debit Card- Not-Present Debit Network Services in the United States in Violation of Sherman Act §§ 2 & 3**

192.    Plaintiffs incorporate the allegations of paragraphs 1 through 185 above.

193.    Visa has attempted to monopolize, in violation of the Sherman Act, 15 U.S.C. §§ 2 & 3, two relevant markets related to debit transactions in the United States: (1) the market for

general purpose card-not-present debit network services; and (2) the market for general purpose debit network services.

194.    Visa has monopoly power, or alternatively has a dangerous probability of obtaining monopoly power, in both relevant markets.

195.    Visa has attempted to monopolize each relevant market through an exclusionary course of conduct and anticompetitive acts described herein. While each of Visa's acts is anticompetitive in its own right, Visa's interrelated and interdependent actions have had a cumulative and self-reinforcing effect that has harmed competition and the competitive process in each relevant market, including, as compared to a more competitive environment, raising barriers to competition by other current and potential competitors, imposing supracompetitive prices, stabilizing prices, depressing price competition, restricting output or other services, and slowing innovation.

196.    In undertaking this course of conduct, Visa has acted with specific intent to monopolize each relevant market in the United States. Each of Visa's actions individually and collectively were specifically intended to monopolize each relevant market in the United States by destroying effective competition in those markets through the acts alleged herein. There is a dangerous probability that, unless restrained, Visa will succeed in monopolizing each market in the United States in violation of Sections 2 and 3 of the Sherman Act.

197.    Visa's exclusionary conduct lacks a procompetitive justification that offsets the harm caused by Visa's anticompetitive and unlawful conduct.

198.    Visa's exclusionary conduct has caused harm to the Class in the form of higher fees paid to Visa and reduced innovation in the market. These harms entitle the Class to damages and to an injunction to prevent further harm.

### 3. Third Claim for Relief: Unlawful Agreements Not to Compete in Violation of Sherman Act §§ 1 & 3

199.    Plaintiffs incorporate the allegations of paragraphs 1 through 185 above.

200.    Visa's agreements with competitors and potential competitors not to compete unreasonably restrain competition, in violation of the Sherman Act, 15 U.S.C. §§ 1 & 3, in two relevant markets related to debit transactions in the United States: (1) the market for general purpose card-not-present debit network services; and (2) the market for general purpose debit network services.

201.    Visa has market power in both relevant markets.

202.    Visa's agreements pay competitors not to compete in each relevant market and pay potential competitors not to develop alternatives to debit card networks or adopt new technologies that may disintermediate traditional debit card networks. These agreements reduce or eliminate competition from existing or potential rivals who would challenge Visa's dominance and thus impede competition and unreasonably restrain trade in each relevant market. Compared to a more competitive environment, the effects of these agreements include raising barriers to competition by current and potential competitors, imposing supracompetitive prices, stabilizing prices, depressing price competition, restricting output or other services, and slowing innovation.

203.    These agreements are not reasonably necessary to accomplish any procompetitive goals. Any procompetitive benefits are outweighed by anticompetitive harm, and there are less restrictive alternatives by which Visa would be able to reasonably achieve any procompetitive goals.

204.    Visa's anticompetitive agreements have caused harm to the Class in the form of higher fees paid to Visa and reduced innovation in the market. These harms entitle the Class to damages and to an injunction to prevent further harm.

### 4.    Fourth Claim for Relief: Unlawful Agreements that Restrain Trade in Violation of Sherman Act §§ 1 & 3

205.    Plaintiffs incorporate the allegations of paragraphs 1 through 185 above.

206.    Visa's agreements with merchants, issuers, and acquirers unreasonably restrain trade, in violation of the Sherman Act, 15 U.S.C. §§ 1 & 3, in two relevant markets related to debit transactions in the United States: (1) the market for general purpose card-not- present debit network services; and (2) the market for general purpose debit network services.

207.    Visa has market power in both relevant markets.

208.    These agreements contain penalties, cliff pricing terms, volume commitments, and other terms that unreasonably restrain competition, including by foreclosing a substantial share of each relevant market. These agreements make it difficult for competition from existing or potential rivals to challenge Visa's dominance and thus impede competition and unreasonably restrain trade in each relevant market. The effects of these agreements include raising barriers to competition by current and potential competitors, imposing supracompetitive prices, stabilizing prices, depressing price competition, reducing output or other services, and slowing innovation.

209.    These agreements are not reasonably necessary to accomplish any procompetitive goals. Any procompetitive benefits are outweighed by anticompetitive harm, and there are less restrictive alternatives by which Visa would be able to reasonably achieve any procompetitive goals.

210.    Visa's anticompetitive agreements have caused harm to the Class in the form of higher fees paid to Visa and reduced innovation in the market. These harms entitle the Class to damages and to an injunction to prevent further harm.

**5. Fifth Claim for Relief: Monopolization of the Relevant Markets for General Purpose Debit Network Services and General Purpose Card-Not-Present Debit Network Services in Violation of the Arizona Uniform State Antitrust Act, Ariz. Rev. Stat. §§ 44-1401, *et seq.* (with respect to Class Members' Purchases in Arizona**

211.    Plaintiffs incorporate the allegations of paragraphs 1 through 185 above.

212.    In violation of Ariz. Rev. Stat. § 44-1403, Visa has willfully and unlawfully maintained its monopoly in the relevant markets through the exclusionary course of conduct and anticompetitive acts described herein. Visa's acts, individually and collectively, increased, maintained, or protected its monopoly in both relevant markets.

213.    Visa's violations of Arizona law were flagrant and willful.

214.    The Class has been injured in its business or property in Arizona by Visa' violations of Ariz. Rev. Stat. § 44-1403.

**6. Sixth Claim for Relief: Attempted Monopolization of the Relevant Markets for General Purpose Debit Network Services and General Purpose Card-Not-Present Debit Network Services in Violation of the Arizona Uniform State Antitrust Act, Ariz. Rev. Stat. §§ 44-1401, *et seq.* (with respect to Class Members' Purchases in Arizona)**

215.    Plaintiffs incorporate the allegations of paragraphs 1 through 185 above.

216.    In violation of Ariz. Rev. Stat. § 44-1403, Visa has attempted to monopolize each of the relevant markets through the exclusionary course of conduct and anticompetitive acts described. Each of Visa's acts is anticompetitive in its own right. Collectively, Visa's actions have a cumulative effect that has harmed competition in each relevant market, including raising barriers to competition by current and potential competitors, imposing supracompetitive prices,

stabilizing those prices, limiting price competition, restricting output and other services, and limiting innovation.

217.    Visa's violations of Arizona law were flagrant and willful.

218.    The Class has been injured in its business or property in Arizona by Visa's violations of Ariz. Rev. Stat. § 44-1403.

**7. Seventh Claim for Relief: Unlawful Agreements Not to Compete in Violation of the Arizona Uniform State Antitrust Act, Ariz. Rev. Stat. §§ 44-1401, *et seq.* (with respect to Class Members' Purchases in Arizona)**

219.    Plaintiffs incorporate the allegations of paragraphs 1 through 185 above.

220.    In violation of Ariz. Rev. Stat. § 44-1402, Visa agreed with competitors and potential competitors Apple, PayPal, and Square not to compete. These agreements unreasonably restrain competition in two relevant markets related to debit transactions in the United States: (1) the market for general purpose card-not-present debit network services, and (2) the market for general purpose debit network services.

221.    Visa's violations of Arizona law were flagrant and willful.

222.    The Class has been injured in its business or property in Arizona by Visa's violations of Ariz. Rev. Stat. § 44-1402.

**8. Eighth Claim for Relief: Unlawful Agreements That Restrain Trade in Violation of the Arizona Uniform State Antitrust Act, Ariz. Rev. Stat. §§ 44-1401, *et seq.* (with respect to Class Members' Purchases in Arizona)**

223.    Plaintiffs incorporate the allegations of paragraphs 1 through 185 above.

224.    In violation of Ariz. Rev. Stat. § 44-1402, Visa's agreements with merchants, issuers, and acquirers unreasonably restrain trade in two relevant markets related to debit transactions in the United States: (1) the market for general purpose card-not-present debit network services, and (2) the market for general purpose debit network services.

225.     Visa's violations of Arizona law were flagrant and willful.

226.    The Class has been injured in its business or property in Arizona by Visa's violations of Ariz. Rev. Stat. § 44-1402.

**9.    Ninth Claim for Relief: Monopolization of the Relevant Markets for General Purpose Debit Network Services and General Purpose Card-Not-Present Debit Network Services in Violation of the California Cartwright Act, Cal. Bus. & Prof. Code §§ 16700, *et seq.*, and §§ 17200, *et seq.* (with respect to Class Members' Purchases in California)**

227.    Plaintiffs incorporate the allegations of paragraphs 1 through 185 above.

228.    Visa has willfully and unlawfully maintained its monopoly in the relevant markets through the exclusionary course of conduct and anticompetitive acts described herein, which constitute illegal "trusts" within the meaning of Cal. Bus. & Prof. Code § 16720. Visa's acts, individually and collectively, increased, maintained, or protected its monopoly in both relevant markets.

229.    Visa's violations of California law were flagrant and willful.

230.    The Class has been injured in its business or property in California by Visa's violations of Cal. Bus. & Prof. Code § 16720.

**10.    Tenth Claim for Relief: Attempted Monopolization of the Relevant Markets for General Purpose Debit Network Services and General Purpose Card-Not-Present Debit Network Services in Violation of the California Cartwright Act, Cal. Bus. & Prof. Code §§ 16700, *et seq.*, and §§17200, *et seq.* (with respect to Class Members' Purchases in California)**

231.    Plaintiffs incorporate the allegations of paragraphs 1 through 185 above.

232.    Visa has attempted to monopolize each of the relevant markets through the exclusionary course of conduct and anticompetitive acts described, which constitute illegal "trusts" within the meaning of Cal. Bus. & Prof. Code § 16720. Each of Visa's acts is anticompetitive in its own right. Collectively, Visa's actions have a cumulative effect that has harmed competition in each relevant market, including raising barriers to competition by current

and potential competitors, imposing supracompetitive prices, stabilizing those prices, limiting

price competition, restricting output and other services, and limiting innovation. Visa's acts,

individually and collectively, increased, maintained, or protected its monopoly in both relevant

markets.

233.    Visa's violations of California law were flagrant and willful.

234.    The Class has been injured in its business or property in California by Visa's

violations of Cal. Bus. & Prof. Code § 16720.

**11.  Eleventh Claim for Relief: Unlawful Agreements Not to Compete in Violation of the California Cartwright Act, Cal. Bus. & Prof. Code §§ 16700, *et seq.*, and §§ 17200, *et seq.* (with respect to Class Members' Purchases in California)**

235.    Plaintiffs incorporate the allegations of paragraphs 1 through 185 above.

236.    Visa entered into agreements that are illegal "trusts," within the meaning of Cal.

Bus. & Prof. Code § 16720, by agreeing with its competitors and potential competitors Apple,

PayPal, and Square not to compete in the relevant markets. These agreements constitute

unreasonable restraints of trade and "combination[s] of capital, skill or acts by two or more

persons" in order to: "create or carry out restrictions in trade or commerce" (§16720(a));

"prevent competition in [the] sale or purchase of merchandise" (§ 16720(c)); and "fix [a]

standard or figure, whereby [the] price" of credit and charge card network services "shall

be…controlled or established" (§16720(d)).

237.    Visa's violations of California law were flagrant and willful.

238.    The Class has been injured in its business or property in California by Visa's

violations of Cal. Bus. & Prof. Code § 16720.

**12.  Twelfth Claim for Relief: Unlawful Agreements That Restrain Trade in Violation of the California Cartwright Act, Cal. Bus. & Prof. Code §§ 16700, *et seq.*, and §§ 17200, *et seq.* (with respect to Class Members'**

Purchases in California)

239.    Plaintiffs incorporate the allegations of paragraphs 1 through 185 above.

240.    Visa entered into agreements with merchants, acquirers, and issuers that are illegal "trusts," within the meaning of Cal. Bus. & Prof. Code § 16720. These agreements constitute unreasonable restraints of trade and "combination[s] of capital, skill or acts by two or more persons" in order to: "create or carry out restrictions in trade or commerce" (§16720(a)); "prevent competition in [the] sale or purchase of merchandise" (§ 16720(c)); and "fix [a] standard or figure, whereby [the] price" of credit and charge card network services "shall be…controlled or established" (§16720(d)).

241.    Visa's violations of California law were flagrant and willful.

242.    The Class has been injured in its business or property in California by Visa's violations of Cal. Bus. & Prof. Code § 16720.

## 13.  Thirteenth Claim for Relief: Violation of California's Unfair Competition Law

243.    Plaintiffs incorporate the allegations of paragraphs 1 through 185 above.

244.    Visa's conduct described above constitutes unfair, unlawful, or fraudulent business acts or practices as proscribed by California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq.* (the "UCL").

245.    Visa's conduct is unethical, unscrupulous, against public policy, and violates fundamental rules of honesty and fair dealing.

Visa's conduct is unfair because it violates Sections 1 and 2 of the Sherman Act, and the California public policy against monopoly.

246.    Visa's conduct is unlawful, as it violates the spirit and letter of Sections 1 and 2 of the Sherman Act, and California's common law prohibition on monopolies.

247.    Plaintiffs and members of the Class lost money because they paid inflated prices for Visa-processed debit transactions, and seek the full extent of restitution available under the UCL.

### 14. Fourteenth Claim for Relief: Monopolization of the Relevant Markets for General Purpose Debit Network Services and General Purpose Card-Not-Present Debit Network Services in Violation of the Colorado Antitrust Act, Colo. Rev. Stat. §§ 6-4-104, *et seq.* (with respect to Class Members' Purchases in Colorado)

248.    Plaintiffs incorporate the allegations of paragraphs 1 through 185 above.

249.    In violation of Colo. Rev. Stat. § 6-4-105, Visa has willfully and unlawfully maintained its monopoly in the relevant markets through the exclusionary course of conduct and anticompetitive acts described herein. Visa's acts, individually and collectively, increased, maintained or protected its monopoly in both relevant markets.

250.    Visa's violations of Colorado law were flagrant and willful.

251.    The Class has been injured in its business or property in Colorado by Visa's violations of Colo. Rev. Stat. § 6-4-105.

### 15. Fifteenth Claim for Relief: Attempted Monopolization of the Relevant Markets for General Purpose Debit Network Services and General Purpose Card-Not-Present Debit Network Services in Violation of the Colorado Antitrust Act, Colo. Rev. Stat. §§ 6-4-104, *et seq.* (with respect to Class Members' Purchases in Colorado)

252.    Plaintiffs incorporate the allegations of paragraphs 1 through 185 above.

253.    In violation of Colo. Rev. Stat. § 6-4-105, Visa has attempted to monopolize each of the relevant markets through the exclusionary course of conduct and anticompetitive acts described. Each of Visa's acts is anticompetitive in its own right. Collectively, Visa's actions have a cumulative effect that has harmed competition in each relevant market, including raising barriers to competition by current and potential competitors, imposing supracompetitive prices,

stabilizing those prices, limiting price competition, restricting output and other services, and limiting innovation.

254.    Visa's violations of Colorado law were flagrant and willful.

255.    The Class has been injured in its business or property in Colorado by Visa's violations of Colo. Rev. Stat. § 6-4-105.

**16.    Sixteenth Claim for Relief: Unlawful Agreements Not to Compete in Violation of the Colorado Antitrust Act, Colo. Rev. Stat. §§ 6-4-104, *et seq.* (with respect to Class Members' Purchases in Colorado)**

256.    Plaintiffs incorporate the allegations of paragraphs 1 through 185 above.

257.    In violation of Colo. Rev. Stat. § 6-4-104, Visa agreed with competitors and potential competitors Apple, PayPal, and Square not to compete. These agreements unreasonably restrain competition in two relevant markets related to debit transactions in the United States: (1) the market for general purpose card-not-present debit network services, and (2) the market for general purpose debit network services.

258.    Visa's violations of Colorado law were flagrant and willful.

259.    The Class has been injured in its business or property in Colorado by Visa's violations of Colo. Rev. Stat. § 6-4-104.

**17.    Seventeenth Claim for Relief: Unlawful Agreements That Restrain Trade in Violation of the Colorado Antitrust Act, Colo. Rev. Stat. §§ 6-4-104, *et seq.* (with respect to Class Members' Purchases in Colorado)**

260.    Plaintiffs incorporate the allegations of paragraphs 1 through 185 above.

261.    In violation of Colo. Rev. Stat. § 6-4-104, Visa's agreements with merchants, issuers, and acquirers unreasonably restrain trade in two relevant markets related to debit transactions in the United States: (1) the market for general purpose card-not-present debit network services, and (2) the market for general purpose debit network services.

262.    Visa's violations of Colorado law were flagrant and willful.

263.    The Class has been injured in its business or property in Colorado by Visa's violations of Colo. Rev. Stat. § 6-4-104.

**18. Eighteenth Claim for Relief: Monopolization of the Relevant Markets for General Purpose Debit Network Services and General Purpose Card-Not-Present Debit Network Services in Violation of the Connecticut Antitrust Act, Conn. Gen. Stat. §§ 35-24, *et seq.* (with respect to Class Members' Purchases in Connecticut)**

264.    Plaintiffs incorporate the allegations of paragraphs 1 through 185 above.

265.    In violation of Conn. Gen. Stat. §§ 35-27, Visa has willfully and unlawfully maintained its monopoly in the relevant markets through the exclusionary course of conduct and anticompetitive acts described herein. Visa's acts, individually and collectively, increased, maintained, or protected its monopoly in both relevant markets.

266.    Visa's violations of Connecticut law were flagrant and willful.

267.    The Class has been injured in its business or property in Connecticut by Visa's violations of Conn. Gen. Stat. §§ 35-27.

**19. Nineteenth Claim for Relief: Attempted Monopolization of the Relevant Markets for General Purpose Debit Network Services and General Purpose Card-Not-Present Debit Network Services in Violation of the Connecticut Antitrust Act, Conn. Gen. Stat. §§ 35-24, *et seq.* (with respect to Class Members' Purchases in Connecticut)**

268.    Plaintiffs incorporate the allegations of paragraphs 1 through 185 above.

269.    In violation of Conn. Gen. Stat. §§ 35-27, Visa has attempted to monopolize each of the relevant markets through the exclusionary course of conduct and anticompetitive acts described. Each of Visa's acts is anticompetitive in its own right. Collectively, Visa's actions have a cumulative effect that has harmed competition in each relevant market, including raising barriers to competition by current and potential competitors, imposing supracompetitive prices, stabilizing those prices, limiting price competition, restricting output and other services, and limiting innovation.

270.    Visa's violations of Connecticut law were flagrant and willful.

271.    The Class has been injured in its business or property in Connecticut by Visa's violations of Conn. Gen. Stat. §§ 35-27.

**20.    Twentieth Claim for Relief: Unlawful Agreements Not to Compete in Violation of the Connecticut Antitrust Act, Conn. Gen. Stat. §§ 35-24, *et seq.* (with respect to Class Members' Purchases in Connecticut)**

272.    Plaintiffs incorporate the allegations of paragraphs 1 through 185 above.

273.    In violation of Conn. Gen. Stat. §§ 35-26, Visa agreed with competitors and potential competitors Apple, PayPal, and Square not to compete. These agreements unreasonably restrain competition in two relevant markets related to debit transactions in the United States: (1) the market for general purpose card-not-present debit network services, and (2) the market for general purpose debit network services.

274.    Visa's violations of Connecticut law were flagrant and willful.

275.    The Class has been injured in its business or property in Connecticut by Visa's violations of Conn. Gen. Stat. §§ 35-26.

**21.    Twenty-First Claim for Relief: Unlawful Agreements That Restrain Trade in Violation of the Connecticut Antitrust Act, Conn. Gen. Stat. §§ 35-24, *et seq.* (with respect to Class Members' Purchases in Connecticut)**

276.    Plaintiffs incorporate the allegations of paragraphs 1 through 185 above.

277.    In violation of Conn. Gen. Stat. §§ 35-26, Visa's agreements with merchants, issuers, and acquirers unreasonably restrain trade in two relevant markets related to debit transactions in the United States: (1) the market for general purpose card-not-present debit network services, and (2) the market for general purpose debit network services.

278.    Visa's violations of Connecticut law were flagrant and willful.

279.    The Class has been injured in its business or property in Connecticut by Visa's violations of Conn. Gen. Stat. §§ 35-26.

22. **Twenty-Second Claim for Relief: Monopolization of the Relevant Markets for General Purpose Debit Network Services and General Purpose Card-Not-Present Debit Network Services in Violation of the District of Columbia Antitrust Act, D.C. Code §§ 28-4501, *et seq.* (with respect to Class Members' Purchases in the District of Columbia)**

280.    Plaintiffs incorporate the allegations of paragraphs 1 through 185 above.

281.    In violation of D.C. Code §§ 28-4503, Visa has willfully and unlawfully maintained its monopoly in the relevant markets through the exclusionary course of conduct and anticompetitive acts described herein. Visa's acts, individually and collectively, increased, maintained, or protected its monopoly in both relevant markets.

282.    Visa's violations of District of Columbia law were flagrant and willful.

283.    The Class has been injured in its business or property in the District of Columbia by Visa's violations of D.C. Code §§ 28-4503.

23. **Twenty-Third Claim for Relief: Attempted Monopolization of the Relevant Markets for General Purpose Debit Network Services and General Purpose Card-Not-Present Debit Network Services in Violation of the District of Columbia Antitrust Act, D.C. Code §§ 28-4501, *et seq.* (with respect to Class Members' Purchases in the District of Columbia)**

284.    Plaintiffs incorporate the allegations of paragraphs 1 through 185 above.

285.    In violation of D.C. Code §§ 28-4503, Visa has attempted to monopolize each of the relevant markets through the exclusionary course of conduct and anticompetitive acts described. Each of Visa's acts is anticompetitive in its own right. Collectively, Visa's actions have a cumulative effect that has harmed competition in each relevant market, including raising barriers to competition by current and potential competitors, imposing supracompetitive prices, stabilizing those prices, limiting price competition, restricting output and other services, and limiting innovation.

286.    Visa's violations of District of Columbia law were flagrant and willful.

287.    The Class has been injured in its business or property in the District of Columbia by Visa's violations of D.C. Code §§ 28-4503.

**24. Twenty-Fourth Claim for Relief: Unlawful Agreements Not to Compete in Violation of the District of Columbia Antitrust Act, D.C. Code §§ 28-4501, *et seq.* (with respect to Class Members' Purchases in the District of Columbia)**

288.    Plaintiffs incorporate the allegations of paragraphs 1 through 185 above.

289.    In violation of D.C. Code §§ 28-4502, Visa agreed with competitors and potential competitors Apple, PayPal, and Square not to compete. These agreements unreasonably restrain competition in two relevant markets related to debit transactions in the United States: (1) the market for general purpose card-not-present debit network services, and (2) the market for general purpose debit network services.

290.    Visa's violations of District of Columbia law were flagrant and willful.

291.    The Class has been injured in its business or property in the District of Columbia by Visa's violations of D.C. Code §§ 28-4502.

**25. Twenty-Fifth Claim for Relief: Unlawful Agreements That Restrain Trade in Violation of the District of Columbia Antitrust Act, D.C. Code §§ 28-4501, et seq. (with respect to Class Members' Purchases in the District of Columbia)**

292.    Plaintiffs incorporate the allegations of paragraphs 1 through 185 above.

293.    In violation of D.C. Code §§ 28-4502, Visa's agreements with merchants, issuers, and acquirers unreasonably restrain trade in two relevant markets related to debit transactions in the United States: (1) the market for general purpose card-not-present debit network services, and (2) the market for general purpose debit network services.

294.    Visa's violations of District of Columbia law were flagrant and willful.

295.    The Class has been injured in its business or property in the District of Columbia by Visa's violations of Conn. Gen. Stat. §§ 35-26.

**26. Twenty-Sixth Claim for Relief: Monopolization of the Relevant Markets for General Purpose Debit Network Services and General Purpose Card-Not-Present Debit Network Services in Violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201, *et seq.* (with respect to Class Members' Purchases in Florida)**

296.     Plaintiffs incorporate the allegations of paragraphs 1 through 185 above.

297.     In violation of Fla. Stat. § 501.204, Visa has willfully and unlawfully maintained its monopoly in the relevant markets through the exclusionary course of conduct and anticompetitive acts described herein. Visa's acts, individually and collectively, increased, maintained, or protected its monopoly in both relevant markets.

298.     Visa's violations of Florida law were flagrant and willful.

299.     The Class has been injured in its business or property in Florida by Visa's violations of Fla. Stat. § 501.204.

**27. Twenty-Seventh Claim for Relief: Attempted Monopolization of the Relevant Markets for General Purpose Debit Network Services and General Purpose Card-Not-Present Debit Network Services in Violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201, *et seq.* (with respect to Class Members' Purchases in Florida)**

300.     Plaintiffs incorporate the allegations of paragraphs 1 through 185 above.

301.     In violation of Fla. Stat. § 501.204, Visa has attempted to monopolize each of the relevant markets through the exclusionary course of conduct and anticompetitive acts described. Each of Visa's acts is anticompetitive in its own right. Collectively, Visa's actions have a cumulative effect that has harmed competition in each relevant market, including raising barriers to competition by current and potential competitors, imposing supracompetitive prices, stabilizing those prices, limiting price competition, restricting output and other services, and limiting innovation.

302.     Visa's violations of Florida law were flagrant and willful.

303.    The Class has been injured in its business or property in Florida by Visa's violations of Fla. Stat. § 501.204.

**28. Twenty-Eighth Claim for Relief: Unlawful Agreements Not to Compete in Violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201, *et seq.* (with respect to Class Members' Purchases in Florida)**

304.    Plaintiffs incorporate the allegations of paragraphs 1 through 185 above.

305.    In violation of Fla. Stat. § 501.204, Visa agreed with competitors and potential competitors Apple, PayPal, and Square not to compete. These agreements unreasonably restrain competition in two relevant markets related to debit transactions in the United States: (1) the market for general purpose card-not-present debit network services, and (2) the market for general purpose debit network services.

306.    Visa's violations of Florida law were flagrant and willful.

307.    The Class has been injured in its business or property in Florida by Visa's violations of Fla. Stat. § 501.204.

**29. Twenty-Ninth Claim for Relief: Unlawful Agreements That Restrain Trade in Violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201, *et seq.* (with respect to Class Members' Purchases in Florida)**

308.    Plaintiffs incorporate the allegations of paragraphs 1 through 185 above.

309.    In violation of Fla. Stat. § 501.204, Visa's agreements with merchants, issuers, and acquirers unreasonably restrain trade in two relevant markets related to debit transactions in the United States: (1) the market for general purpose card-not-present debit network services, and (2) the market for general purpose debit network services.

310.    Visa's violations of Florida law were flagrant and willful.

311.    The Class has been injured in its business or property in Florida by Visa's violations of Fla. Stat. § 501.204.

**30. Thirtieth Claim for Relief: Monopolization of the Relevant Markets for General Purpose Debit Network Services and General Purpose Card-Not-Present Debit Network Services in Violation of the Hawaii Antitrust Statute, Haw. Rev. Stat. §§ 480-1, *et seq.* (with respect to Class Members' Purchases in Hawaii)**

312.    Plaintiffs incorporate the allegations of paragraphs 1 through 185 above.

313.    In violation of Haw. Rev. Stat. § 480-9, Visa has willfully and unlawfully maintained its monopoly in the relevant markets through the exclusionary course of conduct and anticompetitive acts described herein. Visa's acts, individually and collectively, increased, maintained, or protected its monopoly in both relevant markets.

314.    Visa's violations of Hawaii law were flagrant and willful.

315.    The Class has been injured in its business or property in Hawaii by Visa's violations of Haw. Rev. Stat. § 480-9.

**31. Thirty-First Claim for Relief: Attempted Monopolization of the Relevant Markets for General Purpose Debit Network Services and General Purpose Card-Not-Present Debit Network Services in Violation of the Hawaii Antitrust Statute, Haw. Rev. Stat. §§ 480-1, *et seq.* (with respect to Class Members' Purchases in Hawaii)**

316.    Plaintiffs incorporate the allegations of paragraphs 1 through 185 above.

317.    In violation of Haw. Rev. Stat. § 480-9, Visa has attempted to monopolize each of the relevant markets through the exclusionary course of conduct and anticompetitive acts described. Each of Visa's acts is anticompetitive in its own right. Collectively, Visa's actions have a cumulative effect that has harmed competition in each relevant market, including raising barriers to competition by current and potential competitors, imposing supracompetitive prices, stabilizing those prices, limiting price competition, restricting output and other services, and limiting innovation.

318.    Visa's violations of Hawaii law were flagrant and willful.

319.    The Class has been injured in its business or property in Hawaii by Visa's

violations of Haw. Rev. Stat. § 480-9.

**32. Thirty-Second Claim for Relief: Unlawful Agreements Not to Compete in Violation of the Hawaii Antitrust Statute, Haw. Rev. Stat. §§ 480-1, *et seq.* (with respect to Class Members' Purchases in Hawaii)**

320.    Plaintiffs incorporate the allegations of paragraphs 1 through 185 above.

321.    In violation of Haw. Rev. Stat. § 480-4, Visa agreed with competitors and potential competitors Apple, PayPal, and Square not to compete. These agreements unreasonably restrain competition in two relevant markets related to debit transactions in the United States: (1) the market for general purpose card-not-present debit network services, and (2) the market for general purpose debit network services.

322.    Visa's violations of Hawaii law were flagrant and willful.

323.    The Class has been injured in its business or property in Hawaii by Visa's violations of Haw. Rev. Stat. § 480-4.

**33. Thirty-Third Claim for Relief: Unlawful Agreements That Restrain Trade in Violation of the Hawaii Antitrust Statute, Haw. Rev. Stat. §§ 480-1, *et seq.* (with respect to Class Members' Purchases in Hawaii)**

324.    Plaintiffs incorporate the allegations of paragraphs 1 through 185 above.

325.    In violation of Haw. Rev. Stat. § 480-4, Visa's agreements with merchants, issuers, and acquirers unreasonably restrain trade in two relevant markets related to debit transactions in the United States: (1) the market for general purpose card-not-present debit network services, and (2) the market for general purpose debit network services.

326.    Visa's violations of Hawaii law were flagrant and willful.

327.    The Class has been injured in its business or property in Hawaii by Visa's violations of Haw. Rev. Stat. § 480-4.

**34. Thirty-Fourth Claim for Relief: Monopolization of the Relevant Markets for General Purpose Debit Network Services and General Purpose Card-Not-Present Debit Network Services in Violation of the**

**Illinois Antitrust Act, 740 Ill. Comp. Stat. 10/1, *et seq.* (with respect to Class Members' Purchases in Illinois)**

328.    Plaintiffs incorporate the allegations of paragraphs 1 through 185 above.

329.    In violation of 740 Ill. Comp. Stat. 10/3, Visa has willfully and unlawfully maintained its monopoly in the relevant markets through the exclusionary course of conduct and anticompetitive acts described herein. Visa's acts, individually and collectively, increased, maintained, or protected its monopoly in both relevant markets. Visa maintained monopoly power over a substantial part of trade or commerce of Illinois for the purpose of excluding competition and controlling, fixing, or maintaining prices in such trade or commerce.

330.    Visa's violations of Illinois law were flagrant and willful.

331.    The Class has been injured in its business or property in Illinois by Visa's violations of 740 Ill. Comp. Stat. 10/3.

**35.    Thirty-Fifth Claim for Relief: Attempted Monopolization of the Relevant Markets for General Purpose Debit Network Services and General Purpose Card-Not-Present Debit Network Services in Violation of the Illinois Antitrust Act, 740 Ill. Comp. Stat. 10/1, *et seq.* (with respect to Class Members' Purchases in Illinois)**

332.    Plaintiffs incorporate the allegations of paragraphs 1 through 185 above.

333.    In violation of 740 Ill. Comp. Stat. 10/3, Visa has attempted to monopolize each of the relevant markets through the exclusionary course of conduct and anticompetitive acts described. Each of Visa's acts is anticompetitive in its own right. Collectively, Visa's actions have a cumulative effect that has harmed competition in each relevant market, including raising barriers to competition by current and potential competitors, imposing supracompetitive prices, stabilizing those prices, limiting price competition, restricting output and other services, and limiting innovation. Visa attempted to monopolize a substantial part of trade or commerce of Illinois for the purpose of excluding competition and controlling, fixing, or maintaining prices in

such trade or commerce.

334.    Visa's violations of Illinois law were flagrant and willful.

335.    The Class has been injured in its business or property in Illinois by Visa's violations of 740 Ill. Comp. Stat. 10/3.

**36.  Thirty-Sixth Claim for Relief: Unlawful Agreements Not to Compete in Violation of the Illinois Antitrust Act, 740 Ill. Comp. Stat. 10/1,** *et seq.* **(with respect to Class Members' Purchases in Illinois)**

336.    Plaintiffs incorporate the allegations of paragraphs 1 through 185 above.

337.    In violation of 740 Ill. Comp. Stat. 10/3, Visa agreed with competitors and potential competitors Apple, PayPal, and Square not to compete. These agreements unreasonably restrain competition in two relevant markets related to debit transactions in the United States: (1) the market for general purpose card-not-present debit network services, and (2) the market for general purpose debit network services.

338.    Visa made contracts with, or engaged in combinations or conspiracies with, other persons who are, or but for a prior agreement would be, a competitor of such person for the purpose or with the effect of fixing, controlling or maintaining the price or rate charged for any fee charged or paid for debit network services performed by the parties thereto in Illinois.

339.    Visa fixed, controlled or maintained the sale or supply of debit network services, for the purpose or with the effect of fixing, controlling or maintaining the price or rate charged or paid for debit network services in Illinois.

340.    By contract, combination or conspiracy, Visa unreasonably restrained trade or commerce for debit network services in Illinois.

341.    Visa's violations of Illinois law were flagrant and willful.

342.    The Class has been injured in its business or property in Illinois by Visa's violations of 740 Ill. Comp. Stat. 10/3.

**37. Thirty-Seventh Claim for Relief: Unlawful Agreements That Restrain Trade in Violation of the Illinois Antitrust Act, 740 Ill. Comp. Stat. 10/1, *et seq.* (with respect to Class Members' Purchases in Illinois)**

343.    Plaintiffs incorporate the allegations of paragraphs 1 through 185 above.

344.    In violation of 740 Ill. Comp. Stat. 10/3, Visa's agreements with merchants, issuers, and acquirers unreasonably restrain trade in two relevant markets related to debit transactions in the United States: (1) the market for general purpose card-not-present debit network services, and (2) the market for general purpose debit network services.

345.    Visa made contracts with, or engaged in combinations or conspiracies with, other persons who are, or but for a prior agreement would be, a competitor of such person for the purpose or with the effect of fixing, controlling or maintaining the price or rate charged for any fee charged or paid for debit network services performed by the parties thereto in Illinois.

346.    Visa fixed, controlled or maintained the sale or supply of debit network services, for the purpose or with the effect of fixing, controlling or maintaining the price or rate charged or paid for debit network services in Illinois.

347.    By contract, combination or conspiracy, Visa unreasonably restrained trade or commerce for debit network services in Illinois.

348.    Visa's violations of Illinois law were flagrant and willful.

349.    The Class has been injured in its business or property in Illinois by Visa's violations of 740 Ill. Comp. Stat. 10/3.

**38. Thirty-Eighth Claim for Relief: Monopolization of the Relevant Markets for General Purpose Debit Network Services and General Purpose Card-Not-Present Debit Network Services in Violation of the Iowa Competition Law, Iowa Code §§ 553.1, *et seq.* (with respect to Class Members' Purchases in Iowa)**

350.    Plaintiffs incorporate the allegations of paragraphs 1 through 185 above.

351.    In violation of Iowa Code §§ 553.5, Visa has willfully and unlawfully maintained

its monopoly in the relevant markets through the exclusionary course of conduct and

anticompetitive acts described herein. Visa's acts, individually and collectively, increased,

maintained, or protected its monopoly in both relevant markets.

352.    Visa's violations of Iowa law were flagrant and willful.

353.    The Class has been injured in its business or property in Iowa by Visa's violations

of Iowa Code §§ 553.5.

### 39.    Thirty-Ninth Claim for Relief: Attempted Monopolization of the Relevant Markets for General Purpose Debit Network Services and General Purpose Card-Not-Present Debit Network Services in Violation of the Iowa Competition Law, Iowa Code §§ 553.1, *et seq.* (with respect to Class Members' Purchases in Iowa)

354.    Plaintiffs incorporate the allegations of paragraphs 1 through 185 above.

355.    In violation of Iowa Code §§ 553.5, Visa has attempted to monopolize each of the

relevant markets through the exclusionary course of conduct and anticompetitive acts described.

Each of Visa's acts is anticompetitive in its own right. Collectively, Visa's actions have a

cumulative effect that has harmed competition in each relevant market, including raising barriers

to competition by current and potential competitors, imposing supracompetitive prices,

stabilizing those prices, limiting price competition, restricting output and other services, and

limiting innovation.

356.    Visa's violations of Iowa law were flagrant and willful.

357.    The Class has been injured in its business or property in Iowa by Visa's violations

of Iowa Code §§ 553.5.

### 40.    Fortieth Claim for Relief: Unlawful Agreements Not to Compete in Violation of the Iowa Competition Law, Iowa Code §§ 553.1, *et seq.* (with respect to Class Members' Purchases in Iowa)

358.    Plaintiffs incorporate the allegations of paragraphs 1 through 185 above.

359.     In violation of Iowa Code §§ 553.4, Visa agreed with competitors and potential competitors Apple, PayPal, and Square not to compete. These agreements unreasonably restrain competition in two relevant markets related to debit transactions in the United States: (1) the market for general purpose card-not-present debit network services, and (2) the market for general purpose debit network services. Visa entered into contracts, combinations and conspiracies with others that unreasonably restrained trade or commerce in the market for debit network services in Iowa.

360.     Visa's violations of Iowa law were flagrant and willful.

361.     The Class has been injured in its business or property in Iowa by Visa's violations of Iowa Code §§ 553.4.

### 41. Forty-First Claim for Relief: Unlawful Agreements That Restrain Trade in Violation of the Iowa Competition Law, Iowa Code §§ 553.1, *et seq.* (with respect to Class Members' Purchases in Iowa)

362.     Plaintiffs incorporate the allegations of paragraphs 1 through 185 above.

363.     In violation of Iowa Code §§ 553.4, Visa's agreements with merchants, issuers, and acquirers unreasonably restrain trade in two relevant markets related to debit transactions in the United States: (1) the market for general purpose card-not-present debit network services, and (2) the market for general purpose debit network services. Visa entered into contracts, combinations and conspiracies with others that unreasonably restrained trade or commerce in the market for debit network services in Iowa.

364.     Visa's violations of Iowa law were flagrant and willful.

365.     The Class has been injured in its business or property in Iowa by Visa's violations of Iowa Code §§ 553.4.

### 42. Forty-Second Claim for Relief: Monopolization of the Relevant Markets for General Purpose Debit Network Services and General Purpose Card-Not-Present Debit Network Services in Violation of the Kansas

**Restraint of Trade Act, Kan. Stat. Ann. §§ 50-101, *et seq.* (with respect to Class Members' Purchases in Kansas)**

366.    Plaintiffs incorporate the allegations of paragraphs 1 through 185 above.

367.    In violation of Kan. Stat. Ann. §§ 50-101, *et seq.*, Visa has willfully and unlawfully maintained its monopoly in the relevant markets through the exclusionary course of conduct and anticompetitive acts described herein. Visa's acts, individually and collectively, increased, maintained, or protected its monopoly in both relevant markets. Visa entered into arrangements, contracts, agreements, trust or combinations between others made with a view toward preventing or which tend to prevent full and free competition for the provision of debit network services in Kansas.

368.    Visa's violations of Kansas law were flagrant and willful.

369.    The Class has been injured in its business or property in Kansas by Visa's violations of Kan. Stat. Ann. §§ 50-101, *et seq*.

**43.  Forty-Third Claim for Relief: Attempted Monopolization of the Relevant Markets for General Purpose Debit Network Services and General Purpose Card-Not-Present Debit Network Services in Violation of the Kansas Restraint of Trade Act, Kan. Stat. Ann. §§ 50-101, *et seq.* (with respect to Class Members' Purchases in Kansas)**

370.    Plaintiffs incorporate the allegations of paragraphs 1 through 185 above.

371.    In violation of Kan. Stat. Ann. §§ 50-101, *et seq*., Visa has attempted to monopolize each of the relevant markets through the exclusionary course of conduct and anticompetitive acts described. Each of Visa's acts is anticompetitive in its own right. Collectively, Visa's actions have a cumulative effect that has harmed competition in each relevant market, including raising barriers to competition by current and potential competitors, imposing supracompetitive prices, stabilizing those prices, limiting price competition, restricting output and other services, and limiting innovation. Visa entered into arrangements, contracts,

agreements, trust or combinations between others made with a view toward preventing or which tend to prevent full and free competition for the provision of debit network services in Kansas.

372.    Visa's violations of Kansas law were flagrant and willful.

373.    The Class has been injured in its business or property in Kansas by Visa's violations of Kan. Stat. Ann. §§ 50-101, *et seq.*

### 44.    Forty-Fourth Claim for Relief: Unlawful Agreements Not to Compete in Violation of the Kansas Restraint of Trade Act, Kan. Stat. Ann. §§ 50-101, *et seq.* (with respect to Class Members' Purchases in Kansas)

374.    Plaintiffs incorporate the allegations of paragraphs 1 through 185 above.

375.    In violation of Kan. Stat. Ann. §§ 50-101, *et seq.*, Visa agreed with competitors and potential competitors Apple, PayPal, and Square not to compete. These agreements unreasonably restrain competition in two relevant markets related to debit transactions in the United States: (1) the market for general purpose card-not-present debit network services, and (2) the market for general purpose debit network services. Visa entered into arrangements, contracts, agreements, trust or combinations between others made with a view toward preventing or which tend to prevent full and free competition for the provision of debit network services in Kansas.

376.    Visa's violations of Kansas law were flagrant and willful.

377.    The Class has been injured in its business or property in Kansas by Visa's violations of Kan. Stat. Ann. §§ 50-101, *et seq.*

### 45.    Forty-Fifth Claim for Relief: Unlawful Agreements That Restrain Trade in Violation of the Kansas Restraint of Trade Act, Kan. Stat. Ann. §§ 50-101, *et seq.* (with respect to Class Members' Purchases in Kansas)

378.    Plaintiffs incorporate the allegations of paragraphs 1 through 185 above.

379.    In violation of Kan. Stat. Ann. §§ 50-101, *et seq.*, Visa's agreements with merchants, issuers, and acquirers unreasonably restrain trade in two relevant markets related to debit transactions in the United States: (1) the market for general purpose card-not-present debit

network services, and (2) the market for general purpose debit network services. Visa entered into contracts, combinations and conspiracies with others that unreasonably restrained trade or commerce in the market for debit network services in Iowa. Visa entered into arrangements, contracts, agreements, trust or combinations between others made with a view toward preventing or which tend to prevent full and free competition for the provision of debit network services in Kansas.

380.    Visa's violations of Kansas law were flagrant and willful.

381.    The Class has been injured in its business or property in Kansas by Visa violations of Kan. Stat. Ann. §§ 50-101, *et seq.*

**46.    Forty-Sixth Claim for Relief: Monopolization of the Relevant Markets for General Purpose Debit Network Services and General Purpose Card-Not-Present Debit Network Services in Violation of Maine's Monopolies and Profiteering Law, Me. Rev. Stat. Ann. tit. 10, §§ 1101, *et seq.* (with respect to Class Members' Purchases in Maine)**

382.    Plaintiffs incorporate the allegations of paragraphs 1 through 185 above.

383.    In violation of Me. Rev. Stat. Ann. tit. 10, § 1102, Visa has willfully and unlawfully maintained its monopoly in the relevant markets through the exclusionary course of conduct and anticompetitive acts described herein. Visa's acts, individually and collectively, increased, maintained, or protected its monopoly in both relevant markets.

384.    Visa's violations of Maine law were flagrant and willful.

385.    The Class has been injured in its business or property in Maine by Visa's violations of Me. Rev. Stat. Ann. tit. 10, § 1102.

**47.    Forty-Seventh Claim for Relief: Attempted Monopolization of the Relevant Markets for General Purpose Debit Network Services and General Purpose Card-Not-Present Debit Network Services in Violation of Maine's Monopolies and Profiteering Law, Me. Rev. Stat. Ann. tit. 10, §§ 1101, *et seq.* (with respect to Class Members' Purchases in Maine)**

386.    Plaintiffs incorporate the allegations of paragraphs 1 through 185 above.

387.    In violation of Me. Rev. Stat. Ann. tit. 10, § 1102, Visa has attempted to

monopolize each of the relevant markets through the exclusionary course of conduct and

anticompetitive acts described. Each of Visa's acts is anticompetitive in its own right.

Collectively, Visa's actions have a cumulative effect that has harmed competition in each

relevant market, including raising barriers to competition by current and potential competitors,

imposing supracompetitive prices, stabilizing those prices, limiting price competition, restricting

output and other services, and limiting innovation.

388.    Visa's violations of Maine law were flagrant and willful.

389.    The Class has been injured in its business or property in Maine by Visa's

violations of Me. Rev. Stat. Ann. tit. 10, § 1102.

**48.    Forty-Eighth Claim for Relief: Unlawful Agreements Not to Compete in Violation of Maine's Monopolies and Profiteering Law, Me. Rev. Stat. Ann. tit. 10, §§ 1101, *et seq.* (with respect to Class Members' Purchases in Maine)**

390.    Plaintiffs incorporate the allegations of paragraphs 1 through 185 above.

391.    In violation of Me. Rev. Stat. Ann. tit. 10, § 1101, Visa agreed with competitors

and potential competitors Apple, PayPal, and Square not to compete. These agreements

unreasonably restrain competition in two relevant markets related to debit transactions in the

United States: (1) the market for general purpose card-not-present debit network services, and (2)

the market for general purpose debit network services.

392.    Visa's violations of Maine law were flagrant and willful.

393.    The Class has been injured in its business or property in Maine by Visa's

violations of Me. Rev. Stat. Ann. tit. 10, § 1101.

**49.    Forty-Ninth Claim for Relief: Unlawful Agreements That Restrain Trade in Violation of Maine's Monopolies and Profiteering Law, Me. Rev. Stat. Ann. tit. 10, §§ 1101, *et seq.* (with respect to Class Members' Purchases in Maine)**

394.    Plaintiffs incorporate the allegations of paragraphs 1 through 185 above.

395.    In violation of Me. Rev. Stat. Ann. tit. 10, § 1101, Visa's agreements with merchants, issuers, and acquirers unreasonably restrain trade in two relevant markets related to debit transactions in the United States: (1) the market for general purpose card-not-present debit network services, and (2) the market for general purpose debit network services.

396.    Visa's violations of Maine law were flagrant and willful.

397.    The Class has been injured in its business or property in Maine by Visa's violations of Me. Rev. Stat. Ann. tit. 10, § 1101.

## 50.    Fiftieth Claim for Relief: Monopolization of the Relevant Markets for General Purpose Debit Network Services and General Purpose Card-Not-Present Debit Network Services in Violation of the Maryland Antitrust Act, Md. Code Com. Law § 11-201, *et seq*. (with respect to Class Members' Purchases in Maryland)

398.    Plaintiffs incorporate the allegations of paragraphs 1 through 185 above.

399.    In violation of Md. Code Com. Law § 11-204, Visa has willfully and unlawfully maintained its monopoly in the relevant markets through the exclusionary course of conduct and anticompetitive acts described herein. Visa's acts, individually and collectively, increased, maintained, or protected its monopoly in both relevant markets. Visa has monopolized part of the trade or commerce within Maryland, for the purpose of excluding competition or of controlling, fixing, or maintaining prices in trade or commerce.

400.    Visa's violations of Maryland law were flagrant and willful.

401.    The Class has been injured in its business or property in Maryland by Visa's violations of Md. Code Com. Law § 11-204

## 51.    Fifty-First Claim for Relief: Attempted Monopolization of the Relevant Markets for General Purpose Debit Network Services and General Purpose Card-Not-Present Debit Network Services in Violation of the Maryland Antitrust Act, Md. Code Com. Law § 11-201, *et seq.* (with respect to Class Members' Purchases in Maryland)

402.    Plaintiffs incorporate the allegations of paragraphs 1 through 185 above.

403.    In violation of Md. Code Com. Law § 11-204, Visa has attempted to monopolize each of the relevant markets through the exclusionary course of conduct and anticompetitive acts described. Each of Visa's acts is anticompetitive in its own right. Collectively, Visa's actions have a cumulative effect that has harmed competition in each relevant market, including raising barriers to competition by current and potential competitors, imposing supracompetitive prices, stabilizing those prices, limiting price competition, restricting output and other services, and limiting innovation. Visa has attempted to monopolize part of the trade or commerce within Maryland, for the purpose of excluding competition or of controlling, fixing, or maintaining prices in trade or commerce.

404.    Visa's violations of Maryland law were flagrant and willful.

405.    The Class has been injured in its business or property in Maryland by Visa's violations of Md. Code Com. Law § 11-204.

**52.  Fifty-Second Claim for Relief: Unlawful Agreements Not to Compete in Violation of the Maryland Antitrust Act, Md. Code Com. Law § 11-201, _et seq._ (with respect to Class Members' Purchases in Maryland)**

406.    Plaintiffs incorporate the allegations of paragraphs 1 through 185 above.

407.    In violation of Md. Code Com. Law § 11-204, Visa agreed with competitors and potential competitors Apple, PayPal, and Square not to compete. These agreements unreasonably restrain competition in two relevant markets related to debit transactions in the United States: (1) the market for general purpose card-not-present debit network services, and (2) the market for general purpose debit network services.

408.    Visa's violations of Maryland law were flagrant and willful.

409.    The Class has been injured in its business or property in Maryland by Visa's

violations of Md. Code Com. Law § 11-204.

**53. Fifty-Third Claim for Relief: Unlawful Agreements That Restrain Trade in Violation of the Maryland Antitrust Act, Md. Code Com. Law § 11-201, *et seq.* (with respect to Class Members' Purchases in Maryland)**

410.    Plaintiffs incorporate the allegations of paragraphs 1 through 185 above.

411.    In violation of Md. Code Com. Law § 11-204, Visa's agreements with merchants, issuers, and acquirers unreasonably restrain trade in two relevant markets related to debit transactions in the United States: (1) the market for general purpose card-not-present debit network services, and (2) the market for general purpose debit network services.

412.    Visa's violations of Maryland law were flagrant and willful.

413.    The Class has been injured in its business or property in Maryland by Visa's violations of Md. Code Com. Law § 11-204.

**54. Fifty-Fourth Claim for Relief: Monopolization of the Relevant Markets for General Purpose Debit Network Services and General Purpose Card-Not-Present Debit Network Services in Violation of the Massachusetts Consumer Protection Act, Mass. Gen. Laws. Ch. 93A § 1, *et seq.* (with respect to Class Members' Purchases in Massachusetts)**

414.    Plaintiffs incorporate the allegations of paragraphs 1 through 185 above.

415.    In violation of Mass. Gen. Laws. Ch. 93A § 2, Visa has willfully and unlawfully maintained its monopoly in the relevant markets through the exclusionary course of conduct and anticompetitive acts described herein. Visa's acts, individually and collectively, increased, maintained, or protected its monopoly in both relevant markets. Visa has monopolized part of the trade or commerce within Massachusetts, for the purpose of excluding competition or of controlling, fixing, or maintaining prices in trade or commerce.

416.    Visa's violations of Massachusetts law were flagrant and willful.

417.    The Class has been injured in its business or property in Massachusetts by Visa's violations of Mass. Gen. Laws. Ch. 93A § 2.

**55. Fifty-Fifth Claim for Relief: Attempted Monopolization of the Relevant Markets for General Purpose Debit Network Services and General Purpose Card-Not-Present Debit Network Services in Violation of the Massachusetts Consumer Protection Act, Mass. Gen. Laws. Ch. 93A § 1, *et seq*. (with respect to Class Members' Purchases in Massachusetts)**

418.    Plaintiffs incorporate the allegations of paragraphs 1 through 185 above.

419.    In violation of Mass. Gen. Laws. Ch. 93A § 2, Visa has attempted to monopolize each of the relevant markets through the exclusionary course of conduct and anticompetitive acts described. Each of Visa's acts is anticompetitive in its own right. Collectively, Visa's actions have a cumulative effect that has harmed competition in each relevant market, including raising barriers to competition by current and potential competitors, imposing supracompetitive prices, stabilizing those prices, limiting price competition, restricting output and other services, and limiting innovation. Visa has attempted to monopolize part of the trade or commerce within Massachusetts, for the purpose of excluding competition or of controlling, fixing, or maintaining prices in trade or commerce.

420.    Visa's violations of Massachusetts law were flagrant and willful.

421.    The Class has been injured in its business or property in Massachusetts by Visa's violations of Mass. Gen. Laws. Ch. 93A § 2.

**56. Fifty-Sixth Claim for Relief: Unlawful Agreements Not to Compete in Violation of the Massachusetts Consumer Protection Act, Mass. Gen. Laws. Ch. 93A § 1, *et seq.* (with respect to Class Members' Purchases in Massachusetts)**

422.    Plaintiffs incorporate the allegations of paragraphs 1 through 185 above.

423.    In violation of Mass. Gen. Laws. Ch. 93A § 2, Visa agreed with competitors and potential competitors Apple, PayPal, and Square not to compete. These agreements unreasonably restrain competition in two relevant markets related to debit transactions in the United States: (1)

the market for general purpose card-not-present debit network services, and (2) the market for general purpose debit network services.

424.    Visa's violations of Massachusetts law were flagrant and willful.

425.    The Class has been injured in its business or property in Massachusetts by Visa's violations of Mass. Gen. Laws. Ch. 93A § 2.

### 57. Fifty-Seventh Claim for Relief: Unlawful Agreements That Restrain Trade in Violation of the Massachusetts Consumer Protection Act, Mass. Gen. Laws. Ch. 93A § 1, *et seq.* (with respect to Class Members' Purchases in Massachusetts)

426.    Plaintiffs incorporate the allegations of paragraphs 1 through 185 above.

427.    In violation of Mass. Gen. Laws. Ch. 93A § 2, Visa's agreements with merchants, issuers, and acquirers unreasonably restrain trade in two relevant markets related to debit transactions in the United States: (1) the market for general purpose card-not-present debit network services, and (2) the market for general purpose debit network services.

428.    Visa's violations of Massachusetts law were flagrant and willful.

429.    The Class has been injured in its business or property in Massachusetts by Visa's violations of Mass. Gen. Laws. Ch. 93A § 2.

### 58. Fifty-Eighth Claim for Relief: Monopolization of the Relevant Markets for General Purpose Debit Network Services and General Purpose Card-Not-Present Debit Network Services in Violation of the Michigan Antitrust Reform Act, Mich. Comp. Laws Ann. §§ 445.771, *et seq.* (with respect to Class Members' Purchases in Michigan)

430.    Plaintiffs incorporate the allegations of paragraphs 1 through 185 above.

431.    In violation of Mich. Comp. Laws Ann. § 445.773, Visa has willfully and unlawfully maintained its monopoly in the relevant markets through the exclusionary course of conduct and anticompetitive acts described herein. Visa's acts, individually and collectively, increased, maintained, or protected its monopoly in both relevant markets.

432.    Visa's violations of Michigan law were flagrant and willful.

433.    The Class has been injured in its business or property in Michigan by Visa's violations of Mich. Comp. Laws Ann. § 445.773.

**59. Fifty-Ninth Claim for Relief: Attempted Monopolization of the Relevant Markets for General Purpose Debit Network Services and General Purpose Card-Not-Present Debit Network Services in Violation of the Michigan Antitrust Reform Act, Mich. Comp. Laws Ann. §§ 445.771, *et seq.* (with respect to Class Members' Purchases in Michigan)**

434.    Plaintiffs incorporate the allegations of paragraphs 1 through 185 above.

435.    In violation of Mich. Comp. Laws Ann. § 445.773, Visa has attempted to monopolize each of the relevant markets through the exclusionary course of conduct and anticompetitive acts described. Each of Visa's acts is anticompetitive in its own right. Collectively, Visa's actions have a cumulative effect that has harmed competition in each relevant market, including raising barriers to competition by current and potential competitors, imposing supracompetitive prices, stabilizing those prices, limiting price competition, restricting output and other services, and limiting innovation.

436.    Visa's violations of Michigan law were flagrant and willful.

437.    The Class has been injured in its business or property in Michigan by Visa's violations of Mich. Comp. Laws Ann. § 445.773.

**60. Sixtieth Claim for Relief: Unlawful Agreements Not to Compete in Violation of the Michigan Antitrust Reform Act, Mich. Comp. Laws Ann. §§ 445.771, *et seq.* (with respect to Class Members' Purchases in Michigan)**

438.    Plaintiffs incorporate the allegations of paragraphs 1 through 185 above.

439.    In violation of Mich. Comp. Laws Ann. § 445.772, Visa agreed with competitors and potential competitors Apple, PayPal, and Square not to compete. These agreements unreasonably restrain competition in two relevant markets related to debit transactions in the

United States: (1) the market for general purpose card-not-present debit network services, and (2) the market for general purpose debit network services.

440.    Visa's violations of Michigan law were flagrant and willful.

441.    The Class has been injured in its business or property in Michigan by Visa's violations of Mich. Comp. Laws Ann. § 445.772.

**61.  Sixty-First Claim for Relief: Unlawful Agreements That Restrain Trade in Violation of the Michigan Antitrust Reform Act, Mich. Comp. Laws Ann. §§ 445.771,** *et seq.* **(with respect to Class Members' Purchases in Michigan)**

442.    Plaintiffs incorporate the allegations of paragraphs 1 through 185 above.

443.    In violation of Mich. Comp. Laws Ann. § 445.772, Visa's agreements with merchants, issuers, and acquirers unreasonably restrain trade in two relevant markets related to debit transactions in the United States: (1) the market for general purpose card-not-present debit network services, and (2) the market for general purpose debit network services.

444.    Visa's violations of Michigan law were flagrant and willful.

445.    The Class has been injured in its business or property in Michigan by Visa's violations of Mich. Comp. Laws Ann. § 445.772.

**62.  Sixty-Second Claim for Relief: Monopolization of the Relevant Markets for General Purpose Debit Network Services and General Purpose Card-Not-Present Debit Network Services in Violation of the Minnesota Antitrust Law, Minn. Stat. Ann. §§ 325D.49,** *et seq.* **(with respect to Class Members' Purchases in Minnesota)**

446.    Plaintiffs incorporate the allegations of paragraphs 1 through 185 above.

447.    In violation of Minn. Stat. Ann. § 325D.52, Visa has willfully and unlawfully maintained its monopoly in the relevant markets through the exclusionary course of conduct and anticompetitive acts described herein. Visa's acts, individually and collectively, increased, maintained, or protected its monopoly in both relevant markets.

448.  Visa's violations of Minnesota law were flagrant and willful.

449.  The Class has been injured in its business or property in Minnesota by Visa's violations of Minn. Stat. Ann. § 325D.52.

**63.  Sixty-Third Claim for Relief: Attempted Monopolization of the Relevant Markets for General Purpose Debit Network Services and General Purpose Card-Not-Present Debit Network Services in Violation of the Minnesota Antitrust Law, Minn. Stat. Ann. §§ 325D.49, *et seq.* (with respect to Class Members' Purchases in Minnesota)**

450.  Plaintiffs incorporate the allegations of paragraphs 1 through 185 above.

451.  In violation of Minn. Stat. Ann. § 325D.52, Visa has attempted to monopolize each of the relevant markets through the exclusionary course of conduct and anticompetitive acts described. Each of Visa's acts is anticompetitive in its own right. Collectively, Visa's actions have a cumulative effect that has harmed competition in each relevant market, including raising barriers to competition by current and potential competitors, imposing supracompetitive prices, stabilizing those prices, limiting price competition, restricting output and other services, and limiting innovation.

452.  Visa's violations of Minnesota law were flagrant and willful.

453.  The Class has been injured in its business or property in Minnesota by Visa's violations of Minn. Stat. Ann. § 325D.5.

**64.  Sixty-Fourth Claim for Relief: Unlawful Agreements Not to Compete in Violation of the Minnesota Antitrust Law, Minn. Stat. Ann. §§ 325D.49, *et seq.* (with respect to Class Members' Purchases in Minnesota)**

454.  Plaintiffs incorporate the allegations of paragraphs 1 through 185 above.

455.  In violation of Minn. Stat. Ann. § 325D.51, Visa agreed with competitors and potential competitors Apple, PayPal, and Square not to compete. These agreements unreasonably restrain competition in two relevant markets related to debit transactions in the United States: (1)

the market for general purpose card-not-present debit network services, and (2) the market for general purpose debit network services.

456.    Visa's violations of Minnesota law were flagrant and willful.

457.    The Class has been injured in its business or property in Minnesota by Visa's violations of Minn. Stat. Ann. § 325D.51.

**65. Sixty-Fifth Claim for Relief: Unlawful Agreements That Restrain Trade in Violation of the Minnesota Antitrust Law, Minn. Stat. Ann. §§ 325D.49,** *et seq.* **(with respect to Class Members' Purchases in Minnesota)**

458.    Plaintiffs incorporate the allegations of paragraphs 1 through 185 above.

459.    In violation of Minn. Stat. Ann. § 325D.51, Visa's agreements with merchants, issuers, and acquirers unreasonably restrain trade in two relevant markets related to debit transactions in the United States: (1) the market for general purpose card-not-present debit network services, and (2) the market for general purpose debit network services.

460.    Visa's violations of Minnesota law were flagrant and willful.

461.    The Class has been injured in its business or property in Minnesota by Visa's violations of Minn. Stat. Ann. § 325D.51.

**66. Sixty-Sixth Claim for Relief: Monopolization of the Relevant Markets for General Purpose Debit Network Services and General Purpose Card-Not-Present Debit Network Services in Violation of the Mississippi Antitrust Statute, Miss. Code Ann. §§ 75-21-3,** *et seq.* **(with respect to Class Members' Purchases in Mississippi)**

462.    Plaintiffs incorporate the allegations of paragraphs 1 through 185 above.

463.    In violation of Miss. Code Ann. § 75-21-1, *et. seq.*, Visa has willfully and unlawfully maintained its monopoly in the relevant markets through the exclusionary course of conduct and anticompetitive acts described herein. Visa's acts, individually and collectively, increased, maintained, or protected its monopoly in both relevant markets.

464.    Visa's violations of Mississippi law were flagrant and willful.

465.    The Class has been injured in its business or property in Mississippi by Visa's

violations of Miss. Code Ann. § 75-21-1, *et. seq.*

**67. Sixty-Seventh Claim for Relief: Attempted Monopolization of the Relevant Markets for General Purpose Debit Network Services and General Purpose Card-Not-Present Debit Network Services in Violation of the Mississippi Antitrust Statute, Miss. Code Ann. §§ 75-21-3, *et seq.* (with respect to Class Members' Purchases in Mississippi)**

466.    Plaintiffs incorporate the allegations of paragraphs 1 through 185 above.

467.    In violation of Miss. Code Ann. § 75-21-1, *et. seq.,* Visa has attempted to

monopolize each of the relevant markets through the exclusionary course of conduct and

anticompetitive acts described. Each of Visa's acts is anticompetitive in its own right.

Collectively, Visa's actions have a cumulative effect that has harmed competition in each

relevant market, including raising barriers to competition by current and potential competitors,

imposing supracompetitive prices, stabilizing those prices, limiting price competition, restricting

output and other services, and limiting innovation.

468.    Visa's violations of Mississippi law were flagrant and willful.

469.    The Class has been injured in its business or property in Mississippi by Visa's

violations of Miss. Code Ann. § 75-21-1, *et. seq.*

**68. Sixty-Eighth Claim for Relief: Unlawful Agreements Not to Compete in Violation of the Mississippi Antitrust Statute, Miss. Code Ann. §§ 75-21-3, *et seq.* (with respect to Class Members' Purchases in Mississippi)**

470.    Plaintiffs incorporate the allegations of paragraphs 1 through 185 above.

471.    In violation of Miss. Code Ann. § 75-21-1, *et. seq.*, Visa agreed with competitors

and potential competitors Apple, PayPal, and Square not to compete. These agreements

unreasonably restrain competition in two relevant markets related to debit transactions in the

United States: (1) the market for general purpose card-not-present debit network services, and (2) the market for general purpose debit network services.

472.    Visa's violations of Mississippi law were flagrant and willful.

473.    The Class has been injured in its business or property in Mississippi by Visa's violations of Miss. Code Ann. § 75-21-1, *et. seq.*

### 69.    Sixty-Ninth Claim for Relief: Unlawful Agreements That Restrain Trade in Violation of the Mississippi Antitrust Statute, Miss. Code Ann. §§ 75-21-3, *et seq.* (with respect to Class Members' Purchases in Mississippi)

474.    Plaintiffs incorporate the allegations of paragraphs 1 through 185 above.

475.    In violation of Miss. Code Ann. § 75-21-1, *et. seq.*, Visa's agreements with merchants, issuers, and acquirers unreasonably restrain trade in two relevant markets related to debit transactions in the United States: (1) the market for general purpose card-not-present debit network services, and (2) the market for general purpose debit network services.

476.    Visa's violations of Mississippi law were flagrant and willful.

477.    The Class has been injured in its business or property in Mississippi by violations of Miss. Code Ann. § 75-21-1, *et. seq.*

### 70.    Seventieth Claim for Relief: Monopolization of the Relevant Markets for General Purpose Debit Network Services and General Purpose Card-Not-Present Debit Network Services in Violation of the Nebraska Junkin Act, Neb. Code Ann. §§ 59-801, *et seq.* (with respect to Class Members' Purchases in Nebraska)

478.    Plaintiffs incorporate the allegations of paragraphs 1 through 185 above.

479.    In violation of Neb. Code Ann. § 59-802, Visa has willfully and unlawfully maintained its monopoly in the relevant markets through the exclusionary course of conduct and anticompetitive acts described herein. Visa's acts, individually and collectively, increased, maintained, or protected its monopoly in both relevant markets.

480.    Visa's violations of Nebraska law were flagrant and willful.

481.    The Class has been injured in its business or property in Nebraska by Visa's violations of Neb. Code Ann. § 59-802.

**71.    Seventy-First Claim for Relief: Attempted Monopolization of the Relevant Markets for General Purpose Debit Network Services and General Purpose Card-Not-Present Debit Network Services in Violation of the Nebraska Junkin Act, Neb. Code Ann. §§ 59-801, *et seq.* (with respect to Class Members' Purchases in Nebraska)**

482.    Plaintiffs incorporate the allegations of paragraphs 1 through 185 above.

483.    In violation of Neb. Code Ann. § 59-802, Visa has attempted to monopolize each of the relevant markets through the exclusionary course of conduct and anticompetitive acts described. Each of Visa's acts is anticompetitive in its own right. Collectively, Visa's actions have a cumulative effect that has harmed competition in each relevant market, including raising barriers to competition by current and potential competitors, imposing supracompetitive prices, stabilizing those prices, limiting price competition, restricting output and other services, and limiting innovation.

484.    Visa's violations of Nebraska law were flagrant and willful.

485.    The Class has been injured in its business or property in Nebraska by Visa's violations of Neb. Code Ann. § 59-802.

**72.    Seventy-Second Claim for Relief: Unlawful Agreements Not to Compete in Violation of the Nebraska Junkin Act, Neb. Code Ann. §§ 59-801, *et seq.* (with respect to Class Members' Purchases in Nebraska)**

486.    Plaintiffs incorporate the allegations of paragraphs 1 through 185 above.

487.    In violation of Neb. Code Ann. § 59-801, Visa agreed with competitors and potential competitors Apple, PayPal, and Square not to compete. These agreements unreasonably restrain competition in two relevant markets related to debit transactions in the United States: (1) the market for general purpose card-not-present debit network services, and (2) the market for general purpose debit network services.

488.    Visa's violations of Nebraska law were flagrant and willful.

489.    The Class has been injured in its business or property in Nebraska by Visa's

violations of Neb. Code Ann. § 59-801.

**73.    Seventy-Third Claim for Relief: Unlawful Agreements That Restrain Trade in Violation of the Nebraska Junkin Act, Neb. Code Ann. §§ 59-801, *et seq*. (with respect to Class Members' Purchases in Nebraska)**

490.    Plaintiffs incorporate the allegations of paragraphs 1 through 185 above.

491.    In violation of Neb. Code Ann. § 59-801, Visa's agreements with merchants,

issuers, and acquirers unreasonably restrain trade in two relevant markets related to debit

transactions in the United States: (1) the market for general purpose card-not-present debit

network services, and (2) the market for general purpose debit network services.

492.    Visa's violations of Nebraska law were flagrant and willful.

493.    The Class has been injured in its business or property in Nebraska by Visa's

violations of Neb. Code Ann. § 59-802.

**74.    Seventy-Fourth Claim for Relief: Monopolization of the Relevant Markets for General Purpose Debit Network Services and General Purpose Card-Not-Present Debit Network Services in Violation of the Nevada Unfair Trade Practices Act, Nev. Rev. Stat. Ann. §§ 598A.010, *et seq*. (with respect to Class Members' Purchases in Nevada)**

494.    Plaintiffs incorporate the allegations of paragraphs 1 through 185 above.

495.    In violation of Nev. Rev. Stat. Ann. § 598A.060, Visa has willfully and

unlawfully maintained its monopoly in the relevant markets through the exclusionary course of

conduct and anticompetitive acts described herein, including in Nevada. Visa's acts, individually

and collectively, increased, maintained, or protected its monopoly in both relevant markets.

496.    Visa's violations of Nevada law were flagrant and willful.

497.    The Class has been injured in its business or property in Nevada by Visa's

violations of Nev. Rev. Stat. Ann. § 598A.060.

**75. Seventy-Fifth Claim for Relief: Attempted Monopolization of the Relevant Markets for General Purpose Debit Network Services and General Purpose Card-Not-Present Debit Network Services in Violation of the Nevada Unfair Trade Practices Act, Nev. Rev. Stat. Ann. §§ 598A.010, *et seq.* (with respect to Class Members' Purchases in Nevada)**

498.    Plaintiffs incorporate the allegations of paragraphs 1 through 185 above.

499.    In violation of Nev. Rev. Stat. Ann. § 598A.060, Visa has attempted to monopolize each of the relevant markets through the exclusionary course of conduct and anticompetitive acts described, including in Nevada. Each of Visa's acts is anticompetitive in its own right. Collectively, Visa's actions have a cumulative effect that has harmed competition in each relevant market, including raising barriers to competition by current and potential competitors, imposing supracompetitive prices, stabilizing those prices, limiting price competition, restricting output and other services, and limiting innovation.

500.    Visa's violations of Nevada law were flagrant and willful.

501.    The Class has been injured in its business or property in Nevada by Visa's violations of Nev. Rev. Stat. Ann. § 598A.060.

**76. Seventy-Sixth Claim for Relief: Unlawful Agreements Not to Compete in Violation of the Nevada Unfair Trade Practices Act, Nev. Rev. Stat. Ann. §§ 598A.010, *et seq.* (with respect to Class Members' Purchases in Nevada)**

502.    Plaintiffs incorporate the allegations of paragraphs 1 through 185 above.

503.    In violation of Nev. Rev. Stat. Ann. § 598A.060, Visa agreed with competitors and potential competitors Apple, PayPal, and Square not to compete, including in Nevada. These agreements unreasonably restrain competition in two relevant markets related to debit transactions in the United States: (1) the market for general purpose card-not-present debit network services, and (2) the market for general purpose debit network services.

504.    Visa's violations of Nevada law were flagrant and willful.

505.    The Class has been injured in its business or property in Nevada by Visa's violations of Nev. Rev. Stat. Ann. § 598A.060.

**77.    Seventy-Seventh Claim for Relief: Unlawful Agreements That Restrain Trade in Violation of the Nevada Unfair Trade Practices Act, Nev. Rev. Stat. Ann. §§ 598A.010, *et seq*. (with respect to Class Members' Purchases in Nevada)**

506.    Plaintiffs incorporate the allegations of paragraphs 1 through 185 above.

507.    In violation of Nev. Rev. Stat. Ann. § 598A.060, Visa's agreements with merchants, issuers, and acquirers unreasonably restrain trade in two relevant markets related to debit transactions in the United States: (1) the market for general purpose card-not-present debit network services, and (2) the market for general purpose debit network services. Visa's agreements unreasonably restrain trade in Nevada.

508.    Visa's violations of Nevada law were flagrant and willful.

509.    The Class has been injured in its business or property in Nevada by Visa's violations of Nev. Rev. Stat. Ann. § 598A.060.

**78.    Seventy-Eighth Claim for Relief: Monopolization of the Relevant Markets for General Purpose Debit Network Services and General Purpose Card-Not-Present Debit Network Services in Violation of the New Hampshire Antitrust Statute, N.H. Rev Stat. Ann. §§ 356.1, *et seq*. (with respect to Class Members' Purchases in New Hampshire)**

510.    Plaintiffs incorporate the allegations of paragraphs 1 through 185 above.

511.    In violation of N.H. Rev Stat. Ann. § 356.3, Visa has willfully and unlawfully maintained its monopoly in the relevant markets through the exclusionary course of conduct and anticompetitive acts described herein. Visa's acts, individually and collectively, increased, maintained, or protected its monopoly in both relevant markets.

512.    Visa's violations of New Hampshire law were flagrant and willful.

513.    The Class has been injured in its business or property in New Hampshire by

514.    Visa's violations of N.H. Rev Stat. Ann. § 356.3.

**79.  Seventy-Ninth Claim for Relief: Attempted Monopolization of the Relevant Markets for General Purpose Debit Network Services and General Purpose Card-Not-Present Debit Network Services in Violation of the New Hampshire Antitrust Statute, N.H. Rev Stat. Ann. §§ 356.1, *et seq.* (with respect to Class Members' Purchases in New Hampshire)**

515.    Plaintiffs incorporate the allegations of paragraphs 1 through 185 above.

516.    In violation of N.H. Rev Stat. Ann. § 356.3, Visa has attempted to monopolize each of the relevant markets through the exclusionary course of conduct and anticompetitive acts described. Each of Visa's acts is anticompetitive in its own right. Collectively, Visa's actions have a cumulative effect that has harmed competition in each relevant market, including raising barriers to competition by current and potential competitors, imposing supracompetitive prices, stabilizing those prices, limiting price competition, restricting output and other services, and limiting innovation.

517.    Visa's violations of New Hampshire law were flagrant and willful.

518.    The Class has been injured in its business or property in New Hampshire by Visa's violations of N.H. Rev Stat. Ann. § 356.3.

**80.  Eightieth Claim for Relief: Unlawful Agreements Not to Compete in Violation of the New Hampshire Antitrust Statute, N.H. Rev Stat. Ann. §§ 356.1, *et seq.* (with respect to Class Members' Purchases in New Hampshire)**

519.    Plaintiffs incorporate the allegations of paragraphs 1 through 185 above.

520.    In violation of N.H. Rev Stat. Ann. § 356.2, Visa agreed with competitors and potential competitors Apple, PayPal, and Square not to compete. These agreements unreasonably restrain competition in two relevant markets related to debit transactions in the United States: (1) the market for general purpose card-not-present debit network services, and (2) the market for general purpose debit network services.

521.    Visa's violations of New Hampshire law were flagrant and willful.

522.    The Class has been injured in its business or property in New Hampshire by Visa's violations of N.H. Rev Stat. Ann. § 356.2.

**81. Eighty-First Claim for Relief: Unlawful Agreements That Restrain Trade in Violation of the New Hampshire Antitrust Statute, N.H. Rev Stat. Ann. §§ 356.1, *et seq*. (with respect to Class Members' Purchases in New Hampshire)**

523.    Plaintiffs incorporate the allegations of paragraphs 1 through 185 above.

524.    In violation of N.H. Rev Stat. Ann. § 356.2, Visa's agreements with merchants, issuers, and acquirers unreasonably restrain trade in two relevant markets related to debit transactions in the United States: (1) the market for general purpose card-not-present debit network services, and (2) the market for general purpose debit network services.

525.    Visa's violations of New Hampshire law were flagrant and willful.

526.    The Class has been injured in its business or property in New Hampshire by Visa's violations of N.H. Rev Stat. Ann. § 356.2.

**82. Eighty-Second Claim for Relief: Monopolization of the Relevant Markets for General Purpose Debit Network Services and General Purpose Card-Not-Present Debit Network Services in Violation of the New Jersey Antitrust Act, N.J. Stat. Ann. § 56:9-4(a) with respect to Class Members' Purchases in New Jersey)**

527.    Plaintiffs incorporate the allegations of paragraphs 1 through 185 above.

528.    In violation of N.J. Stat. Ann. § 56:9-4(a), Visa has willfully and unlawfully maintained its monopoly in the relevant markets through the exclusionary course of conduct and anticompetitive acts described herein, including in New Jersey. Visa's acts, individually and collectively, increased, maintained, or protected its monopoly in both relevant markets.

529.    Visa's violations of New Jersey law were flagrant and willful.

530.    The Class has been injured in its business or property in New Jersey by Visa's violations of N.J. Stat. Ann. §§ 56:9-4(a).

**83. Eighty-Third Claim for Relief: Attempted Monopolization of the Relevant Markets for General Purpose Debit Network Services and General Purpose Card-Not-Present Debit Network Services in Violation of the New Jersey Antitrust Act, N.J. Stat. Ann. § 56:9-4(a) (with respect to Class Members' Purchases in New Jersey)**

531.    Plaintiffs incorporate the allegations of paragraphs 1 through 185 above.

532.    In violation of N.J. Stat. Ann. § 56:9-4(a), Visa has attempted to monopolize each of the relevant markets through the exclusionary course of conduct and anticompetitive acts described, including in New Jersey. Each of Visa's acts is anticompetitive in its own right. Collectively, Visa's actions have a cumulative effect that has harmed competition in each relevant market, including raising barriers to competition by current and potential competitors, imposing supracompetitive prices, stabilizing those prices, limiting price competition, restricting output and other services, and limiting innovation.

533.    Visa's violations of New Jersey law were flagrant and willful.

534.    The Class has been injured in its business or property in New Jersey by Visa's violations of N.J. Stat. Ann. § 56:9-4(a).

**84. Eighty-Fourth Claim for Relief: Unlawful Agreements Not to Compete in Violation of the New Jersey Antitrust Act, New Jersey Antitrust Act, N.J. Stat. § 56:9-3 (with respect to Class Members' Purchases in New Jersey)**

535.    Plaintiffs incorporate the allegations of paragraphs 1 through 185 above.

536.    In violation of N.J. Stat. § 56:9-3, Visa agreed with competitors and potential competitors Apple, PayPal, and Square not to compete, including in New Jersey. These agreements unreasonably restrain competition in two relevant markets related to debit

transactions in the United States: (1) the market for general purpose card-not-present debit network services, and (2) the market for general purpose debit network services

537.    Visa's violations of New Jersey law were flagrant and willful.

538.    The Class has been injured in its business or property in New Jersey by Visa's violations of N.J. Stat. § 56:9-3.

### 85.  Eighty-Fifth Claim for Relief: Unlawful Agreements That Restrain Trade in  Violation of the New Jersey Antitrust Act, N.J. Stat. § 56:9-3 (with respect to Class Members' Purchases in New Jersey)

539.    Plaintiffs incorporate the allegations of paragraphs 1 through 185 above.

540.    In violation of N.J. Stat. § 56:9-3, Visa's agreements with merchants, issuers, and acquirers unreasonably restrain trade in two relevant markets related to debit transactions in the United States: (1) the market for general purpose card-not-present debit network services, and (2) the market for general purpose debit network services. Visa's agreements unreasonably restrained trade in New Jersey.

541.    Visa's violations of New Jersey law were flagrant and willful.

542.    The Class has been injured in its business or property in New Jersey by Visa's violations of N.J. Stat. § 56:9-3.

### 86.  Eighty-Sixth Claim for Relief: Monopolization of the Relevant Markets for General Purpose Debit Network Services and General Purpose Card-Not-Present Debit Network Services in Violation of the New Mexico Antitrust Act, N.M. Stat. Ann. §§ 57-1-1, *et seq.* (with respect to Class Members' Purchases in New Mexico

543.    Plaintiffs incorporate the allegations of paragraphs 1 through 185 above.

544.    In violation of N.M. Stat. Ann. § 57-1-2, Visa has willfully and unlawfully maintained its monopoly in the relevant markets through the exclusionary course of conduct and anticompetitive acts described herein, including in New Mexico. Visa's acts, individually and collectively, increased, maintained, or protected its monopoly in both relevant markets.

545.    Visa's violations of New Mexico law were flagrant and willful.

546.    The Class has been injured in its business or property in New Mexico by Visa's violations of N.M. Stat. Ann. § 57-1-2.

**87. Eighty-Seventh Claim for Relief: Attempted Monopolization of the Relevant Markets for General Purpose Debit Network Services and General Purpose Card-Not-Present Debit Network Services in Violation of the New Mexico Antitrust Act, N.M. Stat. Ann. §§ 57-1-1, *et seq.* (with respect to Class Members' Purchases in New Mexico)**

547.    Plaintiffs incorporate the allegations of paragraphs 1 through 185 above.

548.    In violation of N.M. Stat. Ann. § 57-1-2, Visa has attempted to monopolize each of the relevant markets through the exclusionary course of conduct and anticompetitive acts described, including in New Mexico. Each of Visa's acts is anticompetitive in its own right. Collectively, Visa's actions have a cumulative effect that has harmed competition in each relevant market, including raising barriers to competition by current and potential competitors, imposing supracompetitive prices, stabilizing those prices, limiting price competition, restricting output and other services, and limiting innovation.

549.    Visa's violations of New Mexico law were flagrant and willful.

550.    The Class has been injured in its business or property in New Mexico by Visa's violations of N.M. Stat. Ann. § 57-1-2.

**88. Eighty-Eighth Claim for Relief: Unlawful Agreements Not to Compete in Violation of the New Mexico Antitrust Act, N.M. Stat. Ann. §§ 57-1-1, *et seq.* (with respect to Class Members' Purchases in New Mexico)**

551.    Plaintiffs incorporate the allegations of paragraphs 1 through 185 above.

552.    In violation of N.M. Stat. Ann. § 57-1-1, Visa agreed with competitors and potential competitors Apple, PayPal, and Square not to compete, including in New Mexico. These agreements unreasonably restrain competition in two relevant markets related to debit

transactions in the United States: (1) the market for general purpose card-not-present debit

network services, and (2) the market for general purpose debit network services.

553.    Visa's violations of New Mexico law were flagrant and willful.

554.    The Class has been injured in its business or property in New Mexico by Visa's

violations of N.M. Stat. Ann. § 57-1-1.

**89. Eighty-Ninth Claim for Relief: Unlawful Agreements That Restrain Trade in Violation of the New Mexico Antitrust Act, N.M. Stat. Ann. §§ 57-1-1, *et seq*. (with respect to Class Members' Purchases in New Mexico)**

555.    Plaintiffs incorporate the allegations of paragraphs 1 through 185 above.

556.    In violation of N.M. Stat. Ann. § 57-1-1, Visa's agreements with merchants,

issuers, and acquirers unreasonably restrain trade in two relevant markets related to debit

transactions in the United States: (1) the market for general purpose card-not-present debit

network services, and (2) the market for general purpose debit network services. Visa's

agreements unreasonably restrained trade in New Mexico.

557.    Visa's violations of New Mexico law were flagrant and willful.

558.    The Class has been injured in its business or property in New Mexico by Visa's

violations of N.M. Stat. Ann. § 57-1-1.

**90. Ninetieth Claim for Relief: Monopolization of the Relevant Markets for General Purpose Debit Network Services and General Purpose Card-Not-Present Debit Network Services in Violation of the New York Donnelly Act, N.Y. Gen. Bus. Law §§ 340, *et seq*. (with respect to Class Members' Purchases in New York)**

559.    Plaintiffs incorporate the allegations of paragraphs 1 through 185 above.

560.    In violation of N.Y. Gen. Bus. Law § 340, Visa has willfully and unlawfully

maintained its monopoly in the relevant markets through contracts, agreements, arrangement, or

combination, including in New York. Visa's acts, individually and collectively, increased, maintained, or protected its monopoly in both relevant markets.

561.    Visa's violations of New York law were flagrant and willful.

562.    The Class has been injured in its business or property in New York by Visa's violations of N.Y. Gen. Bus. Law § 340.

**91. Ninety-First Claim for Relief: Attempted Monopolization of the Relevant Markets for General Purpose Debit Network Services and General Purpose Card-Not-Present Debit Network Services in Violation of the New York Donnelly Act, N.Y. Gen. Bus. Law §§ 340,** *et seq.* **(with respect to Class Members' Purchases in New York)**

563.    Plaintiffs incorporate the allegations of paragraphs 1 through 185 above.

564.    In violation of N.Y. Gen. Bus. Law § 340, Visa has attempted to monopolize each of the relevant markets through contracts, agreements, arrangement, or combination, including in New York. Each of Visa's acts is anticompetitive in its own right. Collectively, Visa's actions have a cumulative effect that has harmed competition in each relevant market, including raising barriers to competition by current and potential competitors, imposing supracompetitive prices, stabilizing those prices, limiting price competition, restricting output and other services, and limiting innovation.

565.    Visa's violations of New York law were flagrant and willful.

566.    The Class has been injured in its business or property in New York by Visa's violations of N.Y. Gen. Bus. Law § 340.

**92. Ninety-Second Claim for Relief: Unlawful Agreements Not to Compete in Violation of the New York Donnelly Act, N.Y. Gen. Bus. Law §§ 340,** *et seq.* **(with respect to Class Members' Purchases in New York)**

567.    Plaintiffs incorporate the allegations of paragraphs 1 through 185 above.

568.    In violation of N.Y. Gen. Bus. Law § 340, Visa agreed with competitors and potential competitors Apple, PayPal, and Square not to compete. Visa entered into contracts,

569.    agreements, arrangements, or combinations that have unreasonably restrained competition in New York and in two relevant markets related to debit transactions in the United States: (1) the market for general purpose card-not-present debit network services, and (2) the market for general purpose debit network services.

570.    Visa's violations of New York law were flagrant and willful.

571.    The Class has been injured in its business or property in New York by Visa's violations of N.Y. Gen. Bus. Law § 340.

**93.    Ninety-Third Claim for Relief: Unlawful Agreements That Restrain Trade in Violation of the New York Donnelly Act, N.Y. Gen. Bus. Law §§ 340, *et seq.* (with respect to Class Members' Purchases in New York)**

572.    Plaintiffs incorporate the allegations of paragraphs 1 through 185 above.

573.    In violation of N.Y. Gen. Bus. Law § 340, Visa's agreements with merchants, issuers, and acquirers unreasonably restrain trade in New York and in two relevant markets related to debit transactions in the United States: (1) the market for general purpose card-not-present debit network services, and (2) the market for general purpose debit network services.

574.    Visa's violations of New York law were flagrant and willful.

575.    The Class has been injured in its business or property in New York by Visa's violations of N.Y. Gen. Bus. Law § 340.

**94.    Ninety-Fourth Claim for Relief: Monopolization of the Relevant Markets for General Purpose Debit Network Services and General Purpose Card-Not-Present Debit Network Services in Violation of Chapter 75 of North Carolina's General Statutes, N.C. Gen. Stat. Ann. §§ 75-1, *et seq.* (with respect to Class Members' Purchases in North Carolina)**

576.    Plaintiffs incorporate the allegations of paragraphs 1 through 185 above.

577.    In violation of N.C. Gen. Stat. Ann. § 75-2.1, Visa has willfully and unlawfully maintained its monopoly in the relevant markets through the exclusionary course of conduct and

anticompetitive acts described herein, including in North Carolina. Visa's acts, individually and collectively, increased, maintained, or protected its monopoly in both relevant markets.

578.    Visa's violations of North Carolina law were flagrant and willful.

579.    The Class has been injured in its business or property in North Carolina by Visa' violations of N.C. Gen. Stat. Ann. § 75-2.1.

**95. Ninety-Fifth Claim for Relief: Attempted Monopolization of the Relevant Markets for General Purpose Debit Network Services and General Purpose Card-Not-Present Debit Network Services in Violation of Chapter 75 of North Carolina's General Statutes, N.C. Gen. Stat. Ann. §§ 75-1, *et seq.* (with respect to Class Members' Purchases in North Carolina)**

580.    Plaintiffs incorporate the allegations of paragraphs 1 through 185 above.

581.    In violation of N.C. Gen. Stat. Ann. § 75-2.1, Visa has attempted to monopolize each of the relevant markets through the exclusionary course of conduct and anticompetitive acts described, including in North Carolina. Each of Visa's acts is anticompetitive in its own right. Collectively, Visa's actions have a cumulative effect that has harmed competition in each relevant market, including raising barriers to competition by current and potential competitors, imposing supracompetitive prices, stabilizing those prices, limiting price competition, restricting output and other services, and limiting innovation.

582.    Visa's violations of North Carolina law were flagrant and willful.

583.    The Class has been injured in its business or property in North Carolina by Visa's violations of N.C. Gen. Stat. Ann. § 75-2.1.

**96. Ninety-Sixth Claim for Relief: Unlawful Agreements Not to Compete in Violation of Chapter 75 of North Carolina's General Statutes, N.C. Gen. Stat. Ann. §§ 75-1, *et seq.* (with respect to Class Members' Purchases in North Carolina)**

584.    Plaintiffs incorporate the allegations of paragraphs 1 through 185 above.

585.    In violation of N.C. Gen. Stat. Ann. § 75-2.1, Visa has attempted to monopolize each of the relevant markets through the exclusionary course of conduct and anticompetitive acts described, including in North Carolina. Each of Visa's acts is anticompetitive in its own right. Collectively, Visa's actions have a cumulative effect that has harmed competition in each relevant market, including raising barriers to competition by current and potential competitors, imposing supracompetitive prices, stabilizing those prices, limiting price competition, restricting output and other services, and limiting innovation.

586.    Visa's violations of North Carolina law were flagrant and willful.

587.    The Class has been injured in its business or property in North Carolina by Visa's violations of N.C. Gen. Stat. Ann. § 75-2.1.

**97.  Ninety-Seventh Claim for Relief: Unlawful Agreements That Restrain Trade in Violation of Chapter 75 of North Carolina's General Statutes, N.C. Gen. Stat. Ann. §§ 75-1, *et seq.* (with respect to Class Members' Purchases in North Carolina)**

588.    Plaintiffs incorporate the allegations of paragraphs 1 through 185 above.

589.    In violation of N.C. Gen. Stat. Ann. § 75-1, Visa's agreements with merchants, issuers, and acquirers unreasonably restrain trade in two relevant markets related to debit transactions in the United States: (1) the market for general purpose card-not-present debit network services, and (2) the market for general purpose debit network services, and in North Carolina.

590.    Visa's violations of North Carolina law were flagrant and willful.

591.    The Class has been injured in its business or property in North Carolina by Visa's violations of N.C. Gen. Stat. Ann. § 75-1.

**98.  Ninety-Eighth Claim for Relief: Monopolization of the Relevant Markets for General Purpose Debit Network Services and General Purpose Card-Not-Present Debit Network Services in Violation of the North Dakota Uniform State Antitrust Act, N.D. Cent. Code §§ 51-08.1-01, *et***

*seq.* **(with respect to Class Members' Purchases in North Dakota)**

592.    Plaintiffs incorporate the allegations of paragraphs 1 through 185 above.

593.    In violation of N.D. Cent. Code § 51-08.1-03, Visa has willfully and unlawfully maintained its monopoly in the relevant markets through the exclusionary course of conduct and anticompetitive acts described herein. Visa's acts, individually and collectively, increased, maintained, or protected its monopoly in both relevant markets.

594.    Visa's violations of North Dakota law were flagrant and willful.

595.    The Class has been injured in its business or property in North Dakota by Visa's violations of N.D. Cent. Code § 51-08.1-03.

**99.    Ninety-Nineth Claim for Relief: Attempted Monopolization of the Relevant Markets for General Purpose Debit Network Services and General Purpose Card-Not-Present Debit Network Services in Violation of the North Dakota Uniform State Antitrust Act, N.D. Cent. Code §§ 51-08.1-01, *et seq.* (with respect to Class Members' Purchases in North Dakota)**

596.    Plaintiffs incorporate the allegations of paragraphs 1 through 185 above.

597.    In violation of N.D. Cent. Code § 51-08.1-03, Visa has attempted to monopolize each of the relevant markets through the exclusionary course of conduct and anticompetitive acts described. Each of Visa's acts is anticompetitive in its own right. Collectively, Visa's actions have a cumulative effect that has harmed competition in each relevant market, including raising barriers to competition by current and potential competitors, imposing supracompetitive prices, stabilizing those prices, limiting price competition, restricting output and other services, and limiting innovation.

598.    Visa's violations of North Dakota law were flagrant and willful.

599.    The Class has been injured in its business or property in North Dakota by Visa's violations of N.D. Cent. Code § 51-08.1-03.

**100. One Hundred for Relief: Unlawful Agreements Not to Compete in Violation of the North Dakota Uniform State Antitrust Act, N.D. Cent. Code §§ 51-08.1-01, *et seq.* (with respect to Class Members' Purchases in North Dakota)**

600.    Plaintiffs incorporate the allegations of paragraphs 1 through 185 above.

601.    In violation of N.D. Cent. Code § 51-08.1-02, Visa agreed with competitors and potential competitors Apple, PayPal, and Square not to compete. These agreements unreasonably restrain competition in two relevant markets related to debit transactions in the United States: (1) the market for general purpose card-not-present debit network services, and (2) the market for general purpose debit network services.

602.    Visa's violations of North Dakota law were flagrant and willful.

603.    The Class has been injured in its business or property in North Dakota by Visa's violations of N.D. Cent. Code § 51-08.1-02.

**101. One Hundred and First Claim for Relief: Unlawful Agreements That Restrain Trade in Violation of the North Dakota Uniform State Antitrust Act, N.D. Cent. Code §§ 51-08.1-01, *et seq.* (with respect to Class Members' Purchases in North Dakota)**

604.    Plaintiffs incorporate the allegations of paragraphs 1 through 185 above.

605.    In violation of N.D. Cent. Code § 51-08.1-02, Visa's agreements with merchants, issuers, and acquirers unreasonably restrain trade in two relevant markets related to debit transactions in the United States: (1) the market for general purpose card-not-present debit network services, and (2) the market for general purpose debit network services.

606.    Visa's violations of North Dakota law were flagrant and willful.

607.    The Class has been injured in its business or property in North Dakota by Visa's violations of N.D. Cent. Code § 51-08.1-02.

**102. One Hundred and Second Claim for Relief: Monopolization of the Relevant Markets for General Purpose Debit Network Services and General Purpose Card-Not-Present Debit Network Services in Violation**

**of the Oregon Antitrust Act, Or. Rev. Stat. §§ 646.705, *et seq*. (with respect to Class Members' Purchases in Oregon)**

608.    Plaintiffs incorporate the allegations of paragraphs 1 through 185 above.

609.    In violation of Or. Rev. Stat. § 646.730, Visa has willfully and unlawfully maintained its monopoly in the relevant markets through the exclusionary course of conduct and anticompetitive acts described herein. Visa's acts, individually and collectively, increased, maintained, or protected its monopoly in both relevant markets.

610.    Visa's violations of Oregon law were flagrant and willful.

611.    The Class has been injured in its business or property in Oregon by Visa's violations of Or. Rev. Stat. § 646.730.

103.    **One Hundred and Third Claim for Relief: Attempted Monopolization of the Relevant Markets for General Purpose Debit Network Services and General Purpose Card-Not-Present Debit Network Services in Violation of the Oregon Antitrust Act, Or. Rev. Stat. §§ 646.705, *et seq*. (with respect to Class Members' Purchases in Oregon)**

612.    Plaintiffs incorporate the allegations of paragraphs 1 through 185 above.

613.    In violation of Or. Rev. Stat. § 646.730, Visa has attempted to monopolize each of the relevant markets through the exclusionary course of conduct and anticompetitive acts described. Each of Visa's acts is anticompetitive in its own right. Collectively, Visa's actions have a cumulative effect that has harmed competition in each relevant market, including raising barriers to competition by current and potential competitors, imposing supracompetitive prices, stabilizing those prices, limiting price competition, restricting output and other services, and limiting innovation.

614.    Visa's violations of Oregon law were flagrant and willful.

615.    The Class has been injured in its business or property in Oregon by Visa's violations of Or. Rev. Stat. § 646.730.

**104.    One Hundred and Fourth Claim for Relief: Unlawful Agreements Not to Compete in Violation of the Oregon Antitrust Act, Or. Rev. Stat. §§ 646.705, *et seq.* (with respect to Class Members' Purchases in Oregon)**

616.    Plaintiffs incorporate the allegations of paragraphs 1 through 185 above.

617.    In violation of Or. Rev. Stat. § 646.725, Visa agreed with competitors and potential competitors Apple, PayPal, and Square not to compete. These agreements unreasonably restrain competition in two relevant markets related to debit transactions in the United States: (1) the market for general purpose card-not-present debit network services, and (2) the market for general purpose debit network services.

618.    Visa's violations of Oregon law were flagrant and willful.

619.    The Class has been injured in its business or property in Oregon by Visa's violations of Or. Rev. Stat. § 646.725.

**105.    One Hundred and Fifth Claim for Relief: Unlawful Agreements That Restrain Trade in Violation of the Oregon Antitrust Act, Or. Rev. Stat. §§ 646.705, *et seq.* (with respect to Class Members' Purchases in Oregon)**

620.    Plaintiffs incorporate the allegations of paragraphs 1 through 185 above.

621.    In violation of Or. Rev. Stat. § 646.725, Visa's agreements with merchants, issuers, and acquirers unreasonably restrain trade in two relevant markets related to debit transactions in the United States: (1) the market for general purpose card-not-present debit network services, and (2) the market for general purpose debit network services.

622.    Visa's violations of Oregon law were flagrant and willful.

623.    The Class has been injured in its business or property in Oregon by Visa's violations of Or. Rev. Stat. § 646.725.

**106.    One Hundred and Sixth Claim for Relief: Monopolization of the Relevant Markets for General Purpose Debit Network Services and General Purpose Card-Not-Present Debit Network Services in Violation of the Rhode Island Antitrust Act, R.I. Gen. Laws §§ 6-36-1, *et seq.* (with respect to Class Members' Purchases in Rhode Island)**

624.    Plaintiffs incorporate the allegations of paragraphs 1 through 185 above.

625.    In violation of R.I. Gen. Laws § 6-36-5, Visa has willfully and unlawfully maintained its monopoly in the relevant markets through the exclusionary course of conduct and anticompetitive acts described herein. Visa's acts, individually and collectively, increased, maintained, or protected its monopoly in both relevant markets.

626.    Visa's violations of Rhode Island law were flagrant and willful.

627.    The Class has been injured in its business or property in Rhode Island by Visa's violations of R.I. Gen. Laws § 6-36-5.

**107. One Hundred and Seventh Claim for Relief: Attempted Monopolization of the Relevant Markets for General Purpose Debit Network Services and General Purpose Card-Not-Present Debit Network Services in Violation of the Rhode Island Antitrust Act, R.I. Gen. Laws §§ 6-36-1, *et seq.* (with respect to Class Members' Purchases in Rhode Island)**

628.    Plaintiffs incorporate the allegations of paragraphs 1 through 185 above.

629.    In violation of R.I. Gen. Laws § 6-36-5, Visa has attempted to monopolize each of the relevant markets through the exclusionary course of conduct and anticompetitive acts

630.    described. Each of Visa's acts is anticompetitive in its own right. Collectively, Visa's actions have a cumulative effect that has harmed competition in each relevant market, including raising barriers to competition by current and potential competitors, imposing supracompetitive prices, stabilizing those prices, limiting price competition, restricting output and other services, and limiting innovation.

631.    Visa's violations of Rhode Island law were flagrant and willful.

632.    The Class has been injured in its business or property in Rhode Island by Visa's violations of R.I. Gen. Laws § 6-36-5.

**108. One Hundred and Eighth Claim for Relief: Unlawful Agreements Not to Compete in Violation of the Rhode Island Antitrust Act, R.I. Gen. Laws §§ 6-36-1, *et seq.* (with respect to Class Members' Purchases in Rhode**

Island)

633.    Plaintiffs incorporate the allegations of paragraphs 1 through 185 above.

634.    In violation of R.I. Gen. Laws § 6-36-4, Visa agreed with competitors and potential competitors Apple, PayPal, and Square not to compete. These agreements unreasonably restrain competition in two relevant markets related to debit transactions in the United States: (1) the market for general purpose card-not-present debit network services, and (2) the market for general purpose debit network services.

635.    Visa's violations of Rhode Island law were flagrant and willful.

636.    The Class has been injured in its business or property in Rhode Island by Visa's violations of R.I. Gen. Laws § 6-36-4.

**109. One Hundred and Ninth Claim for Relief: Unlawful Agreements That Restrain Trade in Violation of the Rhode Island Antitrust Act, R.I. Gen. Laws §§ 6-36-1, *et seq*. (with respect to Class Members' Purchases in Rhode Island)**

637.    Plaintiffs incorporate the allegations of paragraphs 1 through 185 above.

638.    In violation of R.I. Gen. Laws § 6-36-4, Visa's agreements with merchants, issuers, and acquirers unreasonably restrain trade in two relevant markets related to debit transactions in the United States: (1) the market for general purpose card-not-present debit network services, and (2) the market for general purpose debit network services.

639.    Visa's violations of Rhode Island law were flagrant and willful.

640.    The Class has been injured in its business or property in Rhode Island by Visa's violations of R.I. Gen. Laws § 6-36-4.

**110. One Hundred and Tenth Claim for Relief: Monopolization of the Relevant Markets for General Purpose Debit Network Services and General Purpose Card-Not-Present Debit Network Services in Violation of the South Dakota Antitrust Statute, S.D. Codified Laws §§ 37-1-3.1, *et seq*. (with respect to Class Members' Purchases in South Dakota)**

641.     Plaintiffs incorporate the allegations of paragraphs 1 through 185 above.

642.     In violation of S.D. Codified Laws §§ 37-1-3.1, Visa has willfully and unlawfully maintained its monopoly in the relevant markets through the exclusionary course of conduct and anticompetitive acts described herein, including in South Dakota. Visa's acts, individually and collectively, increased, maintained, or protected its monopoly in both relevant markets.

643.     Visa's violations of South Dakota law were flagrant and willful.

644.     The Class has been injured in its business or property in South Dakota by Visa's violations of S.D. Codified Laws §§ 37-1-3.1.

**111. One Hundred and Eleventh Claim for Relief: Attempted Monopolization of the Relevant Markets for General Purpose Debit Network Services and General Purpose Card-Not-Present Debit Network Services in Violation of the South Dakota Antitrust Statute, S.D. Codified Laws §§ 37-1-3.1, *et seq.* (with respect to Class Members' Purchases in South Dakota)**

645.     Plaintiffs incorporate the allegations of paragraphs 1 through 185 above.

646.     In violation of S.D. Codified Laws §§ 37-1-3.1, Visa has attempted to monopolize each of the relevant markets through the exclusionary course of conduct and anticompetitive acts described, including in South Dakota. Each of Visa's acts is anticompetitive in its own right.

647.     Collectively, Visa's actions have a cumulative effect that has harmed competition in each relevant market, including raising barriers to competition by current and potential competitors, imposing supracompetitive prices, stabilizing those prices, limiting price competition, restricting output and other services, and limiting innovation.

648.     Visa's violations of South Dakota law were flagrant and willful.

649.     The Class has been injured in its business or property in South Dakota by Visa's violations of S.D. Codified Laws §§ 37-1-3.1.

**112. One Hundred and Twelfth Claim for Relief: Unlawful Agreements Not to Compete in Violation of the South Dakota Antitrust Statute, S.D.**

**Codified Laws §§ 37-1-3.1, *et seq.* (with respect to Class Members' Purchases in South Dakota)**

650.    Plaintiffs incorporate the allegations of paragraphs 1 through 185 above.

651.    In violation of S.D. Codified Laws §§ 37-1-3.1, Visa agreed with competitors and potential competitors Apple, PayPal, and Square not to compete, including in South Dakota.

652.    These agreements unreasonably restrain competition in two relevant markets related to debit transactions in the United States: (1) the market for general purpose card-not-present debit network services, and (2) the market for general purpose debit network services.

653.    Visa's violations of South Dakota law were flagrant and willful.

654.    The Class has been injured in its business or property in South Dakota by Visa's violations of S.D. Codified Laws §§ 37-1-3.1.

**113.    One Hundred and Thirteenth Claim for Relief: Unlawful Agreements That Restrain Trade in Violation of the South Dakota Antitrust Statute, S.D. Codified Laws §§ 37-1-3.1, *et seq.* (with respect to Class Members' Purchases in South Dakota)**

655.    Plaintiffs incorporate the allegations of paragraphs 1 through 185 above.

656.    In violation of S.D. Codified Laws §§ 37-1-3.1, Visa's agreements with merchants, issuers, and acquirers, including in South Dakota, unreasonably restrain trade in two relevant markets related to debit transactions in the United States: (1) the market for general purpose card-not-present debit network services, and (2) the market for general purpose debit network services.

657.    Visa's violations of South Dakota law were flagrant and willful.

658.    The Class has been injured in its business or property in South Dakota by Visa's violations of S.D. Codified Laws §§ 37-1-3.1.

**114.    One Hundred and Fourteenth Claim for Relief: Monopolization of the Relevant Markets for General Purpose Debit Network Services and General Purpose Card-Not-Present Debit Network Services in Violation**

**of Tennessee's Trade Practices Act, Tenn. Code Ann. §§ 47-25-101, *et seq.* (with respect to Class Members' Purchases in Tennessee)**

659.    Plaintiffs incorporate the allegations of paragraphs 1 through 185 above.

660.    In violation of Tenn. Code Ann. § 47-25-102, Visa has willfully and unlawfully maintained its monopoly in the relevant markets through the exclusionary course of conduct and anticompetitive acts described herein. Visa's acts, individually and collectively, increased, maintained, or protected its monopoly in both relevant markets.

661.    Visa's violations of Tennessee law were flagrant and willful.

662.    The Class has been injured in its business or property Tennessee by Visa's violations of Tenn. Code Ann. § 47-25-102.

**115.    One Hundred and Fifteenth Claim for Relief: Attempted Monopolization of the Relevant Markets for General Purpose Debit Network Services and General Purpose Card-Not-Present Debit Network Services in Violation of Tennessee's Trade Practices Act, Tenn. Code Ann. §§ 47-25-101, *et seq.* (with respect to Class Members' Purchases in Tennessee)**

663.    Plaintiffs incorporate the allegations of paragraphs 1 through 185 above.

664.    In violation of Tenn. Code Ann. § 47-25-102, Visa has attempted to monopolize each of the relevant markets through the exclusionary course of conduct and anticompetitive acts described. Each of Visa's acts is anticompetitive in its own right. Collectively, Visa's actions have a cumulative effect that has harmed competition in each relevant market, including raising barriers to competition by current and potential competitors, imposing supracompetitive prices, stabilizing those prices, limiting price competition, restricting output and other services, and limiting innovation.

665.    Visa's violations of Tennessee law were flagrant and willful.

666.    The Class has been injured in its business or property in Tennessee by Visa's violations of Tenn. Code Ann. § 47-25-102.

**116. One Hundred and Sixteenth Claim for Relief: Unlawful Agreements Not to Compete in Violation of Tennessee's Trade Practices Act, Tenn. Code Ann. §§ 47-25-101, *et seq.* (with respect to Class Members' Purchases in Tennessee)**

667.    Plaintiffs incorporate the allegations of paragraphs 1 through 185 above.

668.    In violation of Tenn. Code Ann. § 47-25-101, Visa agreed with competitors and potential competitors Apple, PayPal, and Square not to compete. These agreements unreasonably restrain competition in two relevant markets related to debit transactions in the United States: (1) the market for general purpose card-not-present debit network services, and (2) the market for general purpose debit network services.

669.    Visa's violations of Tennessee law were flagrant and willful.

670.    The Class has been injured in its business or property in Tennessee by Visa's violations of Tenn. Code Ann. § 47-25-101.

**117. One Hundred and Seventeenth Claim for Relief: Unlawful Agreements That Restrain Trade in Violation of Tennessee's Trade Practices Act, Tenn. Code Ann. §§ 47-25-101, *et seq.* (with respect to Class Members' Purchases in Tennessee)**

671.    Plaintiffs incorporate the allegations of paragraphs 1 through 185 above.

672.    In violation of Tenn. Code Ann. § 47-25-101, Visa's agreements with merchants, issuers, and acquirers unreasonably restrain trade in two relevant markets related to debit transactions in the United States: (1) the market for general purpose card-not-present debit network services, and (2) the market for general purpose debit network services.

673.    Visa's violations of Tennessee law were flagrant and willful.

674.    The Class has been injured in its business or property in Tennessee by Visa's violations of Tenn. Code Ann. § 47-25-101.

**118. One Hundred and Eighteenth Claim for Relief: Monopolization of the Relevant Markets for General Purpose Debit Network Services and General Purpose Card-Not-Present Debit Network Services in Violation**

**of the Utah Antitrust Act, Utah Code Ann. §§ 76-10-3101, *et seq.* (with respect to Class Members' Purchases in Utah)**

675.    Plaintiffs incorporate the allegations of paragraphs 1 through 185 above.

676.    In violation of Utah Code Ann. § 76-10-3104, Visa has willfully and unlawfully maintained its monopoly in the relevant markets through the exclusionary course of conduct and anticompetitive acts described herein. Visa's acts, individually and collectively, increased, maintained, or protected its monopoly in both relevant markets.

677.    Visa's violations of Utah law were flagrant and willful.

678.    The Class has been injured in its business or property Utah by Visa's violations of Utah Code Ann. § 76-10-3104.

**119. One Hundred and Nineteenth Claim for Relief: Attempted Monopolization of the Relevant Markets for General Purpose Debit Network Services and General Purpose Card-Not-Present Debit Network Services in Violation of the Utah Antitrust Act, Utah Code Ann. §§ 76-10-3101, *et seq.* (with respect to Class Members' Purchases in Utah)**

679.    Plaintiffs incorporate the allegations of paragraphs 1 through 185 above.

680.    In violation of Utah Code Ann. § 76-10-3104, Visa has attempted to monopolize each of the relevant markets through the exclusionary course of conduct and anticompetitive acts described. Each of Visa's acts is anticompetitive in its own right. Collectively, Visa's actions have a cumulative effect that has harmed competition in each relevant market, including raising barriers to competition by current and potential competitors, imposing supracompetitive prices, stabilizing those prices, limiting price competition, restricting output and other services, and limiting innovation.

681.    Visa's violations of Utah law were flagrant and willful.

682.    The Class has been injured in its business or property in Utah by Visa's violations of Utah Code Ann. § 76-10-3104.

**120.    One Hundred and Twentieth Claim for Relief: Unlawful Agreements Not to Compete in Violation of the Utah Antitrust Act, Utah Code Ann. §§ 76-10-3101,** *et seq.* **(with respect to Class Members' Purchases in Utah)**

683.    Plaintiffs incorporate the allegations of paragraphs 1 through 185 above.

684.    In violation of Utah Code Ann. § 76-10-3104, Visa agreed with competitors and potential competitors Apple, PayPal, and Square not to compete. These agreements unreasonably restrain competition in two relevant markets related to debit transactions in the United States: (1) the market for general purpose card-not-present debit network services, and (2) the market for general purpose debit network services.

685.    Visa's violations of Utah law were flagrant and willful.

686.    The Class has been injured in its business or property in Utah by Visa's violations of Utah Code Ann. § 76-10-3104.

**121.    One Hundred and Twenty-First Claim for Relief: Unlawful Agreements That Restrain Trade in Violation of the Utah Antitrust Act, Utah Code Ann. §§ 76-10-3101,** *et seq.* **(with respect to Class Members' Purchases in Utah)**

687.    Plaintiffs incorporate the allegations of paragraphs 1 through 185 above.

688.    In violation of Utah Code Ann. § 76-10-3104, Visa's agreements with merchants, issuers, and acquirers unreasonably restrain trade in two relevant markets related to debit transactions in the United States: (1) the market for general purpose card-not-present debit network services, and (2) the market for general purpose debit network services.

689.    Visa's violations of Utah law were flagrant and willful.

690.    The Class has been injured in its business or property in Utah by Visa's violations of Utah Code Ann. § 76-10-3104.

**122.    One Hundred and Twenty-Second Claim for Relief: Monopolization of the Relevant Markets for General Purpose Debit Network Services and General Purpose Card-Not-Present Debit Network Services in Violation**

**of the Vermont Consumer Fraud Act, Vt. Stat. Ann. tit. 9, §§ 2451, *et seq.* (with respect to Class Members' Purchases in Vermont)**

691.    Plaintiffs incorporate the allegations of paragraphs 1 through 185 above.

692.    In violation of Vt. Stat. Ann. tit. 9, §§ 2453, 2465, Visa has willfully and unlawfully maintained its monopoly in the relevant markets through the exclusionary course of conduct and anticompetitive acts described herein. Visa's acts, individually and collectively, increased, maintained, or protected its monopoly in both relevant markets.

693.    Visa's violations of Vermont law were flagrant and willful.

694.    The Class has been injured in its business or property Vermont by Visa's violations of Vt. Stat. Ann. tit. 9, §§ 2453, 2465.

**123.    One Hundred and Twenty-Third Claim for Relief: Attempted Monopolization of the Relevant Markets for General Purpose Debit Network Services and General Purpose Card-Not-Present Debit Network Services in Violation of the Vermont Consumer Fraud Act, Vt. Stat. Ann. tit. 9, §§ 2451, *et seq.* (with respect to Class Members' Purchases in Vermont)**

695.    Plaintiffs incorporate the allegations of paragraphs 1 through 185 above.

696.    In violation of Vt. Stat. Ann. tit. 9, §§ 2453, 2465, Visa has attempted to monopolize each of the relevant markets through the exclusionary course of conduct and anticompetitive acts described. Each of Visa's acts is anticompetitive in its own right.

697.    Collectively, Visa's actions have a cumulative effect that has harmed competition in each relevant market, including raising barriers to competition by current and potential competitors, imposing supracompetitive prices, stabilizing those prices, limiting price competition, restricting output and other services, and limiting innovation.

698.    Visa's violations of Vermont law were flagrant and willful.

699.    The Class has been injured in its business or property in Vermont by Visa's violations of Vt. Stat. Ann. tit. 9, §§ 2453, 2465.

**124. One Hundred and Twenty-Fourth Claim for Relief: Unlawful Agreements Not to Compete in Violation of the Vermont Consumer Fraud Act, Vt. Stat. Ann. tit. 9, §§ 2451, *et seq.* (with respect to Class Members' Purchases in Vermont)**

700.    Plaintiffs incorporate the allegations of paragraphs 1 through 185 above.

701.    In violation of Vt. Stat. Ann. tit. 9, §§ 2453, 2465, Visa agreed with competitors and potential competitors Apple, PayPal, and Square not to compete. These agreements unreasonably restrain competition in two relevant markets related to debit transactions in the United States: (1) the market for general purpose card-not-present debit network services, and (2) the market for general purpose debit network services.

702.    Visa's violations of Vermont law were flagrant and willful.

703.    The Class has been injured in its business or property in Vermont by Visa's violations of Vt. Stat. Ann. tit. 9, §§ 2453, 2465.

**125. One Hundred and Twenty-Fifth Claim for Relief: Unlawful Agreements That Restrain Trade in Violation of the Vermont Consumer Fraud Act, Vt. Stat. Ann. tit. 9, §§ 2451, *et seq.* (with respect to Class Members' Purchases in Vermont)**

704.    Plaintiffs incorporate the allegations of paragraphs 1 through 185 above.

705.    In violation of Vt. Stat. Ann. tit. 9, §§ 2453, 2465, Visa's agreements with merchants, issuers, and acquirers unreasonably restrain trade in two relevant markets related to debit transactions in the United States: (1) the market for general purpose card-not-present debit network services, and (2) the market for general purpose debit network services.

706.    Visa's violations of Vermont law were flagrant and willful.

707.    The Class has been injured in its business or property in Vermont by Visa's violations of Vt. Stat. Ann. tit. 9, §§ 2453, 2465.

**126. One Hundred and Twenty-Sixth Claim for Relief: Monopolization of the Relevant Markets for General Purpose Debit Network Services and General Purpose Card-Not-Present Debit Network Services in Violation**

**of the West Virginia Antitrust Act, W.Va. Code §§ 47-18-1, *et seq*. (with respect to Class Members' Purchases in West Virginia)**

708.    Plaintiffs incorporate the allegations of paragraphs 1 through 185 above.

709.    In violation of W.Va. Code § 47-18-4, Visa has willfully and unlawfully maintained its monopoly in the relevant markets through the exclusionary course of conduct and anticompetitive acts described herein, including in West Virginia. Visa's acts, individually and collectively, increased, maintained, or protected its monopoly in both relevant markets.

710.    Visa's violations of West Virginia law were flagrant and willful.

711.    The Class has been injured in its business or property West Virginia by Visa's violations of W.Va. Code § 47-18-4.

127.    **One Hundred and Twenty-Seventh Claim for Relief: Attempted Monopolization of the Relevant Markets for General Purpose Debit Network Services and General Purpose Card-Not-Present Debit Network Services in Violation of the West Virginia Antitrust Act, W.Va. Code §§ 47-18-1, *et seq*. (with respect to Class Members' Purchases in West Virginia)**

712.    Plaintiffs incorporate the allegations of paragraphs 1 through 185 above.

713.    In violation of W.Va. Code § 47-18-4, Visa has attempted to monopolize each of the relevant markets through the exclusionary course of conduct and anticompetitive acts described herein, including in West Virginia. Each of Visa's acts is anticompetitive in its own right. Collectively, Visa's actions have a cumulative effect that has harmed competition in each relevant market, including raising barriers to competition by current and potential competitors, imposing supracompetitive prices, stabilizing those prices, limiting price competition, restricting output and other services, and limiting innovation.

714.    Visa's violations of West Virginia law were flagrant and willful.

715.    The Class has been injured in its business or property in West Virginia by Visa's violations of W.Va. Code § 47-18-4.

**128. One Hundred and Twenty-Eighth Claim for Relief: Unlawful Agreements Not to Compete in Violation of the West Virginia Antitrust Act, W.Va. Code §§ 47-18-1, *et seq.* (with respect to Class Members' Purchases in West Virginia)**

716.    Plaintiffs incorporate the allegations of paragraphs 1 through 185 above.

717.    In violation of W.Va. Code § 47-18-3, Visa agreed with competitors and potential competitors Apple, PayPal, and Square not to compete, including in West Virginia. These agreements unreasonably restrain competition in two relevant markets related to debit transactions in the United States: (1) the market for general purpose card-not-present debit network services, and (2) the market for general purpose debit network services.

718.    Visa's violations of West Virginia law were flagrant and willful.

719.    The Class has been injured in its business or property in West Virginia by Visa's violations of W.Va. Code § 47-18-3.

**129. One Hundred and Twenty-Ninth Claim for Relief: Unlawful Agreements That Restrain Trade in Violation of the West Virginia Antitrust Act, W.Va. Code §§ 47-18-1, *et seq*. (with respect to Class Members' Purchases in West Virginia)**

720.    Plaintiffs incorporate the allegations of paragraphs 1 through 185 above.

721.    In violation of W.Va. Code § 47-18-3, Visa's agreements with merchants, issuers, and acquirers, including in West Virginia, unreasonably restrain trade in two relevant markets related to debit transactions in the United States: (1) the market for general purpose card-not-present debit network services, and (2) the market for general purpose debit network services.

722.    Visa's violations of West Virginia law were flagrant and willful.

723.    The Class has been injured in its business or property in West Virginia by Visa's violations of W.Va. Code § 47-18-3.

**130. One Hundred and Thirtieth Claim for Relief: Monopolization of the Relevant Markets for General Purpose Debit Network Services and General Purpose Card-Not-Present Debit Network Services in Violation**

**of the Wisconsin Antitrust Act, Wis. Stat. §§ 133.01,** *et seq.* **(with respect to Class Members' Purchases in Wisconsin)**

724.     Plaintiffs incorporate the allegations of paragraphs 1 through 185 above.

725.     In violation of Wis. Stat. § 133.03, Visa has willfully and unlawfully maintained its monopoly in the relevant markets through the exclusionary course of conduct and anticompetitive acts described herein. Visa's acts, individually and collectively, increased, maintained, or protected its monopoly in both relevant markets.

726.     Visa's violations of Wisconsin law were flagrant and willful.

727.     The Class has been injured in its business or property Wisconsin by Visa's violations of Wis. Stat. § 133.03.

**131.     One Hundred and Thirty-First Claim for Relief: Attempted Monopolization of the Relevant Markets for General Purpose Debit Network Services and General Purpose Card-Not-Present Debit Network Services in Violation of the Wisconsin Antitrust Act, Wis. Stat. §§ 133.01,** *et seq.* **(with respect to Class Members' Purchases in Wisconsin)**

728.     Plaintiffs incorporate the allegations of paragraphs 1 through 185 above.

729.     In violation of Wis. Stat. § 133.03, Visa has attempted to monopolize each of the relevant markets through the exclusionary course of conduct and anticompetitive acts described. Each of Visa's acts is anticompetitive in its own right. Collectively, Visa's actions have a cumulative effect that has harmed competition in each relevant market, including raising barriers to competition by current and potential competitors, imposing supracompetitive prices, stabilizing those prices, limiting price competition, restricting output and other services, and limiting innovation.

730.     Visa's violations of Wisconsin law were flagrant and willful.

731.     The Class has been injured in its business or property in Wisconsin by Visa's violations of Wis. Stat. § 133.03.

**132. One Hundred and Thirty-Second Claim for Relief: Unlawful Agreements Not to Compete in Violation of the Wisconsin Antitrust Act, Wis. Stat. §§ 133.01, *et seq.* (with respect to Class Members' Purchases in Wisconsin)**

732.    Plaintiffs incorporate the allegations of paragraphs 1 through 185 above.

733.    In violation of Wis. Stat. § 133.03, Visa agreed with competitors and potential competitors Apple, PayPal, and Square not to compete. These agreements unreasonably restrain competition in two relevant markets related to debit transactions in the United States: (1) the market for general purpose card-not-present debit network services, and (2) the market for general purpose debit network services.

734.    Visa's violations of Wisconsin law were flagrant and willful.

735.    The Class has been injured in its business or property in Wisconsin by Visa's violations of Wis. Stat. § 133.03.

**133. One Hundred and Thirty-Third Claim for Relief: Unlawful Agreements That Restrain Trade in Violation of the Wisconsin Antitrust Act, Wis. Stat. §§ 133.01, *et seq.* (with respect to Class Members' Purchases in Wisconsin)**

736.    Plaintiffs incorporate the allegations of paragraphs 1 through 185 above.

737.    In violation of Wis. Stat. § 133.03, Visa's agreements with merchants, issuers, and acquirers unreasonably restrain trade in two relevant markets related to debit transactions inthe United States: (1) the market for general purpose card-not-present debit network services, and (2) the market for general purpose debit network services.

738.    Visa's violations of Wisconsin law were flagrant and willful.

739.    The Class has been injured in its business or property in Vermont by Visa's violations of Wis. Stat. § 133.03.

**XIV.   REQUEST FOR RELIEF**

740.    To remedy these illegal acts, Plaintiffs respectfully requests that the Court enter judgment in favor of Plaintiffs and the Class against Visa and:

a.    Adjudge and decree that this matter may be maintained as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(2) and (b)(3);

b.    Adjudge and decree that Visa has acted unlawfully to monopolize, or, in the alternative, attempt to monopolize, the market for general purpose card-not-present debit network services in the United States in violation of the Sherman Act, 15 U.S.C. §§ 2, 3;

c.    Adjudge and decree that Visa has acted unlawfully to monopolize, or, in the alternative, attempt to monopolize, the market for general purpose debit network services in the United States in violation of the Sherman Act, 15 U.S.C. §§ 2, 3;

d.    Adjudge and decree that Visa has acted unlawfully to contract or conspire to restrain trade in the market for general purpose card-not-present debit network services in the United States in violation of the Sherman Act, 15 U.S.C. §§ 1, 3;

e.    Adjudge and decree that Visa has acted unlawfully to contract or conspire to restrain trade in the market for general purpose debit network services in the United States in violation of the Sherman Act, 15 U.S.C. §§ 1, 3;

f.    Award Plaintiffs and the Class three times their damages (or other exemplary amount authorized by state law) sustained due to Visa's challenged conduct pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15 and any equivalent state law, in an amount to be determined at trial;

g.      Enjoin Visa from continuing to engage in the anticompetitive practices described herein and from engaging in any other practices with the same purpose or effect as the challenged practices, including, but not limited to:

i.  bundling credit services or credit incentives with debit network services or debit volume;

ii.  imposing pricing or incentive structures, such as cliff pricing, that discourage or eliminate competition from rivals, potential rivals, or customers;

iii.  referencing rivals for Visa debit transactions, implicitly or explicitly, in Visa's contracts;

iv.  imposing fees on debit transactions routed over non-Visa networks; and

v.  limiting, by contract or other means, the number of back-of-card networks on Visa-branded cards;

h.      Enjoin Visa from continuing to engage in the anticompetitive practices described herein and from engaging in any other practices with the same purpose or effect as the challenged practices, including but not limited to:

i.  agreeing, implicitly or explicitly, not to compete;

ii.  imposing contractual limitations on the use of payment methods and payment rails (e.g., ACH, RTP, fintech debit, or alternative debit networks) that may compete with general purpose card-not-present debit network services or general purpose debit network services; and imposing contractual limitations on the ability of customers to

offer their own payment networks or methods, or adopt new

technologies that may disintermediate Visa;

        i.     Enter such relief as needed to cure the anticompetitive harm from all

of Visa's unlawful actions;

        j.     Enter any other preliminary or permanent relief necessary and

appropriate to restore competitive conditions in the markets affected by Visa's

unlawful conduct;

        k.     Enter any other relief necessary and appropriate to prevent evasion of

the Court's preliminary or permanent injunction(s);

        l.     Award Plaintiffs and the Class an amount equal to its costs,

including reasonable attorneys' fees, incurred in bringing this action; and

        m.     Award such other relief as the Court may deem just and

proper.

## JURY DEMAND

Plaintiffs demands a trial by jury on all issues so triable.

Dated: October 30, 2024              Respectfully submitted,

                                          */s/ Scott Martin*

                                          Scott Martin

                                          Daniel P. Weick

                                          **HAUSFELD LLP**

                                          33 Whitehall Street

                                          14th Floor

                                          New York, NY 10004

                                          Tel: (646) 357-1100

                                          Fax: (212) 202-4322

                                          smartin@hausfeld.com

                                          dweick@hausfeld.com

136

Brian A. Ratner*
Jane Shin*
Camila Ringeling*
**HAUSFELD LLP**
888 16th Street, NW
Suite 300
Tel: (202) 540-7200
Fax: (202) 540-7201
bratner@hausfeld.com
jshin@hausfeld.com
cringeling@hausfeld.com

Christopher L. Lebsock*
**HAUSFELD LLP**
600 Montgomery Street
Suite 3200
San Francisco, CA 94111
Tel: (415) 633-1908
Fax: (415) 633-4980
clebsock@hausfeld.com

Joshua H. Grabar, Esq.
Grabar Law Office
One Liberty Place
1650 Market Street
Suite 3600
Philadelphia, PA 19103
Tel:  267-507-6085
Cell: 215-840-7112
jgrabar@grabarlaw.com
www.GrabarLaw.com

*Counsel for Plaintiffs and the Proposed Class*

*\* pro hac vice forthcoming*